**ID SECURITY SYSTEMS CANADA, INC., Plaintiff,**

v.

**CHECKPOINT SYSTEMS, INC. Defendant.**

**No. CIV.A.99–577.**

United States District Court, E.D. Pennsylvania.

March 28, 2003.

See also 198 F.Supp.2d 598 and 2002 WL 1042340.

628

Rudolph Garcia, J. Clayton Undercofler, III, William A. De Stefano, Kara H. Goodchild, Saul Ewing LLP, Philadelphia, PA, for ID Security Systems Canada Inc., Plaintiff.

C. Clark Hodgson, Jr., Stradley, Ronon, Stevens & Young, Patricia Casperson, Stradley, Ronon, Stevens and Young, Phila, John De Q. Briggs, III, Howrey Simon Arnold & White, LLP, Washington, DC, Michael C. Chase, Stradley Ronon Stevens & Young, LLP, Keith R. Dutill, Stradley, Ronon, Stevens & Young, LLP, Philadelphia, for Checkpoint Systems, Inc., Defendant.

OPINION

ROBRENO, District Judge.

TABLE OF CONTENTS

I. FACTS ............................................................. 632

II. DISCUSSION ....................................................... 637
 A. Applicable Standards ......................................... 637
 1. Rule 50 .................................................. 637
 2. Rule 59 .................................................. 638

B. Plaintiff's Antitrust Claims ............................................. 638
 1. Attempt to monopolize ............................................. 638
 a. Relevant market and market power ............................. 639
 i. Kodak and the relevant product market ....................... 639
 ii. Relevant market analysis in the wake of Kodak ................ 641
 b. Evidence at trial ............................................. 642
 i. Switching and information costs ............................. 643
 ii. Absence of post lock-in change of policy ...................... 644
 A. ID Security's average price argument ...................... 644
 B. ID Security's duopoly claim .............................. 645
 iii. Summary of evidence ...................................... 647
 c. Dangerous probability of success prong .......................... 648
 d. Checkpoint's motion for a new trial on the attempt to monopolize
 claim ....................................................... 650
 i. Inconsistent verdicts ....................................... 651
 A. Assuming EAS systems as the relevant market ............ 651
 B. Assuming RF tags as the relevant market ................. 652
 ii. Antitrust jury instructions ................................. 653
 iii. Testimony of Dr. Martin Asher ............................. 655
 iv. Evidence of patent enforcement activity ...................... 655
 v. Evidence of Meto and Mercatec acquisitions .................. 656
 2. Conspiracy to monopolize ......................................... 657
 a. ID Security in fact proceeded under § 2, rather than § 1, of the
 Sherman Act ................................................ 658
 b. ID Security's § 2 failure of proof ................................ 660
 c. Checkpoint's motion for a new trial based on inconsistent jury
 verdicts ..................................................... 662
 3. Antitrust injury ................................................. 663
C. Plaintiff's State Law Claims .............................................. 665
 1. Tortious interference with contractual relations ........................ 665
 a. Evidence at trial ............................................. 665
 i. Material breach ............................................ 666
 ii. Repudiation .............................................. 667
 b. Jury instructions ............................................. 669
 i. Waiver and Checkpoint's conduct at trial ...................... 669
 ii. Exclusion of proposed instruction No. 40 ...................... 672
 iii. Exclusion of proposed instruction No. 44(a) .................... 673
 iv. Exclusion of proposed instruction No. 51(a) .................... 673
 v. Exclusion of proposed instruction No. 51(b) .................... 675
 vi. Exclusion of proposed instruction No. 51(c) .................... 676
 vii. Exclusion of proposed instruction No. 13 ...................... 677
 c. Evidentiary objections ........................................ 679
 i. Exclusion of Haneda letters ................................. 679
 ii. Exclusion of the Haneda affidavits ........................... 681
 iii. Exclusion of Tokai invoices ................................. 683
 iv. Exclusion of evidence of Checkpoint's Post–February 13,-
 1997 knowledge and accompanying failure to instruct the
 jury on that knowledge's relevance ......................... 683
 v. Exclusion of a portion of Geiges' testimony ................... 686
 vi. Exclusion of Greg Mears' deposition ......................... 687
 2. Unfair competition ............................................... 688
D. Damages ............................................................... 689
 1. Future lost sales of Tokai tags ..................................... 689
 2. Future lost sales of Laserfuse tags ................................. 694

III. CONCLUSION ............................................................ 697

Plaintiff, ID Security Systems Canada, Inc. ("ID Security"), brought this federal antitrust and state law action against Checkpoint Systems, Inc. ("Checkpoint") in connection with Checkpoint's alleged interference in a supply agreement between ID Security and Tokai Electronics, Ltd. ("Tokai"). According to ID Security, Checkpoint, a manufacturer of electronic article surveillance systems ("EAS systems"), violated the federal antitrust laws through illegal monopolization, attempted monopolization and conspiracy to monopolize with respect to the radio frequency tags ("RF tags"), products that are used in conjunction with EAS systems. In particular, ID Security alleged that Checkpoint interfered with its existing contract with Tokai in order to block ID Security's efforts to enter the RF tag market as a second supplier of tags to Checkpoint customers and as the future producer of a unique and superior tag compatible with Checkpoint's EAS systems. The contract interference in question also gave rise to ID Security's state law claims of tortious interference with contractual relations and unfair competition.

After a trial, the jury found in favor of Checkpoint on ID Security's claim of monopolization of commerce, but against Checkpoint on ID Security's claims of attempted monopolization and conspiracy to monopolize. It awarded ID Security compensatory damages of $28.5 million. Under federal antitrust law, the court trebled that amount to $85.5 million. The jury also found against Checkpoint on the state law tort claims, and awarded damages in the amount of $19 million, for a combined total of $104.5 million for both the antitrust and the state law claims. Checkpoint has since filed a motion for post-trial relief seeking judgment as a matter of law or, alternatively, a new trial with respect to each of the four claims as to which the

jury found in favor against Checkpoint. Checkpoint further challenges the award of damages in this case as unduly speculative, against the great weight of evidence, and a product of erroneous evidentiary rulings by the court.

With respect to the antitrust issues in this case, the court's threshold inquiry, before it may address whether there is sufficient evidence to sustain either of the antitrust verdicts against Checkpoint, is what constitutes the relevant market in this case, given the particular dynamics between the foremarket for EAS systems, in which Checkpoint competed strenuously with its rival Sensormatic, and the aftermarket for RF tags used with Checkpoint's system, i.e., the market which ID Security attempted to enter as a second source tag supplier. A related question is whether, given the burden of proof and the evidence in this case, the relevant market may be determined as a matter of law. As explained in more detail below, the court has determined that it can, and that a proper application of *Kodak* and its progeny dictate, as a matter of law, that EAS systems alone constitute the relevant market that Checkpoint could be accused of attempting or conspiring to monopolize.

The next question presented by Checkpoint's motion for post-trial relief is whether, given a relevant market for EAS systems, there was legally sufficient evidence to support a jury finding that Checkpoint indeed attempted to monopolize, i.e., had a dangerous probability of succeeding in monopolizing, the EAS systems market. In addition, the court must determine whether there was legally sufficient evidence to support a finding that Checkpoint conspired to monopolize the EAS market in violation of § 2 of the Sherman Act, i.e., whether, even given that Checkpoint had the specific intent to monopolize the EAS

market, Tokai Electronics, the object of its acquisition efforts, shared that intent. Having addressed the difficult antitrust questions that characterize this case, the court turns to an examination of the proofs, instructions, and rulings concerning ID Security's state law claims, as well to a determination of whether a new trial is warranted with respect to the damages awarded by the jury.

For the reasons that follow, the court concludes that ID Security failed to produce sufficient evidence that the RF tag market is the relevant market in this case. Instead, the court finds that the relevant market in this case is the market for EAS systems. Given this market and the proofs at trial, the court concludes that there was no legally sufficient evidence to support a jury finding that Checkpoint is liable either for attempted monopolization or for conspiracy to monopolize in violation of § 2 of the Sherman Act. Thus, the court will grant judgment as a matter of law in Checkpoint's favor on ID Security's federal antitrust claims, and will vacate the verdict in favor of ID Security on the antitrust claims. The court also discerns no error in its treatment warranting either judgment or a new trial with respect to either of the state law claims in this case. However, as set forth in detail below, the court determines, given the speculative nature of the expert testimony offered by ID Security in support of certain items of damages sustained, the court will reduce the state claims award to $13 million.

## I. FACTS

The following facts were established at trial and are viewed in the light most favorable to ID Security, the winner of the jury verdict challenged in this motion.

This case involves the relationship between Checkpoint, a manufacturer of anti-shoplifting devices known as electronic article surveillance systems ("EAS systems"), and ID Security Systems Canada, Inc., a company that unsuccessfully attempted to compete with Checkpoint in the aftermarket for sale of RF tags, devices compatible with Checkpoint's EAS hardware. Tokai is a supplier of tags to Checkpoint and was later acquired by Checkpoint. At the time of the acquisition, ID Security claimed that it had a contract with Tokai under which Tokai was to supply ID Security with tags.

Stores using EAS technology affix to their products a tag that, unless deactivated with the proper equipment, emits a radio frequency (RF) or acoustomagnetic (AM) signal that is detectable by a sensor that is placed near the store's exit. *See* T.T. 4/29/02 (doc. no. 159) at 46–48. The sensor will alert when a shopper attempts to leave the store's premises with a good bearing an active tag, i.e., a good that the shopper has not presented to the cashier for deactivation at the time of payment. T.T. 4/29/02 (doc. no. 159) at 48. Thus, an EAS system is comprised of sensors and deactivators, as well as of a continuing supply of tags compatible with both pieces of hardware. T.T. 5/9/02 (doc. no. 176) at 28–29.

In the market for EAS systems, the two major competitors are Checkpoint, which sells EAS systems based on RF technology and is the defendant in this case, and Sensormatic, which sells EAS systems based on AM technology. T.T. 5/9/02 (doc. no. 176) at 29–30. Given that RF and AM technologies are incompatible with each other, T.T. 5/8/02 (doc. no. 177) at 10; T.T. 5/9/02 (doc. no. 176) at 57–58, the choice of one technology over another is a significant decision, because a customer dissatisfied with a system based on one technology could only switch to a system based on the other at the great expense of replacing its entire existing system and retraining

its employees. T.T. 5/15/02 (doc. no. 192) at 67–68. Such measures are both uneconomic, T.T., 5/9/02 (doc. no. 176) at 58, and rarely undertaken. T.T. 5/15/02 (doc. no. 192) at 67. As of 1997, the relevant period in this litigation, Checkpoint held a 25 percent share of the market for EAS systems, while Sensormatic enjoyed a 59 percent share. T.T. 5/9/02 (doc. no. 176) at 31.

The initial purchase of an EAS system creates an aftermarket for tags compatible with that system. Because RF tags deactivated at the point of sale leave the store with the good that has been purchased, retail stores must buy replacement tags on a continual basis to affix to new inventory. T.T. 4/29/02 (doc. no. 159) at 43. In addition, because RF and AM technologies are incompatible with each other, such that AM tags cannot be used with RF systems, and vice versa, the owner of an RF system, for example, can only buy usable tags from an RF supplier. T.T. 5/8/02 (doc. no. 177) at 10; T.T. 5/9/02 (doc. no. 176) at 57–58. In this aftermarket for RF tags, Checkpoint held at least a 90 percent share of the market for replacement RF tags during the relevant period. T.T. 5/7/02 (doc. no. 172) at 66. Sensormatic, on the other hand, sold 100 percent of the tags compatible with its system. T.T. 5/9/02 (doc. no. 176) at 41.

The sophisticated customers who purchase EAS systems are well aware of the attendant necessity of purchasing compatible replacement tags on an ongoing basis. T.T. 5/9/02 (doc. no. 176) at 40–42. Indeed, Checkpoint and Sensormatic present prospective customers with projections detailing return on investment, based on the nature of the customers' products, the volume of items to be tagged, the customers' estimated future tag needs, and industry trends. T.T. 5/9/02 (doc. no. 176) at 40–44. Such projections also explain to prospective customers the cost of the EAS system, and its component parts, including tags, over time. T.T. 5/15/02 (doc. no. 192) at 78–81.

Prospective EAS system purchasers typically receive competing proposals from Checkpoint and Sensormatic, T.T. 5/15/02 (doc. no. 192) at 81, and then attempt to play the two competitors off against each other in multiple rounds of negotiations in the hope of obtaining a reduced EAS system price as Checkpoint and Sensormatic attempt to undercut each other on price. T.T. 5/9/02 (doc. no. 176) at 45; T.T. 5/15/02 (doc. no. 192) at 81–83. The total price of the EAS system, and thus of its component parts, decrease as a result of these negotiations. T.T. 5/15/02 (doc. no. 192) at 81–83. Moreover, the costs of replacement tags are often explicitly considered in this calculus, with customers typically seeking, and occasionally succeeding, in capping or fixing tag prices over time. T.T. 5/15/02 (doc. no. 192) at 84. Checkpoint customers can attempt, and, in some cases, do attempt successfully, to negotiate lower tag prices at the end of their contracts. T.T. 5/15/02 (doc. no. 192) at 84–85.

In general, however, Checkpoint and Sensormatic match each other's prices so that prospective customers will choose an EAS system based on the relative appeal of their respective technologies. T.T. 5/14/02 (doc. no. 187) at 67–68. For example, drug stores and supermarkets, which will need to deactivate a large volume of tagged items quickly, may tend to prefer RF-based systems, while retail stores tend to choose AM-based systems because widely spaced AM sensors are less likely to obstruct store entrances. T.T. 5/14/02 (doc. no. 187) at 65–67. From 1995 to 2000, Checkpoint, matching Sensormatic's prices, charged an average price of 3.5 cents per tag to both new and installed customers. T.T. 5/9/02 (doc. no. 176) at 49–50; 58.

In 1995, Checkpoint, attempting to enhance its ability to sell EAS systems competitively with Sensormatic in Europe, acquired the Actron Group, Ltd., T.T. 5/10/02 (doc. no. 182) at 179–82, a European company that accounted for 95 percent of the sales of Tokai Electronics, Ltd., a manufacturer of RF tags. T.T. 5/10/02 (doc. no. 182) at 182. At the time, Actron, supported by Tokai's manufacturing, was the only company, other than Checkpoint, that had developed mass-production capabilities for disposable RF tags. T.T. 5/2/02 (doc. no. 165) at 180. Because of the relationship between Actron and Tokai, Checkpoint's acquisition of Actron gave it a one-third ownership interest in Tokai and a seat on Tokai's board of directors. T.T. 5/13/02 (doc. no. 185) at 5. As Checkpoint and Tokai shaped the contours of their new relationship, they entered into a Supply Agreement, under which Checkpoint would purchase 20 to 30 million tags per month over the three years following the acquisition. T.T. 5/13/02 (doc. no. 185) at 7. Although it costed Tokai two cents to make each RF tag, Tokai's agreement with Checkpoint ensured that Checkpoint would be charged one cent per tag. T.T. 5/2/02 (doc. no. 165) at 203–08; 5/13/02 (doc. no. 185) at 52. To compensate for selling tags to Checkpoint at a loss, under the Supply Agreement, Tokai had the right to sell any tags manufactured in excess of Checkpoint's quota to other companies at a higher price per tag. T.T. 4/29/02 (doc. no. 159) at 99; 5/13/02 (doc. no. 185) at 8–9.

ID Security took advantage of Tokai's ability to sell tags to companies other than Checkpoint. On April 1, 1996, Tokai entered into a two-year agreement negotiated by ID Security's President, Peter Murdoch, and Tokai's President, Tadayoshi Haneda, whereby ID Security acquired the right to distribute all Tokai tags produced in excess of the 20 million tags that Tokai was obligated to sell to Checkpoint and the number allotted to Tokai's small group of existing Asian customers. T.T. 4/29/02 (doc. no. 159) at 53, 55. The ID–Tokai contract also contained a provision that prohibited Tokai from selling certain "source tag material" to any company other than ID Security. T.T. 4/29/02 (doc. no. 159) at 154–55. Sometime in the course of 1996, Checkpoint became aware of the fact that ID Security and Tokai had entered into a contract. T.T. 5/6/02 (doc. no. 171) at 14.

Murdoch viewed a contract with Tokai as desirable for ID Security in two main respects. First, ID Security intended to establish a presence in the RF tag aftermarket as a "second source," or alternative supply, of Tokai-made RF tags for Checkpoint customers. T.T. 4/29/02 (doc. no. 159) at 60, 117–18, 122. As such, ID Security expected that it would be able to charge tag prices in excess of Checkpoint's. T.T. 5/1/02 (doc. no. 164) at 95–96. Indeed, Murdoch stated that he had, in fact, undercut Checkpoint's RF tag price only inadvertently, as a result of incorrect information on Checkpoint's pricing. T.T. 4/30/02 (doc. no. 158) at 83–85; 5/1/02 (doc. no. 164) at 95–96.

Second, ID Security planned to use its relationship with Tokai in the long term to further the development of Laserfuse, a novel product that ID Security intended to introduce on the RF tag market. T.T. 4/29/02 (doc. no. 159) at 94. In theory, the particular technology used in Laserfuse tags would provide EAS system owners with tag that was compatible with RF systems, yet superior to existing tags in that, unlike standard RF tags, (1) one-hundred percent of Laserfuse tags on a purchased roll would be active, (2) one-hundred percent of Laserfuse tags would properly deactivate, and (3) there would be no Lazarus effect, i.e., possibility that even a properly deactivated tag would come

back to life at a later date, associated with the product's use, T.T. 4/29/02 (doc. no. 159) at 76, and (4) the Laserfuse technology would allow store owners to control for fraudulent returns because it would allow them to determine whether a tag had, in fact, been passed over the deactivator at a point of sale. T.T. 4/29/02 (doc. no. 159) at 80–81.

At the time of the April 1996 contract, ID Security's long term goal was to sell both standard Tokai tags and Laserfuse tags within the RF tag aftermarket. T.T. 4/29/02 (doc. no. 159) at 98–99. The first step in ID Security's plan was to establish itself as a distributor of Tokai tags; later, once Laserfuse tags were no longer in an embryonic stage, Tokai was to act as co-manufacturer of the marketed Laserfuse product. T.T. 4/29/02 (doc. no. 159) at 98–99. In particular, Tokai was to participate in the development of Laserfuse by providing hot roll laminate, a unique material integral to the proper functioning of the Lasefuse tag, and to participate in the initial manufacturing stages for Laserfuse tags. T.T. 4/29/02 (doc. no. 159) at 93–94, 99.

However, neither portion of ID Security's plan came to fruition. After entering into its contract with Tokai, ID Security managed to warehouse a total of 50 million Tokai tags; of the total 65 million tags purchased, ID Security sold a total of only 16 million up to December 1996, after which point ID Security never ordered, or was permitted to order, another RF tag from Tokai. T.T. 5/1/02 (doc. no. 164) at 199. At trial, ID Security produced only a single purchase order memorializing a promotional sale of ID Security tags to Target at the price of 3 cents per tag, T.T. 4/29/02 (doc. no. 159) at 139–41. Moreover, at the time of trial in 2002, not a single Laserfuse tag was then being produced or offered for sale anywhere in the world. T.T. 5/1/02

(doc. no. 164) at 53, 69. ID alleges that Checkpoint's violations of the antitrust laws and interference with the ID–Tokai contract were ultimately responsible for these eventualities.

In the wake of the April 1996 agreement, a series of disputes arose between ID and Tokai. By December 1996, complaining about the poor quality of the adhesive on Tokai-manufactured tags, and alleging that Tokai had breached their contract by selling source tags to Checkpoint, Murdoch informed Haneda that ID Security would place no further orders for Tokai tags and would withhold payments on invoices for tags already received. T.T. 5/1/02 (doc. no. 164) 187–88, 191–93. In response, Haneda agreed to meet with Murdoch in Amsterdam in January 1997 to discuss their dispute. T.T. 4/29/02 (doc. no. 159) at 159. In the meantime, according to Murdoch, the two companies were to be in "a standstill position relative to the requirement of purchasing more tags and making additional payments `. . . ." T.T. 4/29/02 (doc. no. 159) at 159.

During the time period leading up to and following the Amsterdam meeting between Haneda and Murdoch, however, unbeknownst to Murdoch, Haneda and Tokai were negotiating with Checkpoint, which was hoping to acquire the manufacturer in toto. T.T. 5/6/02 (doc. no. 171) at 20–21. Lucas Geiges, Checkpoint's former Senior Vice President for International Development, testified at trial that, at the time of those negotiations, he was aware that Tokai was selling labels to ID Security, but was unaware that that relationship was an exclusive one. T.T. 5/6/02 (doc. no. 171) at 22.

Haneda proceeded to meet with Murdoch in Amsterdam, and addressed with Murdoch a wide variety of topics, including when the adhesive problem would be fixed, new Laserfuse designs, profit sharing, and

tag prices. T.T. 4/29/02 (doc. no. 159) at 164–65. Coming out of the meeting, Murdoch was satisfied that he and Haneda had agreed that (1) the ID–Tokai contract would be extended for an additional three years, through 2000, T.T. 4/29/02 (doc. no. 159) at 165, (2) source tag material would be sold in the future only to ID Security. T.T. 4/29/02 (doc. no. 159) at 165, (3) the adhesive would be fixed by February 1997, T.T. 4/29/02 (doc. no. 159) at 165–66, (4) no further orders would be placed or products were to be shipped until the adhesive was corrected, T.T. 4/29/02 (doc. no. 159) at 166, (5) a payment schedule for outstanding invoices had been worked out, provided that the meeting in Amsterdam produced a written and signed agreement, T.T. 4/29/02 (doc. no. 159) at 169–70, and (6) that this agreement was intended to replace prior agreements. 5/1/02 (doc. no. 165) at 205. Murdoch believed that he and Haneda had resolved their disputes. T.T. 5/1/02 (doc. no. 164) at 200–201.

Because of Haneda's reportedly poor English skills, in cases, as here, where the parties had met and reached oral agreement, it was customary that Murdoch would memorialize the agreement reached, and would then send it to Haneda for review and signature. T.T. 5/1/02 (doc. no. 164) at 205. Murdoch followed this procedure on January 28, 1997, when he sent Haneda a confirming letter purporting to document the substantive agreement reached between ID Security and Tokai at the Amsterdam meeting, and to suggest that an arbitration clause be added to the agreement between the parties. T.T. 4/29/02 (doc. no. 159) at 177–80. Contrary to Murdoch's expectations, Haneda did not sign or return the confirmation letter, despite Murdoch's repeated requests that he do so. T.T. 4/29/02 (doc. no. 159) at 182–83, 186–88.

In declining to respond to Murdoch's letter, Haneda acted at the request of Geiges, who, upon learning that a possible agreement between ID Security and Tokai had been reached in Amsterdam, convinced Haneda "not to sign the confirming letter or do anything else that could further restrict Tokai's ability to sell all of its RF tags to Checkpoint ... [b]ecause [he] knew that [Checkpoint was] going to ... buy Tokai and [an agreement with ID Security] would be a big obstacle." T.T. 5/6/02 (doc. no. 171) at 31. On February 13, 1997, while Murdoch waited for a response from Haneda, Checkpoint signed a contract that made it the exclusive distributor of Tokai's tags. See Ex. P–140. A press release by Checkpoint to that effect followed. See Ex. P–63.

Upon obtaining a copy of the press release, Murdoch wrote a letter on February 20, 1997 to Checkpoint's President, Kevin Dowd, informing him that ID had a preexisting contract with Tokai to distribute RF tags. T.T. 4/30/02 (doc. no 158) at 9–11. Checkpoint then launched an investigation into Murdoch's allegations that a contract existed between ID Security and Tokai, T.T. 5/6/02 (doc. no. 171) at 33–35, before it decided to extend the exclusive distributorship contract with Tokai through December 31, 1997. T.T. 5/6/02 (doc. no. 171) at 41; P–144. Tokai sent ID Security formal notice of the termination of the ID–Tokai contract as late as April 8, 1997. T.T. 4/30/02 (doc. no. 158) at 32–33; Ex. P–75. Litigation ensued between ID Security and Tokai, and, after that litigation ultimately terminated in a settlement, Checkpoint acquired Tokai in toto. T.T. 5/6/02 (doc. no. 171) at 40–44.

In this litigation, which pits ID Security against Checkpoint, ID Security claims that, as a result of Checkpoint's actions, ID Security lost its financing with respect to its venture with Tokai, its label supplier,

the opportunity to compete with Checkpoint and Sensormatic in the world market, and more than $80 million in potential profits. T.T. 4/30/02 (doc. no. 158) at 105. With respect to Laserfuse, Murdoch asserted that ID Security lost the raw material necessary to make the product, with the result that the introduction of the product was delayed for four years while ID Security scrambled to find an alternative supplier. T.T. 4/30/02 (doc. no. 158) at 105–07. In connection with these claims, ID Security sued Checkpoint in this court for alleged violations of the federal antitrust laws through monopolization, attempt to monopolize, and conspiracy to monopolize, and for Pennsylvania state law torts, including tortious interference with contractual relations and unfair competition.

After trial, the jury returned a verdict in favor of Checkpoint on ID Security's monopolization claim, but found Checkpoint liable for attempted monopolization and for conspiracy to monopolize. On the federal antitrust claims, the jury awarded ID Security $14 million in damages with respect to its Laserfuse line, and $14.5 million in damages for lost Tokai tag sales. The total award of $28.5 million was trebled by the court pursuant to the antitrust laws, such that the Checkpoint was held liable for antitrust damages in the amount of $85.5 million. The jury also found Checkpoint liable on ID Security's state law claims of tortious interference with contractual relations and unfair competition, and awarded ID Security $6 million in damages for its Laserfuse line and $13 million in lost sales of Tokai tags, for a total of $19 million in damages for state law claims. Thus, the award against Checkpoint totalled $104.5 million.

Checkpoint has filed a motion for post-trial relief seeking either judgment as a matter of law or a new trial on all claims.

## II. DISCUSSION

### A. Applicable Standards

#### 1. *Rule 50*

■ Rule 50 provides that in the aftermath of a jury trial, a court may grant a motion for judgment as a matter of law if it determines that there was "no legally sufficient evidentiary basis for a reasonable jury to have found for a particular party on an issue," and that, without a favorable finding on that issue, the party cannot maintain his claim under controlling law. Fed.R.Civ.P. 50(a)(1). In determining whether to grant judgment as a matter of law, the court "must view the evidence in the light most favorable to the non-moving party, and determine whether the record contains the 'minimum quantum of evidence from which a jury might reasonably afford relief.'" *Glenn Distribs. Corp. v. Carlisle Plastics, Inc.,* 297 F.3d 294, 299 (3d Cir.2002) (quoting *Mosley v. Wilson,* 102 F.3d 85, 89 (3d Cir.1996)). Indeed, a court may grant judgment as a matter of law "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *LePage's, Inc. v. 3M,* 324 F.3d 141, 145–46 (3d Cir. 2003) (quoting *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1166 (3d Cir. 1993)).

In this endeavor, "[t]he court may not weigh evidence, determine the credibility of witnesses or substitute its version of the facts for that of the jury," *Parkway Garage, Inc. v. City of Philadelphia,* 5 F.3d 685, 691 (3d Cir.1993), but rather may grant a Rule 50 motion only "if upon review of the record it can be said as a matter of law that the verdict is not supported by legally sufficient evidence." *Id.* at 691–92; *see also LePage's,* at 145–46

("[R]eview of the jury's verdict is limited to determining whether some evidence in the record supports the jury's verdict."); *Glenn Distribs.*, 297 F.3d at 299 (stating that "[t]he standard for granting summary judgment under Rule 56 'mirrors the standard for a directed verdict under Fed. R.Civ.P. 50(a)'") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

### 2. *Rule 59*

■ Rule 59 of the Federal Rule of Civil Procedure allows a trial court, in its discretion, to grant a new trial "on all or part of the issues in an action where there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R.Civ.P. 59(a)(1). Such an endeavor is not, however, lightly undertaken, because it necessarily "effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of the facts." *Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90 (3d Cir.1960) (en banc). Therefore, "[a] new trial may be granted [only] when the verdict is contrary to the great weight of the evidence; that is, 'where a miscarriage of justice would result if the verdict were to stand.'" *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 453 (3d Cir.2001) (quoting *Olefins Trading, Inc. v. Han Yang Chem. Corp.*, 9 F.3d 282, 289 (3d Cir.1993)). When, as here, the asserted basis for a new trial is trial error, "[t]he court's inquiry ... is twofold. It must first determine whether an error was made in the course of the trial, and then must determine whether the error was so prejudicial that refusal to grant a new trial would be inconsistent with substantial justice." *Farra v. Stanley–Bostitch, Inc.*, 838 F.Supp. 1021, 1026 (E.D.Pa.1993).

### B. Plaintiff's Antitrust Claims

### 1. *Attempt to monopolize*

■ Checkpoint challenges under Rule 50(b) the verdict in favor of ID Security on its § 2 claims as being supported by insufficient evidence. In relevant part, § 2 of the Sherman Act sanctions those "who shall ... attempt to monopolize ... any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. In order to prevail under an attempted monopolization claim, "a plaintiff must prove that the defendant (1) engaged in predatory or anticompetitive conduct with (2) specific intent to monopolize and with (3) a dangerous probability of achieving monopoly power." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 442 (3d Cir.1997) (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993); *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 750 (3d Cir. 1996); *Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1197 (3d Cir. 1995)). It is the third of these elements that is most strongly implicated in Checkpoint's motion for judgment as a matter of law.

■ In order to determine whether there is a dangerous probability of monopolization in a particular case, however, a court must first "inquire 'into the relevant product and geographic market and the defendant's economic power in that market.'" *Id.* (quoting *Spectrum Sports*, 506 U.S. at 459, 113 S.Ct. 884, *Ideal Dairy Farms*, 90 F.3d at 750; *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir.1994)). The plaintiff bears the burden of defining and proving the relevant market. *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 513 (3d Cir.1998). The parties agree that the entire world comprises

the relevant geographic product market in this case. T.T. 5/21/02 (doc. no. 202) at 183. As to the product market, in order to assess whether there was legally sufficient evidence to support a finding that Checkpoint was dangerously close to achieving monopoly, the court must first consider whether the relevant product market in this case was the market for EAS systems, as Checkpoint asserts, or the market for RF tags, as ID Security contends. Stated in the specific terms of this case, the court must first assess whether ID Security, as the antitrust plaintiff, produced sufficient evidence that RF tags constituted the relevant product market in this case. Once the relevant product and geographic market is defined, the court must assess whether ID Security produced sufficient evidence that Checkpoint attempted to monopolize that market.

### a. Relevant market and market power

#### i. Kodak and the relevant product market

■ The relevant market for antitrust purposes "is composed of products that have reasonable interchangeability." *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 482, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404, 76 S.Ct. 994, 100 L.Ed. 1264 (1956)); *see also Int'l Wood Processors v. Power Dry, Inc.*, 792 F.2d 416, 430 (4th Cir.1986) (quoting L. Sullivan, Handbook of the Law of Antitrust § 12, at 41 (1977) and defining "relevant

market" as "the narrowest market which is wide enough so that products from adjacent areas or from other producers in the same area cannot compete on substantial parity with those included in the market"). " 'Interchangeability' implies that one product is roughly equivalent to another for the use to which it is put; while there might be some degree of preference for the one over the other, either would work effectively." *Allen–Myland, Inc. v. Int'l Bus. Machs. Corp.*, 33 F.3d 194, 206 (3d Cir.1994) (explaining that "[a] person needing transportation ... could accordingly buy a Ford or a Chevrolet automobile, or could elect to ride a horse or bicycle, assuming those options were feasible.").

The economic interchangeability of products is, in turn, measured by the "cross-elasticity of demand" between a particular product and any substitutes for it. *Brokerage Concepts*, 140 F.3d at 513; *accord Queen City Pizza*, 124 F.3d at 437 (also directing courts to consider "price, use, and qualities"). This is so because, when cross-elasticity is present, the prices of a product and its substitutes are linked such that "the rise in the price of a good within a relevant market would tend to create a greater demand for other like goods in that market." *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 722 n. 6 (3d Cir.1991). The inquiry in this case is to determine which of two closely related and interdependent markets constitutes the actual relevant market for antitrust purposes.[1]

---

1. It is axiomatic that the initial purchase of a good occurs in the primary market, or foremarket. This initial purchase may, in turn, give rise to an "aftermarket," a derivative market consisting of consumable goods or replacement components that must be used for the proper functioning of the primary good, but which are usually purchased in a later transaction. Phillip E. Areeda & Her-

bert Hovenkamp, IIA Antitrust Law ¶ 564b (2d ed.2002). The most prominent case in the foremarket-aftermarket area, the Supreme Court's decision in *Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), also offers the best practical illustration of the phenomenon. A foremarket in photocopiers, for example, could give rise to an aftermarket in photo-

In *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), the Supreme Court confronted, in what was to become the seminal case in the foremarket-aftermarket area, the question of whether a defendant's lack of power in a primary market precludes, as a matter of law, the possibility of market power in derivative aftermarkets. *Id.* at 455, 112 S.Ct. 2072. In particular, the Court had to determine whether Kodak, a manufacturer of complex business machines whose parts were incompatible with those of other manufacturers, had unlawfully monopolized and attempted to monopolize the sale of service for Kodak machines in violation of § 2 of that Act, when it implemented a policy of selling replacement parts only to buyers of Kodak equipment who used Kodak service or repaired their own machines. *Id.* at 456–59, 112 S.Ct. 2072. The practical effect of Kodak's policy was that it became more difficult, if not impossible, for independent service organizations ("ISO's") to sell service for Kodak machines, because they were unable to obtain Kodak parts. *Id.* at 458, 112 S.Ct. 2072.

The ISO's contended that Kodak had monopolized, or attempted to monopolize, what they alleged to be the relevant market, namely the aftermarket for parts and services. *Id.* at 459, 112 S.Ct. 2072. Kodak countered that the existence of competition in the primary equipment market, which it alleged to be the relevant market and of which it did not possess a monopoly share, inherently constrained its ability to raise aftermarket prices of service and parts above the level that would be charged in a competitive market. *See id.* at 465–66, 112 S.Ct. 2072. Therefore, Kodak argued that, as a matter of law, it was neither a monopolist nor an attempted monopolist. *Id.* at 467, 112 S.Ct. 2072. The Supreme Court disagreed. *Id.* at 466–467, 477, 112 S.Ct. 2072.

The Court declined the invitation of the defendant in the case to create a legal presumption that the fore- and aftermarkets inherently act as "pure complements to one another," *id.* at 477, 112 S.Ct. 2072, because market imperfections in the foremarket, "could create a less responsive connection between service and parts prices [in the aftermarket] and equipment sales [in the foremarket]." *Id.* at 473, 112 S.Ct. 2072. In particular, the Supreme Court found that significant information and switching costs, for example, could limit the ability of competition in the foremarket to prevent an exercise of monopoly power in the aftermarket. *Id.*[2] Therefore,

copier replacement parts. *See id.* at 456–57, 112 S.Ct. 2072.

**2.** Information costs may prevent foremarket prices from constraining prices in the aftermarket because consumers of complex, durable goods tend to engage in difficult and costly "lifecycle pricing," assessing "the total cost of the 'package'-equipment, service, and parts -at the time of purchase." *Id.* Much of the information regarding price data, quality, availability of products needed to operate, upgrade, or enhance the initial equipment, service and repair costs, estimates of breakdown frequency, nature of repairs, parts and service prices, length of downtime, and losses incurred from downtime is difficult, if not impossible in some cases, to acquire at the time of the initial purchase. *Id.* Moreover, the expense of acquiring and processing such information may deter consumers from doing so, particularly "[i]f the costs of service are small relative to the equipment price, or if consumers are more concerned about equipment capabilities than service costs ...." Id. at 474–75, 112 S.Ct. 2072. In practical reality, large-volume, sophisticated purchasers are more likely to undertake such an analysis, and thus obtain competitive prices. *See id.* at 475, 112 S.Ct. 2072.

Switching costs may limit the ability of foremarket prices to constrain those in the aftermarket because "[i]f the cost of switching is high, consumers who already have purchased the equipment, and are thus 'locked in,' will

the Supreme Court directed that courts faced with the task of evaluating whether a tie between fore- and aftermarkets violates the antitrust laws must proceed on "a case by case basis, focusing on the particular facts disclosed by the record." *Id.* at 467, 112 S.Ct. 2072.

*Kodak*'s teaching is not about market power alone, but about market definition. Noting that Kodak had chosen in its arguments to the Court "to focus on market power directly rather than arguing that the relationship between equipment and service and parts is such that the three should be included in the same market definition," *id.* at 469 n. 15, 112 S.Ct. 2072, the Court explained that "[w]hether considered in the conceptual category of 'market definition' or 'market power,' the ultimate inquiry is the same-whether competition in the equipment market will significantly restrain power in the service and parts markets." *Id.* (emphasis supplied).[3] Therefore, switching and information costs are significant, not only as indicators of market power, but also in the definition of the relevant market, because they inherently interfere with the cross-elasticity of demand. *See id.* at 469, 473, 112 S.Ct. 2072.

### ii. *Relevant market analysis in the wake of Kodak*

■ In the wake of *Kodak*, reasonable interchangeability continues to define the boundaries of the relevant market. *See Brokerage Concepts, Inc. v. U.S. Health-*

care, Inc., 140 F.3d 494, 513 (3d Cir. 1998); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 439 (3d Cir.1997). However, Kodak established that, in a situation where a court must determine whether the aftermarket, rather than the foremarket, is the relevant market for antitrust purposes, the fact that the aftermarket goods are unique, i.e., not interchangeable with similar repair or replacement products, does not automatically establish the aftermarket as the relevant market. *See Queen City Pizza*, 124 F.3d at 439–40.

Rather, both the uniqueness of aftermarket goods, and the existence of foremarket switching and information costs that "create an economic lock-in that could reduce or eliminate the cross-elasticity of demand" between fore- and aftermarket products, serve to establish the aftermarket as the relevant market. *See id.* This is so because uniqueness, switching and information costs, in tandem, generate market power even as they delineate the boundaries of the market in which such power is exercised. *See id.* Using the facts of *Kodak* as an example, the Third Circuit explained:

> If Kodak repair parts had not been unique, but rather, could be obtained from additional sources at a reasonable price, Kodak could not have forced copier purchasers to buy repair parts from Kodak. This would be true even if the copier purchasers faced information and

tolerate some level of ... price increases [in the aftermarket] before changing equipment brands." *Id.* at 476, 112 S.Ct. 2072. In practical effect, therefore, "a seller profitably could maintain supracompetitive prices in the aftermarket if the switching costs were high relative to the increase in ... [aftermarket] prices, and the number of locked-in customers were high relative to the number of new purchasers." *Id.*

3. An examination of the *Kodak* opinion also reveals that the Supreme Court intended for its discussion of market power to apply to claims brought under both § 1 and § 2 of the Sherman Act. *See id.* at 481–83, 112 S.Ct. 2072 ("Monopoly power under § 2, requires, of course, something greater than market power under § 1 ... The second element of a § 2 claim is the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor.").

switching costs that locked them into to (sic) use of Kodak copiers. This fact indicates that switching and information costs alone cannot create market power. Rather, it is the lack of a competitive market in the object to be purchased-for instance, a competitive market in Kodak parts-that gives a company market power.

*Id.* at 439 n. 10; *see also Brokerage Concepts,* 140 F.3d at 515 (noting that, in the wake of *Kodak,* it was possible that "a single brand market may be considered the relevant market where a legitimate class of consumers is locked in to purchasing a non-interchangeable tying product in a derivative market due to high switching costs" in the foremarket); *Allen–Myland, Inc. v. Int'l Bus. Machs. Corp.,* 33 F.3d 194, 208 n. 16 (3d Cir.1994) (noting that the "true inquiry" was whether IBM was "constrained by the prices of large scale mainframe computers when pricing its upgrades," and stating that, "[i]f it is so constrained, then the relevant market consists of both mainframes and upgrades. If not, then it is simpler and more accurate to say that the relevant market itself, not some submarket of it, contains only upgrades").

Furthermore, as Checkpoint emphasizes, several courts writing post-*Kodak* have found that the existence of uniqueness of aftermarket goods and the existence of switching and information costs in the foremarket are insufficient to establish the aftermarket as the relevant market, unless an antitrust defendant has actually changed its policy after locking-in some of its customers. *See Alcatel USA, Inc. v. DGI Techs., Inc.,* 166 F.3d 772, 783 (5th Cir.1999); *PSI Repair Servs.,Inc. v. Honeywell, Inc.,* 104 F.3d 811, 820 (6th Cir.1997). As the Sixth Circuit explained, *Kodak* itself lends some support to this position:

[T]he change in policy in *Kodak* was the crucial factor in the Court's decision. By changing its policy after customers were "locked in," Kodak took advantage of the fact that its customers lacked the information to anticipate this change. Therefore, it was Kodak's own actions that increased its customers' information costs. In our view, this was the evil condemned by the Court and the reason for the Court's extensive discussion of information costs ... [W]e thus hold that an antitrust plaintiff cannot succeed on a *Kodak*-type theory when the defendant has not changed its policy after locking-in some of its customers, and the defendant has been otherwise forthcoming about its pricing structure and service policies.

*PSI Repair Servs.,* 104 F.3d at 820. The court finds this logic persuasive. That a defendant is unable to change the prices of its goods in the aftermarket, even with respect to its most vulnerable customers, i.e., those who are already locked-in to its particular system, strongly suggests, if it does not compel, an absence of market power in the aftermarket. This inability to raise prices in the aftermarket, in turn, indicates that the aftermarket is not the relevant market in which a court should assess the defendant's market power. With these principles in mind, the court now examines the evidence presented at trial.

### b. Evidence at trial

In this case, the parties argue whether the relevant market is the market for EAS systems, as Checkpoint asserts, or RF tags, as ID contends. Given the applicable framework and viewing all evidence in a light most favorable to ID Security as the non-moving party, however, the evidence presented at trial provided no legally sufficient evidentiary basis for a reasonable juror to conclude that the rele-

vant market in this case was the market for RF tags. In particular, even given that RF tags are undisputedly a unique product, *see* T.T. 5/8/02 (doc. no. 177) at 10, and that the switching costs between RF- and AM-based systems are high, low information costs and the absence of evidence of post lock-in exploitation on the part of Checkpoint undermine the conclusion that RF tags, as opposed to EAS systems, comprise the relevant market in this case. Under these circumstances, the court concludes that ID Security's evidence failed to show that the RF tag market constitutes the relevant market for antitrust purposes.

### i. *Switching and information costs*

Evidence introduced at trial revealed that switching costs between RF and AM-based EAS systems are significant and extremely high. Logically, then, switching between systems is rare. Once a customer purchases an RF, as opposed to an AM-based system, that customer may thereafter only purchase RF tags for use in that system, because AM tags are incompatible with RF-based security systems. T.T. 5/8/02 (doc. no. 177) at 10; T.T. 5/9/02 (doc. no. 176) at 57–58. Therefore, in order for a dissatisfied customer to switch from an RF-based system to an AM-based system, that customer would have to replace its entire existing system and retrain its employees. T.T. 5/15/02 (doc. no. 192) at 67–68. Switching, thus, is "uneconomic," T.T. 5/9/02 (doc. no. 176) at 58, and, in any event, rare. T.T. 5/15/02 (doc. no. 192) at 67. Indeed, David Shoemaker, Checkpoint's Group Vice President for Strategic Marketing, could not provide a single example of a "chain-wide rollout switch" from one technology to another. T.T. 5/15/02 (doc. no. 192) at 67.

The evidence at trial also revealed that the high switching costs associated with EAS systems are significantly counterbalanced by information costs so low as to be almost nonexistent, a fact that increases a consumer's ability to make an intelligent choice when choosing the company with which it will have a long relationship. As Dr. Martin Asher, testifying for ID as an expert, noted, the purchasers of EAS systems are aware at the time of purchase that buying an RF-based system will necessitate their buying tags throughout the long life of their EAS system, and, most likely, from Checkpoint, the major supplier of RF tags. T.T. 5/9/02 (doc. no. 176) at 40–42. Moreover, Dr. Asher conceded that purchasers of EAS systems are retailers, i.e., sophisticated customers, whose analysis of the return on investment expected from the purchase of a security system is facilitated by the fact that both Checkpoint and Sensormatic present them with return detailed projections based on the customers' products, number of items passing through the store, the number of tags that the customer will need in the future, and well as industry trends. T.T. 5/9/02 (doc. no. 176) at 40–44. Dr. Asher further conceded that Checkpoint and Sensormatic provide this information to the customers, who then try to play the two off against each other in an effort to obtain a reduced price for the entire system (equipment and replacement tags) to be purchased. T.T. 5/9/02 (doc. no. 176) at 44–45.

The testimony of Timothy J. King, Vice President of Checkpoint's sales division, confirmed and fleshed out these market place dynamics. King testified that the return on investment projections prepared by Checkpoint help to quantify for prospective customers the specific cost for the EAS system and its component parts, including tags, projected over up to four years. T.T. 5/15/02 (doc. no. 192) at 78–79, 81. According to King, the typical customer receives proposals from both Checkpoint and Sensormatic, and then engages in multiple rounds of negotiations with the

two, with the result that the total price of the EAS systems decreases during the course of the negotiations. T.T. 5/15/02 (doc. no. 192) at 81.–83. King's testimony further indicates that tag prices are one aspect of return on investment that customers consider as they negotiate; customers typically request that tag prices be fixed or capped over time, and Checkpoint occasionally accedes to those requests. T.T. 5/15/02 (doc. no. 192) at 84. Given these market realities, the court concludes that the low information costs, despite the high cost of switching from an AM- to an RF-based EAS system, militate strongly against a finding that RF tags alone constitute the relevant market for antitrust purposes.

### ii. *Absence of post lock-in change of policy*

The unequivocal evidence offered at trial further reveals that Checkpoint did not change the price of RF tags even after its customers were locked-in to an RF-based system. Dr. Asher, ID Security's expert, conceded that from 1995 to 2000, Checkpoint and Sensormatic both charged approximately 3.5 cents for every tag. T.T. 5/9/02 (doc. no. 176) at 49–50. Indeed, once customers were locked-in, Checkpoint continued to charge 3.5 cents per tag. T.T. 5/9/02 (doc. no. 176) at 58. Checkpoint contends that its consistent pricing reveals that competition with Sensormatic in the EAS foremarket deprived it of actual market power in the RF tag aftermarket, and shows that Checkpoint was unable to exploit even its locked-in customers, despite its 90 percent share of the aftermarket. Consequently, Checkpoint argues that the court must consider the foremarket for EAS systems as the relevant market for antitrust purposes.

ID Security attempts to counter this argument, and combat the inference raised by Checkpoint's consistent RF tag pricing, with several arguments. ID Security first argues, in essence, that Checkpoint did not disprove the possibility, left open by the fact that 3.5 cents per tag was an average price, i.e., some customers paid more while others paid less for their tags, that locked-in customers were required to pay the highest tag prices. ID Security then asserts that the relatively consistent price of 3.5 cents per tag does not demonstrate that Checkpoint is constrained by foremarket competition, but rather reveals that Checkpoint and Sensormatic operate as a duopoly whose effective collusion interferes with the cross-elasticity of demand between foremarket and aftermarket, and allows Checkpoint to charge supracompetitive prices for RF tags in the aftermarket.

As noted above, ID Security, as the plaintiff in an antitrust suit, has the burden of proving the relevant market in which the jury was to measure Checkpoint's market power. *See Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 513 (3d Cir.1998). For the reasons that follow, ID Security failed to meet this burden at trial through evidence of post lock-in exploitation on the part of Checkpoint.

### A. *ID's average price argument*

ID Security asserts that, because 3.5 cents per tag constituted an average tag price, such that some customers paid more and some paid less for their RF tags, "Checkpoint failed to establish [at trial] that the prices charged to aftermarket customers were not at the higher end of [the average] range." Mem. of Law by Pl. in Response to Mot. by Def. for Post–Trial Relief at 39. In support of this argument, ID Security cites the testimony of Checkpoint witness Timothy King, and asserts that King "admitted" that customers are often charged prices at or above the aver-

age price of RF tags once their initial fixed price contracts with Checkpoint expire. Next, ID Security cites the testimony of Mark Perker, Checkpoint's Senior Director for Planning and Strategic Development, as proof that Checkpoint attempted to raise aftermarket prices on RF tags.

As an initial matter, it appears that ID Security has misconstrued its burden of proof in this case. As noted above, the burden of proving the relevant market rests squarely on the shoulders of the antitrust plaintiff. *See Brokerage Concepts,* 140 F.3d at 513. Thus, ID Security bears the burden of proving post lock-in exploitation and Checkpoint need not prove the negative, i.e., that aftermarket customers were not, in fact, charged higher than average prices. In its response to Checkpoint's motion for post-trial relief, ID Security offers not a single transcript reference that directly supports its exploitation claim. Moreover, as set forth in greater detail below, the testimony of King and Perker does not provide evidence of post lock-in exploitation sufficient to prove that RF tags, rather than EAS systems, constitute the relevant market in this case.

King testified that tag prices were indeed subject to renegotiation at the end of initial fixed-price contracts. T.T. 5/15/02 (doc. no. 192) at 84. Upon further questioning, he also explained that "if [Checkpoint has] a blanket purchase order or a contractual agreement with [its] customer, when that ends the customer will undoubtedly attempt to renegotiate a lower price ...." T.T. 5/15/02 (doc. no. 192) at 84, and that the typical result was that Checkpoint "work[s] hard to maintain the pricing [it]

had in effect and in some instances we end up lowering the price as a concession ... for a multiple year agreement." T.T. 5/15/02 (doc. no. 192) at 85. Perker testified that in 1998 Checkpoint attempted to enhance its profitability by attempting to increase prices on *both* base and repeat tag business "where and if possible." T.T. 5/7/02 (doc. no. 172) at 115–16. He did not comment on the success of any such attempts.

Even viewed in a light most favorable to ID, the above testimony clearly does not establish that locked-in customers were charged prices at or above the average price of RF tags, and, thus, that Checkpoint had significant market power in the RF tag aftermarket. At most, King and Perker established that Checkpoint attempted to charge higher prices to locked-in customers.[4] That this attempt was planned and made, however, says nothing about Checkpoint's ability to succeed. Indeed, King's testimony suggests that Checkpoint's market power was, in fact, insufficient to support its aspirations.

Therefore, the court concludes that, contrary to ID Security's claim, the testimony of King and Perker supports no reasonable inference that Checkpoint exploited its locked-in RF tag customers, and thus fails to constitute legally sufficient proof that the RF tag market is the relevant market in this case.

### B. *ID Security's duopoly claim*

ID Security next argues that, given the consistent pricing of RF tags in the aftermarket and the absence of apparent post

---

4. Moreover, the testimony of ID Security's own expert, Dr. Asher, undermines any conclusion that Checkpoint charged higher prices to customers who had already purchased EAS systems than it did to new customers. Dr. Asher testified primarily that Checkpoint was a "uniform price monopolist" that did not

price discriminate between new and installed customers. T.T. 5/9/02 (doc. no. 176) at 57–58, 60–64. ID Security's theory of the case at trial hinged on this testimony. Therefore, ID Security appears to be advancing a different theory in its opposition to Checkpoint's motion for post-trial relief.

lock-in exploitation, the existence of a duopoly, "[a] condition in the market in which there are only two producers or sellers of a given product." Black's Law Dictionary 502 (6th ed., 1990), constitutes a market imperfection in the foremarket for EAS systems not present under the facts of *Kodak,* and renders the foremarket incapable of constraining Checkpoint's behavior in the RF tag aftermarket. According to ID Security, competition between Checkpoint and Sensormatic in the EAS foremarket is illusory, because the two companies, in practical effect, match their prices, and thus minimize the extent to which a prospective customer can use an offer by one company as leverage against the other to lower the ultimate purchase price of an EAS system and its components. Unable to choose between the two companies based on price, the customer then chooses a system based on his particular technological needs. ID Security asserts that this alleged duopoly arrangement meant that Checkpoint and Sensormatic were not truly competing in the foremarket, and that Checkpoint was left free to charge a consistent price that mirrored Sensormatic's tag prices for AM tags, but that was supracompetitive in the RF tag market, as evidenced by the fact that ID Security was willing to accept a lower profit margin per tag and to undercut tag prices offered by Checkpoint.

ID cites the testimony of Mark Perker, Checkpoint's Senior Director for Planning and Strategic Development, as factual support for the duopoly theory ultimately advanced by its expert, Dr. Martin Asher. Perker indeed indicated that Checkpoint and Sensormatic match prices, so that customers choose between the two systems based on their technological needs. T.T. 5/14/02 (doc. no. 187) at 67–68. Perker explained that supermarkets and drug stores tend to prefer RF technology because of their need to process numerous retail items quickly, while clothing retailers tend to prefer AF technology, because they can place the tag sensors far apart and avoid obstructing the exits of their stores. T.T. 5/14/02 (doc. no. 187) at 65–67. ID Security contends that Perker's testimony supports the inference that "a potential increase in price, or an existing lock-in at a supracompetitive price, will not inevitably drive potential purchasers of Checkpoint's system to its sole systems competitor, Sensormatic. For many of these customers, RF systems are the *only* viable choice." Mem. of Law in Support of Pl.'s Resp. to Mot. by Def. for Post–Trial Relief at 26. For the following three reasons, the court does not agree.

First, that a particular customer prefers one foremarket technology over the other does not necessarily confer on the preferred foremarket supplier an impermissible market power in the aftermarket. As the First Circuit has explained:

In a product-differentiated market ... there will always be a subset of customers whose subjective preferences, given their specific business needs, will align them more closely with one manufacturer ... [T]his kind of preference does not translate into the kind of economic power that antitrust laws aim to mitigate. Sophisticated customers with such preferences will know beforehand that they will lock themselves in by their choice of manufacturer and do so willingly. What would be of concern is if a firm were able to extend its control over a sufficiently sizable number of customers who did not have such a preference.

*SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.,* 188 F.3d 11, 23 (1st Cir. 1999). In this case, regardless of their ultimate technological preference, prospective EAS system customers receive proposals from both Checkpoint and Sensormatic and pit the two firms against each

other in order to decrease the price of the EAS system that they will ultimately buy. *See* discussion, *supra.* Indeed, the record reveals that customer preferences for one type of EAS technology as opposed to another are ultimately not so ironclad as to preclude a customer from considering, or purchasing, a system based on the other technology. For example, although a drugstore, CVS uses Sensormatic's AM technology, while Target, a retailer, uses Checkpoint's RF-based system. T.T. 5/9/02 (doc. no. 176) at 33–34. ID Security has offered no evidence to the contrary.

Second, an examination of the record in this case belies the notion that a competition-stifling collusion or coordination exists between Checkpoint and Sensormatic. To the contrary, as Dr. Asher conceded, Checkpoint and Sensormatic compete in price and technology within every vertical market. T.T. 5/9/02 (doc. no. 172) at 33–35. The return on investment projections, provided by each company to prospective customers, provide the most obvious manifestation of this competition, see T.T. 5/9/02 (doc. no. 176) at 40–45; T.T. 5/15/02 (doc. no. 192) at 81–84, because they spark multiple rounds of price negotiations during which the customers pit offers from Checkpoint against those of Sensormatic in order to receive lower prices from each. T.T. 5/9/02 (doc. no. 176) at 44–45; T.T. 5/15/02 (doc. no. 192) at 81–84. As a direct result of these negotiations, the prices of EAS systems as a whole, and, by implication, their component parts, decrease. T.T. 5/15/02 (doc. no. 192) at 81–83.

Moreover, ID Security's own expert conceded a constraining link between fore-

market and aftermarket that outlives the initial purchase of an EAS system. When asked why Checkpoint, faced with a tag shortage in 1995 through 1997, did not raise tag prices to lessen tag demands, Dr. Asher responded that if Checkpoint were to "change the price, then it's going to affect people's purchases, and they may lose some system sales and future purchases." T.T. 5/9/02 (doc. no. 176) at 67–68. Thus, this context of competition offers no factual support for ID Security's assertion and the conclusion of its expert that Checkpoint's consistent price of 3.5 cents per tag actually constituted a "supra-competitive" price that stemmed from a lack of competition in the EAS market and that would have been lowered had competition been allowed in the RF tag market.[5]

### iii. *Summary of evidence*

In summary, the evidence introduced by both sides at trial revealed unequivocally that the foremarket for EAS systems is characterized by high switching costs, exceptionally low information costs, lively competition between Checkpoint and Sensormatic, and a lack of post lock-in exploitation in the RF tag aftermarket. Given this factual context and the teachings of *Kodak* and its progeny, the court finds that there is a legally insufficient basis for a reasonable jury to conclude that the RF tag aftermarket constitutes the relevant market that Checkpoint allegedly attempted or conspired to monopolize. To the contrary, the court finds that EAS systems constitute the relevant market as a matter of law. It is therefore in the EAS systems product market where ID Security must

---

**5.** Indeed, ID Security's evidence at trial suggested that ID Security intended to raise, rather than lower, prices in the RF market. Peter Murdoch, President of ID Security Canada, testified that ID Security's intent, upon entering as a competitor in the RF tag market, was not, in fact, to charge prices less than those offered by Checkpoint. T.T. 4/30/02 (doc. no. 158) 83–84. In fact, Murdoch stated that erroneous assumptions concerning Checkpoint's pricing resulted in ID Security's offering RF tags at a lesser price. T.T. 4/30/02 (doc. no. 158) at 83–84, T.T. 5/1/02 (doc. no 164) at 95–96.

demonstrate that Checkpoint attempted to monopolize.

### c. Dangerous probability of success prong

In order to succeed on its attempted monopoly claim at trial, ID, as an antitrust plaintiff, was required to prove that Checkpoint "(1) engaged in predatory or anticompetitive conduct with (2) specific intent to monopolize and with (3) a dangerous probability of achieving monopoly power." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 442 (3d Cir.1997) (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993); *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 750 (3d Cir.1996); *Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1197 (3d Cir.1995)). At the post-trial motions stage in this case, the issue before the court is whether the evidence introduced at trial was legally sufficient to support a jury finding that Checkpoint "possessed 'sufficient market power' to come dangerously close to success within [the EAS] market." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 513 (3d Cir.1994). For the reasons that follow, the court concludes that the evidence was insufficient to support a jury finding on this third prong, and that the evidence was therefore insufficient to support a jury verdict against Checkpoint on ID Security's attempted monopoly claim.

■ The Third Circuit has emphasized that, in determining whether a particular defendant enjoys a dangerous probability of success, "[t]here is no simple formula." *Id.* This is so because market share constitutes the most significant, but not exclusive, factor in determining the existence of a dangerous probability of success. *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 112 (3d Cir.1992); *see also Pastore*, 24 F.3d at 513 (characterizing market share

as the "most significant" factor in an attempted monopolization claim, and observing that "[i]ndeed, a pair of the leading antitrust commentators state that 'it is clear that the basic thrust of the classic rule is the presumption that attempt does not occur in the absence of a rather significant market share.' "). As a matter of law, a market share of less than 30 percent is presumptively insufficient to establish the market power that is a prerequisite to a defendant's enjoying a dangerous probability of achieving monopoly power. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 26 n. 43, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) (market power indicated by 30 percent market share generally insufficient to create an unacceptable likelihood of anticompetitive conduct); *see also Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 119 n. 15, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986) ("With only a 28.4% share ... and lacking a plan to collude, [defendant] would harm only itself by embarking on a sustained campaign of predatory pricing."); *AD/SAT, Div. of Skylight, Inc. v. Assoc. Press*, 181 F.3d 216, 229 (2d Cir.1999) (20 percent to 30 percent market share "does not approach the level required for a showing of dangerous probability of monopoly power"); *Acme Mkts., Inc. v. Wharton Hardware & Supply Corp.*, 890 F.Supp. 1230, 1241 (D.N.J.1995) (endorsing the idea that "[f]or defendants who control 30% or less of the relevant market, claims of attempted monopolization should be 'presumptively' rejected").

■ Because assessing a defendant's probability of achieving monopoly hinges on an assessment of market power, which is not always accurately reflected by market share alone, other factors may affect a defendant's probability of achieving monopoly in a relevant market, such as "the strength of competition, probable development of the industry, the barriers to entry,

the nature of the anti-competitive conduct, and the elasticity of consumer demand." *Barr Labs.*, 978 F.2d at 112. With these factors in mind, therefore, the court turns to an examination of the evidence in this case.

■ It is undisputed that Checkpoint possesses a 25 percent share of the EAS systems market, T.T. 5/9/02 (doc. no. 176) at 31, a market share presumptively insufficient to confer upon Checkpoint a dangerous probability of success. In an attempt to rebut this presumption, ID Security resurrects the duopoly argument that it earlier advanced to prove that RF tags were the relevant market in this case. In particular, ID Security asserts that Checkpoint's small share of the EAS systems market does not accurately reflect its power within that market. This is so, according to ID Security, because there was sufficient evidence to support a jury finding that Checkpoint enjoyed a dangerous probability of achieving monopoly because Checkpoint and Sensormatic, in theory, comprise a price matching duopoly. Noting that Checkpoint's tag manufacturing costs were less than those of Sensormatic, ID Security insists that the jury could have found that Checkpoint would be able to raise its RF tag prices with impunity after eliminating All–Tag, a minor player in the RF tag market, and would thereafter increase the price of its system, with the result that "such a price increase by Checkpoint might be quickly and eagerly followed by Sensormatic." Mem. of Law by Pl. in Response to Mot. by Def. for Post–Trial Relief at 32. Essentially, ID Security argues that the fact that Checkpoint and Sensormatic price match allows Checkpoint to raise the price of both RF- and AM-based systems, much as a monopolist would, even though

Checkpoint does not have a majority share of the EAS systems market. The court does not agree.

■ First, those courts that have squarely addressed the issue have determined that § 2 of the Sherman Act applies to the conduct of single firms only, rather than to the conduct of a small number of firms engaged in tacit collusion, as in cases involving oligopoly, shared monopoly, or, as here, duopoly. *See Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1443 (9th Cir.1995) (stating that the "fact that competitors may see proper ... to follow the prices of another manufacturer ... does not violate the Sherman Act ... To pose a threat of monopolization, one firm *alone* must have the power to control market output and exclude competition" and that "[a]n oligopolist lacks this unilateral power. By definition, oligopolists are interdependent. An oligopolist can increase market price, but only if the others go along"); *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1416 (7th Cir.1989) ("At best, [plaintiff's theory] poses the danger that [defendant's] ... conduct could result in diminished price competition in an oligopolistic, or, at worst, a duopolistic market. Section 2, however, does not govern single-firm anti-competitive conduct aimed only at creating oligopoly."); *H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1018 (2d Cir.1989) (affirming the district court's conclusion that the market shares of two defendants "could not be aggregated to establish an attempt to monopolize in violation of Sherman Act section two ...." and endorsing the view that "in order to sustain a charge of ... attempted monopolization, a plaintiff must allege the necessary domination of a particular defendant").[6] This view garners some support

---

**6.** Other cases have treated the question as

open. *See, e.g., Morgenstern v. Wilson,* 29

from Supreme Court dicta, which provides that "[t]he conduct of a *single* firm is governed by § 2 alone and is unlawful only when it threatens actual monopolization." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (emphasis supplied). Given this precedent, the court concludes that, as a matter of law, ID Security cannot maintain a § 2 attempted monopoly claim based on the alleged existence of a Checkpoint–Sensormatic duopoly. Accordingly, Checkpoint is entitled to judgment in its favor on ID Security's attempted monopoly claim.

Even, assuming it were legally correct for ID Security to premise a § 2 claim on a duopoly theory,[7] however, ID Security has pointed to no evidence that Checkpoint and Sensormatic in fact operated as a duopoly. As discussed above, the evidence reveals that competition between Checkpoint and Sensormatic is actually quite lively, *see* discussion, *supra* Part II. B.1.b.ii.B., and that the two firms' consistent practice is to compete for prospective customers by decreasing their prices during price negotiations with prospective customers. T.T. 5/15/02 (doc. no. 192) at 82. Thus, ID Security failed to prove that Sensormatic would "eagerly" match a systems price increase by Checkpoint.

Nor is there merit to the claim that the elimination of All–Tag would somehow cause Checkpoint to cease attempts to undercut Sensormatic on price, and would instead elect to raise its prices in the EAS system market. The potential impact by All–Tag on the EAS systems market was barely mentioned at trial. Indeed, All–Tag only garnered one passing reference during ID's closing argument, where counsel noted only that Checkpoint was "trying to exclude All–Tag" from the relevant market. T.T. 5/21/02 (doc. no. 202) at 87. Simply put, in the context of the EAS systems relevant market,[8] ID Security's § 2 attempted monopoly claim falters on its facts. Thus, the court concludes that there is insufficient evidence to support ID's attempt to monopolize claim, and will grant Checkpoint judgment as a matter of law.

d. *Checkpoint's motion for a new trial on the attempt to monopolize claim*

Rule 50 of the Federal Rules of Civil Procedure requires that a court that has granted a renewed motion for judgment as a matter of law "shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or re-

---

F.3d 1291, 1295 n. 2 (8th Cir.1994); *Harkins Amusement Enters., Inc. v. Gen. Cinema Corp.*, 850 F.2d 477, 490 (9th Cir.1988).

**7.** Checkpoint points to Dr. Asher's expert testimony in support of this theory, notwithstanding that Dr. Asher cites to no factual basis for his opinion.

**8.** Checkpoint argues that, even if RF tags constituted the relevant market, it could not, as a matter of law, be held liable for attempting to monopolize, given that it was already a monopolist holding a 90 percent share of that market. Neither the parties nor the court has located any Third Circuit authority recognizing the liability of a monopolist for attempt to maintain monopoly power under § 2. *See Le-*

*Page's v. 3M*, 324 F.3d at 169 (3d Cir.2003) (en banc) (declining to reach the issue). *But see LePage's v. 3M*, 277 F.3d 365, 2002 WL 46961, at *31 (3d Cir. Jan.14, 2002) (Sloviter, J., dissenting), *aff'd in part and rev'd in part en banc*, 324 F.3d 141 (3d Cir.2003) (finding a § 2 violation through activity on the part of a monopolist that was designed to achieve actual or virtual sole supplier status). In any event, in this case, even assuming that the RF tag market is the relevant product market, there is insufficient evidence to conclude that Checkpoint's conduct in the RF tag market would constitute an attempt or attempt to maintain monopoly. *See supra;* discussion *infra* Part II.B.1.d.

versed, and shall specify the grounds for granting or denying the motion for the new trial." Fed.R.Civ.P. 50(c)(1). Mindful of its responsibility, the court notes that Checkpoint has made an alternative motion for a new trial with respect to ID Security's attempt to monopolize claim on the grounds that (1) the jury verdict in favor of Checkpoint on the monopolization claim was, given the facts of this case, fundamentally inconsistent and irreconcilable with the verdict rendered against Checkpoint on the attempted monopolization claim, (2) the jury instructions given by the court were incorrect, and that the court erred in admitting (3) the expert testimony of ID Security's expert, Dr. Martin Asher, (4) evidence of Checkpoint's patent enforcement activities, and (5) evidence of Checkpoint's acquisition of manufacturers Meto and Mercatec. For the reasons that follow, the court concludes that, if Checkpoint is not entitled to judgment as a matter of law on the attempted monopolization claim, then irreconcilable inconsistency between the jury verdicts in this case warrants the grant of a new trial. The court concludes, however, that Checkpoint's other arguments in favor of a new trial are without merit.

### i. *Inconsistent verdicts*

 Although inconsistent verdicts constitute grounds for ordering a new trial, *Malley–Duff & Assoc., Inc. v. Crown Life Ins. Co.,* 734 F.2d 133, 145 (3d Cir. 1984), a district court faced with inconsistent verdicts is under a constitutional mandate to search for any view of the case that reconciles the verdicts. *McAdam v. Dean Witter Reynolds, Inc.,* 896 F.2d 750, 764 (3d Cir.1990); *see also Mycogen Plant Science, Inc. v. Monsanto Co.,* 61 F.Supp.2d 199, 266 (D.Del.1999) ("A district court

should uphold the jury's verdict if there exists some legal basis, supported by the evidence, upon which the verdict could be based."). Indeed, "[t]he court is obligated to reconcile the jury's verdict independently of whether the jury likely reasoned in the same fashion and it is the court's duty to harmonize the jury's answers if at all possible to do so." *Mycogen Plant Science,* 61 F.Supp.2d at 266 (citing *Gallick v. Baltimore & Ohio R.R. Co.,* 372 U.S. 108, 119, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963); *Allen Organ Co. v. Kimball Int'l, Inc.,* 839 F.2d 1556, 1563 (C.A.Fed.1988)).

An examination of the jury verdicts rendered in favor of Checkpoint on ID Security's monopolization claim and against Checkpoint on ID Security's attempted monopolization claim reveals that, regardless of whether the jury determined that the relevant market in this case was that of EAS systems or RF tags,[9] the verdict is plagued by fundamental inconsistencies that stem from the fact that Checkpoint controls approximately 25 percent of the EAS systems market, and approximately 90 percent of the market for RF tags, and that the apparent inconsistencies are irreconcilable. For the reasons that follow, the court concludes that, if judgment as a matter of law in Checkpoint's favor with respect to ID Security's antitrust claims were vacated on appeal, the inconsistency of the jury verdicts would warrant a new trial on ID Security's attempted monopolization claim.

### A. *Assuming EAS systems as the relevant market*

Examination of the jury verdicts from the perspective that the jury determined that the relevant market was the market for EAS systems reveals at least facial

---

**9.** The jury was not asked to specify on the verdict sheet the market that it had identified

as the relevant market in this case.

inconsistencies between the verdict in favor of Checkpoint on monopolization and against Checkpoint on attempt. It is undisputed that Checkpoint's 25 percent share of the EAS systems market is insufficient to establish that Checkpoint was a monopolist within that market. However, this market share is also presumptively insufficient to confer on Checkpoint the dangerous probability of achieving monopoly power that would support imposing liability for attempted monopolization. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 26 n. 43, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). Acknowledging this apparent inconsistency, ID Security has advanced one convoluted theory that, it asserts, would reconcile this verdict. For the reasons that follow, the court, unable itself to imagine any plausible competing explanation, does not agree.

ID Security's theory is, in essence, that the jury could have concluded that (1) competitor All–Tag, barely mentioned at trial, somehow constrains Checkpoint's ability to raise prices in the RF tag market, (2) Checkpoint would be able to eliminate All–Tag from the RF tag market through successful patent enforcement actions, (3) Checkpoint, having eliminated All–Tag in the RF tag market, would then raise RF tag prices, and, therefore, the prices of its EAS systems, and that (4) Sensormatic would then match Checkpoint's EAS systems price increases.

None of the evidence at trial, however, supports such a scenario. As Checkpoint notes, although All–Tag was mentioned in connection with its patent enforcement actions, there is no evidence from which a reasonable jury could have concluded that Checkpoint's RF tag pricing was constrained by the presence of All–Tag in the RF market. Instead, Checkpoint's officers consistently testified that All–Tag's product, plagued by inferior quality, inability to meet demand, and inability to charge competitive prices, was not considered a competitive threat. T.T. 5/6/02 (doc. no. 171) at 154–55, 165–66. These were contentions that ID Security never directly refuted. Moreover, not even ID Security's counsel advanced during closing any theory akin to that now advanced to reconcile the verdicts in this case, but rather chose to refer only in passing to Checkpoint's attempts to "exclude" All–Tag from the RF market. T.T. 5/21/02 (doc. no. 202) at 87. Therefore, the court concludes that if the jury determined that EAS systems constituted the relevant market in this case, the verdict in favor of Checkpoint on monopolization and against Checkpoint on attempted monopolization, are both inconsistent and irreconcilable.

B. *Assuming RF tags as the relevant market*

Examination of the jury verdicts from the perspective that the jury determined that the relevant market was the market for RF tags also reveals facial inconsistencies between the verdict in favor of Checkpoint on monopolization and against Checkpoint on attempt. Checkpoint points out that, in essence, with a 90 percent share of the RF tag market, it was already a monopolist, so that, if the jury believed that the relevant market was the market for RF tags, it was obliged to find *against* Checkpoint on the monopolization claim. Moreover, Checkpoint asserts that there was no evidence from which a reasonable jury could have concluded that Checkpoint lacked monopoly power in the tag market despite its market share, but had a dangerous probability of achieving monopoly power by obtaining an even greater market share. ID Security has advanced several scenarios that purport to resolve this inconsistency. For the reasons that follow, the court concludes that its attempt is unsuccessful.

ID Security first argues that the jury could have found that All–Tag's presence constrained Checkpoint from charging monopoly prices, despite Checkpoint's 90 percent market share, and that the elimination of All–Tag would remove that barrier. As discussed in detail above, *see supra* Part II.B.1.d.i.A, ID Security's theory envisions a role for All–Tag that the trial evidence does not support, and the court concludes that this attempt to reconcile the verdict is without merit.

ID Security's second and third attempts to reconcile the verdict are variations on a theme; both are premised on the theory that the jury could have found that Checkpoint attempted to acquire monopoly power by eliminating ID Security, but was unsuccessful because competition from Sensormatic in the EAS systems market constrained its ability to charge monopoly prices in the RF tag market.[10] Against this background, ID Security argues that the jury could nonetheless have determined that Checkpoint had a dangerous probability of achieving monopoly power because Sensormatic may choose to match price increases by Checkpoint. Given that there is literally no evidence in the record that Sensormatic would match a price *increase* by Checkpoint, however, the court determines that ID Security's argument on this point is without merit, given Checkpoint's consistent pattern of pricing. *See* T.T. 5/7/02 (doc. no. 172) at 90–91, 137; 5/10/02 (doc. no. 182) at 162; 5/15/02 (doc. no. 192) at 87.

In its alternative third theory, ID Security argues that the jury could have determined that Checkpoint's 90 percent share *per se* constituted a dangerous probability of succeeding in obtaining monopoly power in the RF tag aftermarket. The jury was

not so instructed, *See* T.T. 5/21/02 (doc. no. 202) at 194–95, and ID Security has pointed to no law supporting such an approach. Consequently, the court determines that the jury verdicts on monopolization and attempted monopolization are inconsistent, and irreconcilable, and that, in the event that Checkpoint is not entitled to judgment as a matter of law, it is entitled to a new trial on ID Security's attempted monopolization claim.

### ii. *Antitrust jury instructions*

■ Checkpoint next argues that it is entitled to a new trial on the theory that the court erred by failing to instruct the jury according to Checkpoint's proposed jury instructions 16, 17, 19, 20, 21, 22, and 23. The instructions deal generally with the issue of market power and market definition. Checkpoint contends that the court's decision not to charge according to its proposed instructions resulted in an inadequate and inaccurate charge. The court does not agree, and does not find that Checkpoint is entitled to a new trial on the basis asserted.

The court instructed the jury on relevant product market as follows:

> In determining the product market, the basic idea is that the products within it are interchangeable as a practical matter from the buyer's point of view. This does not mean that the two products must be identical to be in the same market. It means that they must be as a matter of practical fact and the actual behavior of consumers substantial or reasonably interchangeable to fill the same consumer needs or purpose. Two products are within a single market if one of them could suit the buyer's needs substantially as well as the other. In

---

**10.** The idea that the EAS systems foremarket constrains the RF tag aftermarket, of course, begs the question of whether, in fact, EAS systems are, as the court has determined, the relevant market as a matter of law in this case.

sum, what you are being asked to ask is to decide which products compete with each other. This is a practical determination. Products do not have to be identical to be in the same relevant product market, but they must compete meaningfully with each other. In defining the relevant product market you must consider what is called the commercial realities faced by buyers. You may consider some factors which may help you to make this determination: Whether and to what extent the market for EAS systems constrains or limits the prices that are charged for RF tags. You may consider the information regarding tags and whether such information is available to purchasers of EAS systems and RF tags, and, if so, at what point in time during the transaction. You may also consider whether Checkpoint made any unexpected changes or increases in its tag prices.

T.T. 5/21/02 (doc. 202) at 181–82.

The instruction given by the court, as a whole, offers a correct statement of the law and the applicable legal standard. The charge highlighted for the jury that a relevant market is determined by reasonable interchangeability of use, *see East-man Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 482, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 513 (3d Cir.1998); *Queen City Pizza, Inc.*

*v. Domino's Pizza, Inc.,* 124 F.3d 430, 439 (3d Cir.1997), that the jury should consider to what extent the foremarket realistically constrains the aftermarket in a given case, *see Kodak,* 504 U.S. at 473, 477, 112 S.Ct. 2072; *Allen–Myland, Inc. v. Int'l Bus. Machs. Corp.,* 33 F.3d 194, 208 n. 16 (3d Cir.1994), and that, to this end, it should take information costs into account, *see Queen City Pizza,* 124 F.3d at 439–40, as well as any post lock-in changes of policy. *See Alcatel, USA, Inc. v. DGI Techs., Inc.,* 166 F.3d 772, 783 (5th Cir.1997).[11]

Checkpoint's Proposed Instructions 16, 17, 19, 20, 21, 22, and 23, though all correct statements of the law, are merely flourishes on and refinements of the basic legal framework that was articulated in the cases that the court used to formulate its charge.[12] That the court exercised its discretion and refused to charge the jury in the precise fashion that Checkpoint requested, is not error where the charge given by the court "as a whole, stated the correct legal standard." *Ryder v. West-inghouse Elec. Corp.,* 128 F.3d 128, 135 (3d Cir.1997). Similarly, the fact that the court also instructed the jury that "[t]wo products are within a single market if one of them could suit the buyer's needs substantially as well as the other," T.T. 5/21/02 (doc. no. 202) at 182, did not render the jury instructions inaccurate by obscuring, as Checkpoint contends, the impor-

---

**11.** The court notes that switching costs, identified in *Kodak* and its progeny as a relevant consideration in the definition of relevant market, *see Queen City Pizza,* 124 F.3d at 439–40, were argued to the jury, but not specifically addressed or defined in the jury charge. Checkpoint did not request such an instruction, and is not now claiming that omitting a reference or definition of switching costs is grounds for a new trial.

**12.** In defining the relevant market, Instruction No. 16 urges the jury to consider whether economic forces constrain a firm's freedom to

act as it wishes; Nos. 17 and 20 emphasize that a relevant market consists of groups of products such that a profit maximizing firm that was the only seller of those products likely would impose at least a small but significant and permanent increase in the price of those products; No. 19 encourages the jurors to .consider commercial realities facing buyers; No. 21 directs that the jury consider to what extent the market for EAS systems constrains the prices charged in the RF market; and No. 22 elaborates on information costs.

tance of an inquiry into whether prices in the secondary market are constrained by competition in the primary market. Indeed, the court explicitly directed the jury to consider the existence of such a constraint, and emphasized the importance of information costs, as well as post lock-in conduct, relevant to that determination. T.T. 5/21/02 (doc. no. 202) at 181–82. Accordingly, the court concludes that it did not err in excluding Checkpoint's proposed jury instructions from the charge given, and that the exclusion of those instructions does not warrant a new trial.

### iii. Testimony of Dr. Martin Asher

 Checkpoint next contends that it is entitled to a new trial on ID Security's antitrust claims on the theory that the court erred in applying the *Daubert* principles,[13] and, therefore, in admitting the testimony of ID Security's antitrust expert, Dr. Martin Asher. Checkpoint contends that Dr. Asher's testimony does not "fit" the facts of the case, primarily because Dr. Asher reached his conclusion that Checkpoint was charging supracompetitive prices in the RF tag market from the hotly disputed factual proposition that ID Security was willing to enter the RF market at a promotional price of approximately 2.95 cents per tag or a regular price of 3 cents per tag, approximately half a cent lower than Checkpoint's price of 3.5 cents. Upon review of the relevant materials, the court concludes that Dr. Asher's economic model was itself sufficiently reliable to warrant the admission of his testimony into evidence for the reasons stated in *ID Sec. Sys. Canada, Inc. v. Checkpoint, Inc.*, 198 F.Supp.2d 598, 605 (E.D.Pa.2002).

That Dr. Asher's theory rested on a particular interpretation of a disputed fact in this case does not mean that his testimony, based on a methodology that the court previously found to be reliable, should have been excluded from evidence. Resolution of the question of whether ID Security was willing and able to enter the RF tag market at a price that undercut that of Checkpoint, was properly left to the jury. If the jury chose to credit the factual predicate on which Dr. Asher's economic theory operated, then it was also free to accept, if it so chose, Dr. Asher's suggestion that Checkpoint was charging supracompetitive prices in the RF tag market. Therefore, the court concludes that it did not err in admitting Dr. Asher's testimony into evidence, and Checkpoint is not entitled to a new trial on this point.

### iv. Evidence of patent enforcement activity

 Checkpoint next contends that it is entitled to a new trial because the court erred in allowing ID Security to introduce evidence of patent enforcement lawsuits brought by Checkpoint against would-be competitors in the RF tag market in order to show that Checkpoint had engaged in anticompetitive conduct. The court does not agree.

Generally, a patent holder who brings an infringement action to enforce its patent rights is "exempt from the antitrust laws, even though such a suit may have an anticompetitive effect," *In re Indep. Serv. Orgs. Antitrust Litig. CSU, L.L.C.*, 203 F.3d 1322, 1325 (C.A.Fed.2000), except in cases where (1) the asserted patent was obtained through fraud, *see LePage's, Inc. v. 3M*, 324 F.3d 141, 152 (3d Cir.2003); *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068–69 (C.A.Fed. 1998), or (2) the patent infringement suit is a "sham," i.e., the antitrust plaintiff can prove that the defendant's enforcement suit was "objectively baseless and subjectively motivated by a desire to impose

---

**13.** For a more detailed discussion of *Daubert*, see *infra* Part II.D.

collateral, anti-competitive injury rather than to obtain a justifiable legal remedy." *In re Independent,* 203 F.3d at 1325. It is undisputed that neither of these standard exceptions was implicated by the facts of this case. However, some courts have also recognized a third exception, that "patent owners may incur antitrust liability for enforcement of a patent ... where there is an overall scheme to use the patent to violate the antitrust laws." *Atari Games Corp. v. Nintendo of Am., Inc.,* 897 F.2d 1572, 1576–77 (C.A.Fed.1990); *see also Kobe, Inc. v. Dempsey Pump Co.,* 198 F.2d 416, 425 (10th Cir.1952) ("The infringement action ... in [itself was] not unlawful, ... but when considered with the entire monopolistic scheme which preceded [it] we think ... that [it] may be considered as having been done to give effect to the unlawful scheme.").[14] In this case, the court, ruling on a motion in limine, initially excluded evidence of Checkpoint's patent enforcement activities on the grounds that ID Security had pointed to no evidence in the record in support of the proposition that any of these exceptions applied. *See ID Sec.,* 198 F.Supp.2d at 627 n. 20.

However, at trial, ID Security cured this defect by pointing the court to the deposition testimony of Lucas Geiges, Checkpoint's former Senior Vice President for International Development, and that of Albert E. Wolf, Checkpoint's founder, both of whom suggested that Checkpoint in fact sued to enforce its patents in order to gain business advantage. Geiges testified at his deposition, ultimately presented at trial, that, with respect to Actron, "Checkpoint felt quite strong at that point that they had a case where if Actron wouldn't cooperate [by allowing Checkpoint to ac-

quire a major equity position in Tokai] they could force them out due to the patent litigation," and that Checkpoint wanted Actron out of business because Actron "was an unfriendly competitor." T.T. 5/8/02 (doc. no. 177) at 88. Moreover, in describing the course of the negotiations that led to Checkpoint's acquisition of the desired ownership interest in Tokai, Wolf detailed the manner in which Checkpoint used the threat of possible patent litigation of the type previously undertaken against Actron in Europe as leverage to obtain the ownership interest that it sought in Tokai and thus neutralize Tokai as a competing source of RF tags. T.T. 5/8/02 (doc. no. 177) at 89–96. Having revisited this evidence, and its clear bearing on Checkpoint's motivation for embarking on otherwise pro-competitive and protected patent litigation, the court concludes that the testimony of both Geiges and Wolf was properly admitted into evidence under the overall scheme exception to the prohibition against allowing patent enforcement activities to be used as evidence of anticompetitive conduct in antitrust suits. Therefore, the admission of this evidence, by itself, does not warrant a new trial for Checkpoint on the attempted monopoly claim.

### v. *Evidence of Meto and Mercatec acquisitions*

■ Checkpoint argues that the court erred in admitting evidence concerning Checkpoint's acquisitions of two RF tag manufacturers, Meto and Mercatec, and in allowing ID Security to argue in its closing that Checkpoint had ultimately excluded Meto, as well as Tokai and ID Security, from the RF tag market. In particular, Checkpoint asserts that it is entitled to a

---

**14.** As Checkpoint points out, some courts have questioned the continued viability of the overall scheme exception. *See Grip–Pak, Inc. v. Illinois Tool Works, Inc.,* 651 F.Supp. 1482, 1498 (N.D.Ill.1986); *United States v. Braniff*

*Airways, Inc.,* No. SA–77–CR–164, 1978 U.S. Dist. LEXIS 18623, at *116 n. 17 (W.D.Tex. Apr. 3, 1978). Neither *Atari* nor *Kobe* has, however, been overruled.

new trial on ID Security's attempt to monopolize claim on the theory that the evidence of the Meto and Mercatec acquisitions is irrelevant to the question of whether Checkpoint's actions in connection with the contract between ID and Tokai constituted an attempt to monopolize because both acquisitions occurred *after* the events involving the ID–Tokai contract and because neither company devoted a significant portion of its business to RF tags. The court does not agree that Checkpoint is entitled to a new trial on ID Security's attempt to monopolize claim on this basis.

ID Security counters, and the court agrees, that the evidence was relevant to the extent that Checkpoint's actions subsequent to its interference with the ID–Tokai contract could constitute circumstantial evidence of what its specific intent may have been at the time of that interference. To put it another way, the evidence of the Meto and Mercatel acquisitions bears on whether Checkpoint's actions in connection with the ID–Tokai contract were part of a larger, ongoing pattern of anticompetitive conduct on Checkpoint's part, and on whether Checkpoint specifically intended to control literally 100 percent of the RF tag market. As described in detail above, a finding of specific intent is necessary to both an attempt to monopolize claim, *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 442 (3d Cir.1997), and a § 2 conspiracy to monopolize claim. *United States v. Jerrold Electronics Corp.*, 187 F.Supp. 545, 567 (E.D.Pa.1960).

It is true, of course, that the probative value of this evidence is diminished by the fact that the acquisitions occurred after the events at issue in this case, and by the fact that neither company apparently had significant investment in RF tags. However, even if admitting the Meto and Mercatel evidence was error, such error was harmless. The record reveals that Checkpoint was able to undercut this evidence as to Checkpoint's intent by cross-examining extensively with respect to these companies' de minimis presence in the RF market. *See* T.T. 5/7/02 (doc. no. 172) at 64–65; T.T. 5/9/02 (doc. no. 176) at 84, 94–96. Therefore, the court concludes that the admission of this evidence did not prejudice Checkpoint, and does not warrant granting Checkpoint a new trial.

### 2. *Conspiracy to monopolize*

Checkpoint challenges the jury verdict on conspiracy to monopolize as supported by legally insufficient evidence. In order to succeed on a conspiracy to monopolize theory brought under § 2 of the Sherman Act, a plaintiff must prove: "(1) the existence of a combination or conspiracy to monopolize; (2) overt acts done in furtherance of the combination or conspiracy; (3) an effect on an appreciable amount of interstate commerce; and (4) a specific intent to monopolize." *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1028 (10th Cir.2002); *see also Friedman v. Del. County Memorial Hosp.*, 672 F.Supp. 171, 196 (E.D.Pa.1987); *Pontius v. Children's Hosp.*, 552 F.Supp. 1352, 1377 (E.D.Pa. 1982) (both stating the elements of a § 2 conspiracy to monopolize as "(1) an agreement or understanding between two or more economic entities, (2) a specific intent to monopolize, and (3) the commission of an overt act in furtherance of the alleged conspiracy").[15]

**15.** There is no Third Circuit authority setting forth the elements required for conspiracy to monopolize. In addition to the elements listed above, some lower courts within the Third Circuit have also required proof of a fourth element, namely that the antitrust defendant enjoy a "dangerous probability of success." *Urdinaran v. Aarons*, 115 F.Supp.2d 484, 491 (D.N.J.2000) (quoting *Farr v. Healtheast, Inc.*,

Within this framework, a plaintiff alleging antitrust conspiracy to monopolize under § 2 of the Sherman Act bears "the burden of providing sufficient evidence to establish that the conspirators 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Friedman*, 672 F.Supp. at 196 (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir.1980)). For the reasons set forth below, the court concludes that, even assuming that Checkpoint possessed the requisite intent, there was no legally sufficient proof to support a finding by a reasonable jury that Tokai, the target of Checkpoint's acquisitions efforts and the alleged co-conspirator in Checkpoint's alleged attempt to monopolize either the EAS systems foremarket or the RF tag aftermarket, shared Checkpoint's specific intent to monopolize.

a. *ID Security in fact proceeded under § 2, rather than § 1, of the Sherman Act.*

Before proceeding to an analysis of the merits of ID Security's § 2 conspiracy claim, the court must, as an initial matter, evaluate ID's assertion that its conspiracy claim was actually premised on a violation of § 1, rather than on § 2, of the Sherman Act. The import of this argument is that, if so, ID Security would be relieved on the burden of proving specific intent to monopolize on the part of Checkpoint and Tokai, and could prevail essentially on a showing that there was a conspiracy that had illegal objects, anticompetitive effects, and caused injury to ID. *See Syufy Enters. v. American Multicinema, Inc.*, 793 F.2d 990, 1000 (9th Cir.1986) ("[E]very combination or conspiracy that offends antitrust policy can easily be held to be an unreasonable restraint of trade, without the need for considering the additional complexities that flow from using the § 2 monopoly concept.") (quoting 3 P. Areeda & D. Turner, Antitrust ¶ 839 (1978)); *see also Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139, 147 (3d Cir.1981) (explaining the requisite elements of a § 1 claim). In this attempt, ID Security argues that a § 1 claim was stated in the complaint, argued to the jury, and charged by the court in both its preliminary and final instructions to the jury. Upon examination of the relevant materials and, given the evolution of this case, the court does not agree that ID Security stated a § 1 claim in the complaint, or that the case was tried on a § 1 theory of conspiracy, or that the jury was so charged. Instead, the court concludes that it properly instructed the jury on the § 2 conspiracy requirements.

In the complaint, ID Security did not identify or refer by name to § 1 or § 2 of the Sherman Act as the basis for its conspiracy claim. Curiously, while using the § 1 language "conspiracy to restrain commerce," the complaint plead specific intent, a requirement of § 2. Thus, the complaint states: "Checkpoint, Tokai and others so conspired with the *specific intent* of restraining and monopolizing trade and commerce in the relevant product and geographic market." Complaint ¶ 48 (emphasis supplied).

Second, as discovery unfolded in this case, it became clearer that ID Security was proceeding on a § 2 conspiracy theory, and not a § 1. During his deposition, Dr. Asher, ID Security's key expert, stated that he was not offering any opinions with respect to § 1 violations on the part of Checkpoint, and that his analysis focused on economic issues relating to a monopolization claim under § 2 of the Sherman Act. Asher Dep. at 10. Asher further

No. Civ. A. 91–6960, 1993 WL 220680, at *11 (E.D.Pa. June 9, 1993)).

explained that he was not offering any opinion regarding "any illegal conspiracy to restrain commerce," because he was not asked to do so. Asher Dep. at 11. No other expert testimony was presented by ID Security relating to a § 1 conspiracy.

Third, the proposed instructions submitted by ID Security shed further light on the nature of the case. ID Security invoked § 2 with the caption of the charge, which was styled "conspiracy to monopolize." Pl.'s Proposed Jury Instructions I.D.2. Moreover, the requested charge described the first element as

> First: That there was conspiracy between Checkpoint and Tokai to monopolize an appreciable amount of identifiable interstate or foreign commerce, which commerce plaintiff claims to be the disposable RF tag market.

Pl.'s Proposed Jury Instructions I.D.2. This language evokes the first element of a § 2 claim. *See* Kevin F. O'Malley, Jay E. Grenig & William C. Lee, Federal Jury Practice and Instructions, § 150.33 ("First: That there was a conspiracy between defendant ... and others to monopolize an appreciable amount of identifiable interstate or foreign commerce of the United States, which commerce plaintiff ... claims to be describe relevant market ....").[16]

Fourth, in its proposed jury verdict form ID Security sought that the jury answer the following question:

> Did defendant monopolize, attempt to monopolize, and/or *conspire to monopolize* trade or commerce in violation of the Sherman Act?

Pl.'s Proposed Verdict Form and Special Interrogatories to the Jury (emphasis supplied). Nowhere does ID Security seek that the jury determine whether Checkpoint conspired to "restrain trade" under § 1.

Fifth, the issue of whether the jury should be instructed on the basis of a § 1 or a § 2 claim was raised during the charge conference. T.T. 5/20/02 (doc. no. 200) at 49–50. On the one hand, defense counsel informed the court that "this is the first time I've heard ... that there was a Section 1 claim in this case ...." T.T. 5/20/02 (doc. no. 200) at 49.[17] This contention was disputed by ID Security's counsel. T.T. 5/20/02 (doc. no. 200) at 49–50. Ultimately, the court charged the jury on the specific intent requirement that is characteristic of a § 2 claim. T.T. 5/21/02 (doc. no. 202) at 204. This construction was consistent with the court's preliminary instructions to the jury, which also charged on the requirement of specific intent. *See* T.T. 4/26/02 (doc. no. 170) at 7–8. ID Security did not object to the inclusion of the specific intent requirement in the final

---

16. ID Security's proposed instruction is, in actuality, a potpourri of the elements of the suggested § 1 and § 2 conspiracy charges set forth in O'Malley, Grenig & Lee, Federal Jury Practice and Instructions. The second and third elements of ID Security's proposed conspiracy charge come from § 150.40 of that work, and pertain only to a § 1 conspiracy claim. However, the first element of a § 1 conspiracy charge, namely that there be a "conspiracy among some or all of the defendants ... to fix ... prices," O'Malley, *supra*, § 150.40, is completely absent from ID Security's proposed charge.

17. Although counsel and the court on occasion did refer to the claim as one for conspiracy to restrain trade, *see, e.g.*, T.T. 5/21/02 (doc. no. 202) at 179–80, 196, 203, these isolated references, in light of the overwhelming evidence that the case was tried and submitted to the jury on the basis of § 2, are insufficient to support a claim that the jury returned a verdict on conspiracy to restrain trade in violation of § 1, a claim that would not have required specific intent.

charge, just as it had not objected to the preliminary instruction on specific intent.[18] In fact, ID Security's sole objection to the conspiracy charge centered around its contention that an actionable claim of conspiracy was made out through Checkpoint's actions with entities other than Tokai, T.T. 5/20/02 (doc. no. 200) at 14–16, an issue totally unrelated to the need to show specific intent.

Finally, the final verdict sheet, of which ID Security twice indicated its approval, T.T. 5/21/02 (doc. no. 202) at 34–35, made no mention of a claim of any "conspiracy in restraint of trade," supposedly based on § 1 of the Sherman Act. Rather, the verdict sheet specifically required the jury to determine whether ID Security had proved by a preponderance of the evidence "its claim of conspiracy to *monopolize* commerce," a § 2 claim. ID Security also did not object during the jury charge to the court's use of the phrase "conspiracy to monopolize," rather than "conspiracy to restrain trade." *See, e.g.,* T.T. 5/21/02 (doc. no. 202) at 195, 204. It is thus clear that ID Security did not intend that a § 1 conspiracy claim be placed before the jury, and it cannot at this late date inject a new theory of liability with a different and lower threshold of proof.

**b. *ID Security's § 2 failure of proof***

■ As mentioned above, "[a] finding of specific intent by the person or persons involved either to achieve [an] unlawful end or to conspire to do so is necessary to establish a violation of [Section 2 of the Sherman Act].". *United States v. Jerrold Electronics Corp.,* 187 F.Supp. 545, 567 (E.D.Pa.1960). Given this requirement, a plaintiff alleging a § 2 conspiracy has the burden of producing sufficient evidence to establish that the alleged conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective," namely that of endowing one conspirator with monopoly power.[19] *See Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 111 (3d Cir.1980); *see also Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.,* 812 F.2d 786, 796 (2d Cir. 1987) ("Plaintiff's theory fails because it does not reasonably establish that any individual defendant except [the would-be monopolist] intended to create a monopoly; a plurality of actors sharing such an intent is required under section 2."); *Syufy Enters. v. American Multicinema, Inc.,* 793 F.2d 990, 1000–01 (9th Cir.1986) (" [W]e know of no authority that a Section 2 conspiracy may be established without some showing that more than one of the alleged co-conspirators had at least some

---

**18.** Neither Checkpoint nor ID Security objected any other aspect of the manner in which the jury was instructed on the § 2 conspiracy claim. Accordingly, the court has not reviewed the jury instructions for any other infirmity.

**19.** There is some debate among the circuits over whether proof of a relevant market and market power, although integral to a claim of monopoly, are required in a conspiracy to monopolize claim. *Compare, e.g., Salco Corp. v. Gen. Motors Co.,* 517 F.2d 567, 576 (10th Cir.1975) ("Specific intent to monopolize is the heart of a conspiracy charge, and a plaintiff is not required to prove what is the 'rele-

vant market.' ") *with Doctor's Hosp. of Jefferson, Inc. v. S.E. Med. Alliance, Inc.,* 123 F.3d 301, 311 (5th Cir.1997) ("To establish Section 2 violations premised on ... conspiracy to monopolize, plaintiff must define the relevant market."). It does not appear that the Third Circuit has taken a position on this issue. The court determines that it need not address the issue in this case, because, for the reasons set forth in this section, there is no legally sufficient evidence that Checkpoint and Tokai had the requisite specific intent to monopolize *either* the EAS market, which is the relevant market as a matter of law, or the RF tag market.

awareness that the underlying conduct was anticompetitive or monopolistic.").

The requisite intent "need not be proven by direct evidence but can be inferred from the practices of the defendants." *Jerrold Electronics Corp.*, 187 F.Supp. at 567. However, "[f]ederal antitrust law requires a plaintiff to introduce evidence that tends to exclude the possibility that the defendants acted independently or legitimately." *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 1002 (11th Cir. 1993) (recommendation to set prices low enough to inflict losses on a competitor "merely shows a desire to win on the basis of efficiently producing a product and selling it at a lower price than less efficient rivals."); *cf. also Yeager's Fuel, Inc. v. Pa. Power & Light Co.*, 953 F.Supp. 617, 639 (E.D.Pa.1997) (describing specific intent in the context of a § 2 attempted monopoly claim, and stating that "a mere intention to prevail over rivals or improve market position is insufficient. Even an intent to perform acts that can be objectively viewed as tending toward the acquisition of monopoly power is insufficient, unless it also appears that the acts were not predominantly motivated by legitimate business aims.").

The question before the court at this juncture is whether, even assuming that Checkpoint possessed the specific intent to monopolize either the RF tag or the EAS systems market, there was legally sufficient evidence from which a jury could infer that Tokai, in selling its business and assets to Checkpoint, shared in that intent, and therefore was Checkpoint's co-conspirator in the alleged conspiracy to monopolize. ID argues that five "offending" agreements, read together, reveal that Tokai was a co-conspirator in Checkpoint's alleged scheme to monopolize, because "Tokai clearly intended to eliminate ID Security when it agreed not to sell any more RF tags to ID Security and knew that would assist Checkpoint in monopolizing the market," and because "Checkpoint and Tokai both knew that the probable consequence of their actions would be to eliminate ID Security as a competitor." Mem. of Law by Pl. in Response to Mot. by Def. for Post–Trial Relief at 79, 80. For the reasons that follow, the court finds that the evidence at trial was not, in fact, legally sufficient to support such a finding with respect to either market.

In support, ID Security pointed the jury to the following facts:[20] (1) a February 13, 1997 agreement between Checkpoint and Tokai made Checkpoint the exclusive purchaser of Tokai's RF tags, *see* Exh. P–140, even though Tokai had been obligated to sell millions of RF tags to ID Security through May 1997 through preexisting contracts with ID Security, *see* Ex. P–1, P–30, (2) according to Checkpoint's Senior Vice President, Lukas Geiges, before Checkpoint and Tokai entered this agreement, Haneda had agreed, at Geiges' request, not to sign any letter confirming a three-year extension of Tokai's contract with ID Security, "or to do anything else that could further restrict Tokai's ability to sell all of its RF tags to Checkpoint," T.T. 5/6/02 (doc. no. 171) at 31, (3) Checkpoint and Tokai agreed on May 12, 1997 to extend their contract until December 31,

---

**20.** ID Security actually addresses these agreements in the course of its argument concerning a § 1 conspiracy, and offers no record citations whatsoever in relation to its § 2 claims. However, considering the basic similarities and degree of overlap between § 1 and § 2 Sherman Act claims, *see Syufy Enters. v. American Multicinema, Inc.*, 793 F.2d 990, 1000 (9th Cir.1986), it appears that these five agreements actually constitute ID's strongest proof of conspiracy under both provisions. Accordingly, the court will examine them for proof of Tokai's specific intent to endow Checkpoint with monopoly power, either in the RF tag or EAS market, in connection with ID Security's § 2 conspiracy claim.

1997, *see* P–144, (4) Tokai sold all of its assets to Checkpoint on November 10, 1997, *see* P–145, and (5) Tokai's parent company, Tokai Aluminum, decided that it would sell its aluminum laminate only to Checkpoint. *See* T.T. 4/30/02 (doc. no. 158) at 106. In addition, Geiges testified that Checkpoint's founder's "dream was to be the sole supplier of [RF] labels and maintain it." T.T. 5/2/02 (doc. no. 165) at 146.

The proffered evidence, even when viewed in a light most favorable to ID Security, establishes at most that Checkpoint desired to be the sole supplier, even a monopolist, in the RF tag market. On the other hand, however, the agreements and testimony offer absolutely no insight into whether the sale of Tokai's business to Checkpoint stemmed from a specific intent on the part of Tokai to endow Checkpoint with monopoly power, rather than from an independent and legitimate interest in exiting the RF tag business, *see U.S. Anchor,* 7 F.3d at 1002. The fact that Tokai breached its preexisting contracts with ID Security and ultimately sold its business to Checkpoint does not, without more, establish that Checkpoint and Tokai were engaged in a conspiracy to monopolize. *Cf. Syufy Enters.,* 793 F.2d at 1000 ("[A] supplier who licenses a product to another does not join the licensee in a conspiracy to monopolize merely because the licensee turns around and exploits the license for its own monopolistic purposes ... [A] specific intent to monopolize is required to make one a Section 2 conspirator."). Consequently, the court concludes that there was no legally sufficient evidence that would warrant a reasonable jury in finding that Tokai had the specific intent for Checkpoint to become a monopolist, either in the RF tag or the EAS market, and will

grant Checkpoint's motion for judgment as a matter of law on ID Security's § 2 conspiracy claim.

### c. *Checkpoint's motion for a new trial based on inconsistent jury verdicts*

 Checkpoint asserts that the verdict in its favor on ID Security's monopolization claim is inconsistent with the verdict rendered against it on conspiracy to monopolize, and that it is entitled to a new trial as a result. The court does not agree.

If the jury determined that the market for EAS systems constituted the relevant market in this case, the two verdicts are not at all inconsistent.[21] This is so because, with a market share of 25 percent in the EAS systems market, Checkpoint was clearly not a monopolist. Upon a showing that Checkpoint and Tokai shared the specific intent to monopolize, however, the jury could have concluded that Checkpoint was liable for conspiracy to obtain monopoly power in that market. Although Checkpoint argues that "there is no evidence whatsoever that Checkpoint conspired with anyone to monopolize the market for EAS systems," Mem. of Law in Support of Def.'s Mot. for Post–Trial Relief at 59, this argument is, in essence, a challenge to the legal sufficiency of the evidence against Checkpoint on specific intent, rather than an allegation that the jury verdicts were inconsistent. Therefore, the court concludes that, if it is determined on appeal that Checkpoint is not entitled to judgment as a matter of law on ID Security's conspiracy to monopolize claim, Checkpoint is not entitled to a new trial on the

---

**21.** It is true, as Checkpoint argues, that if the jury determined that the relevant market was the market for RF tags, the real possibility of inconsistency would exist. Checkpoint ques-

tions how it could be found to have conspired to monopolize a market in which it already held a 90 percent share, i.e., monopoly power.

ground that the jury verdicts in this case were irreconcilable.

### 3. *Antitrust injury*

 The Supreme Court has required that a plaintiff alleging any violation of the antitrust laws prove "antitrust injury," an injury "of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful," *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), and that reflects "the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.* With this principle in mind, and because "[t]he antitrust laws were enacted for 'the protection of *competition*, not *competitors*,'" *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)) (emphasis in original), the Third Circuit has consistently held that "an individual plaintiff personally aggrieved by an alleged anticompetitive agreement has not suffered an antitrust injury unless the activity has a wider impact on the competitive market." *Eichorn v. AT & T Corp.*, 248 F.3d 131, 140 (3d Cir.2001).

In this case, the issue presented in Checkpoint's alternative argument in favor of post-trial relief is whether, assuming that there was sufficient evidence to support a finding that Checkpoint was liable for attempt or conspiracy to monopolize, there was legally sufficient evidence to support a finding that ID Security had suffered a cognizable antitrust injury as a result of Checkpoint's conduct. Citing *Columbia Metal Culvert Co., Inc. v. Kaiser Aluminum & Chem. Corp.*, 579 F.2d 20 (3d Cir.1978) for the proposition that "the presence of independent producers in an oligopolistic market serves to limit the market power of the dominant firms, [such that] the departure of an independent producer in such a situation adversely affects competition," *id.* at 32, ID Security argues that Checkpoint's exclusion of ID Security from the RF tag market established injury to competition, because there was clear evidence at trial that ID Security was selling RF tags to customers for prices that were substantially below those of Checkpoint. Thus, according to ID Security, the jury could have concluded that by forcing ID Security out of the market, consumers were deprived of the benefits of market competition, both in the EAS and the RF tag markets, and the lower prices that such competition would ostensibly produce. For the reasons that follow, however, the court concludes, as Checkpoint asserts,[22] that there was no legally sufficient evidence to support such a finding in this case, given the lack of proof that ID Security was, in fact, charging lower prices for

**22.** The court notes that in its original motion for post-trial relief, Checkpoint raised two other contentions, (1) that the verdict against ID Security on its monopolization claim represented a finding by the jury that Checkpoint lacked the power to inflict an antitrust injury by charging supracompetitive prices, and (2) that ID Security failed to allege any harm that resulted from Checkpoint's allegedly supracompetitive RF tag prices, since ID Security was free to charge the same high price. *See* Mem. of Law in Support of Def.'s Mot. for Post–Trial Relief, at 32–38. Because ID Security ultimately clarified, however, that its exclusion from the RF market, rather than supracompetitive pricing on Checkpoint's part, constituted the basis for its antitrust injury, *see* Mem. of Law by Pl. in Response to Mot. by Def. for Post–Trial Relief, at 58, the court concludes that Checkpoint's original arguments, insofar as they incorrectly anticipated those advanced by ID Security, are inapposite to its consideration of whether ID Security proved that it suffered a cognizable antitrust injury.

RF tags, and that ID Security's exclusion had a wider impact on competition in either the EAS market or the RF tag market.

Most significantly, the evidence reveals that ID Security's presence had no impact on competition within the relevant market in this case, namely the market for EAS systems. Moreover, the evidence also reveals that, even within the narrow market for RF tags, ID Security left no competitive footprint. First, as ID Security's expert conceded at trial, Checkpoint maintained a constant price of 3.5 cents per tag from 1995 to 2000, T.T. 5/9/02 (doc. no. 176) at 49–50, regardless of the fact that, during that period, ID Security entered, participated in, and ultimately exited the RF tag market. Second, even though plaintiff's expert, Dr. Asher, claimed, in the course of rendering his expert opinion, that he saw "a number" of ID Security invoices memorializing sales of tags at a price of 3 cents per tag, T.T. 5/9/02 (doc. no. 176) at 75, the evidence actually introduced at trial reflects that ID Security

made only one actual sale in the RF tag market, namely a promotional sale of 2.7 million RF tags at an introductory price of 3 cents per tag. T.T. 4/29/02 (doc. no. 159) at 139–41. Third, ID Security's presence in the RF tag market was not intended to have the price reducing effect typically associated with competition. ID Security's President, Peter Murdoch, acknowledged that he expected to sell RF tags at prices in excess of Checkpoint's, and that he had undercut Checkpoint's price only inadvertently, as a result of incorrect information. T.T. 5/1/02 (doc. no. 164) at 95–96. Even viewing this evidence in a light most favorable to ID Security, the court concludes that there was no legally sufficient evidence to support a jury finding that the exclusion of ID Security had a wider impact on the RF tag market, much less on the market for EAS systems, and that ID Security therefore suffered an antitrust injury.[23] Accordingly, the court concludes that the lack of an antitrust injury in this case constitutes an alternative ground that warrants judgment as a matter of law to be entered in Checkpoint's favor.

**23.** The court is not persuaded, however, by Checkpoint's assertion that a finding of antitrust injury is foreclosed as a matter of law by the logic of *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6 (1st Cir.1999) and *Florida Seed Co., Inc. v. Monsanto Co.*, 105 F.3d 1372 (11th Cir.1997), cases in which a distributor unsuccessfully alleged antitrust injury in connection with the loss of its distributorship after its sole supplier was purchased by a company with which the supplier had previously competed. In both of these cases, the courts concluded that the distributor had not suffered antitrust injury, and thus lacked standing to bring an antitrust claim, essentially because the distributor, i.e., a sales representative, was neither a consumer nor a competitor, and that its exclusion could have no anticompetitive effect. *See Serpa*, 199 F.3d at 12; *Florida Seed*, 105 F.3d at 1374–75. The court notes that the facts of this case, however, are distinguishable from those of *Serpa* and *Florida Seed*. By 1996, Checkpoint and ID Security were sharing Tokai as a common supplier of

RF tags. As a result of Checkpoint's acquisition of a one-third ownership interest in Tokai, T.T. 5/6/02 (doc. no. 171) at 125–26, Tokai was selling a large volume of RF tags to Checkpoint at a loss, and made up for its shortfall by selling the remainder to ID and others at an increased price. *See* T.T. 5/8/02 (doc. no. 177) at 195; T.T. 5/13/02 (doc. no. 185) at 52. With a common supplier, Checkpoint and ID Security were aligned to compete directly with each other as distributors of RF tags. ID Security was therefore a competitor, rather than a mere distributor, and that its exclusion could have an anticompetitive effect and thus constitute a cognizable antitrust injury, is not a conclusion that can be foreclosed as a matter of law. As discussed in detail above, however, the fact that ID Security's exclusion had no wider impact on competition controls the court's finding that no reasonable jury could have concluded that ID Security suffered an antitrust injury in this case.

## C. Plaintiff's State Law Claims

The jury returned a verdict in favor of ID Security on both the tortious interference with contractual relations and unfair competition claims, and awarded a total of $19 million in damages. Checkpoint attacks the liability verdict as well as the damages award, and asks for judgment as a matter of law, or, in the alternative, a new trial on both counts.

### 1. *Tortious interference with contractual relations*

■ Pennsylvania law defines tortious interference with contractual relations as "inducing or otherwise causing a third person not to perform a contract with another ... without a privilege to do so." *Nat'l Data Payment Sys., Inc. v. Meridian Bank*, 212 F.3d 849, 856 (3d Cir.2000) (quoting *Glazer v. Chandler*, 414 Pa. 304, 200 A.2d 416, 418 (1964)), and requires a plaintiff alleging tortious interference with contractual relations to prove: "(1) the existence of a contractual relationship; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship; (3) the absence of a privilege or justification for such interference, and (4) damages resulting from the defendant's conduct." *Beidelman v. Stroh Brewery Co.*, 182 F.3d 225, 234–35

(3d Cir.1999) (citing *Triffin v. Janssen*, 426 Pa.Super. 57, 626 A.2d 571, 574 (1993)).[24]

Checkpoint has challenged the tortious interference verdict on three main fronts, supported by a plethora of arguments. First, Checkpoint asserts that it is entitled to judgment as a matter of law on the grounds that the evidence was legally insufficient to support a jury verdict against it. Second, and alternatively, Checkpoint contends that the jury charge on tortious interference was flawed in several key respects, and that the errors in the charge warrant a new trial. Third, Checkpoint asserts that evidentiary rulings made by the court at trial were errors warranting a new trial. The court will address all of Checkpoint's contentions seriatim below.

### a. *Evidence at trial*

In this case, Checkpoint asserts that it is entitled to judgment as a matter of law on ID Security's claim of tortious interference with contractual relations for two reasons: (1) that the court was required to find that the 1996 contract between ID Security and Tokai had been materially breached by ID Security's refusal to pay for tags, and therefore that the contract was not in existence as a matter of law at the time of Checkpoint's alleged interference, and (2) that the court was required to find that, even if ID Security's nonpayment for tags

---

**24.** The parties agree that Pennsylvania law supplies the elements of tortious interference with contractual relations. However, they disagree over whether the U.C.C., or the International Sale of Goods Act ("IASG") constitutes the applicable law under which the jury was to decide whether a contract was still in existence between ID Security and Tokai at the time that Tokai contracted with Checkpoint, or whether material breach and repudiation had terminated that ID–Tokai agreement. The issue of a possible conflict between these two laws was raised and discussed during the charge conference, at which all parties and the court concluded that there were no material differences between these laws, that the court's proposed instructions were accurate under both statutory compilations, and that there was no conflict. *See* T.T. 5/20/02 (doc. no. 200) at 50–58. Although ID Security now strenuously argues the applicability of the IASG, the court concludes, after a comparison of the two statutory sources, that there is no outcome-determinative conflict between them, and that, even under the UCC, the code that Checkpoint favors, Checkpoint is not entitled to judgment as a matter of law on ID Security's tortious interference claim.

did not destroy the ID–Tokai contract, ID Security repudiated that contract when it sought to force Tokai into signing a different contract with additional terms.

### i. *Material breach*

■ It is axiomatic that a defendant cannot be held liable for interfering with a contract that did not, in fact, exist at the time of the alleged interference. Thus, as a threshold matter, the court must examine whether there was legally sufficient evidence to support a reasonable jury in finding that a contractual relationship was in existence between ID Security and Tokai as of February 13, 1997 with which Checkpoint could have interfered. For the reasons that follow, the court concludes, contrary to Checkpoint's assertions, that there was legally sufficient evidence to warrant such a jury finding.

Citing provisions of the Pennsylvania Uniform Commercial Code, which allows a seller to cancel a contract with a materially breaching buyer, Checkpoint asserts that ID Security's decision to withhold payment for Tokai's tags in late 1996 in retaliation for the poor quality of Tokai's adhesive and for the fact that Tokai had sold source tags to Checkpoint in violation of their agreement, itself constituted a material breach. The import of this breach, according to Checkpoint, was that "Tokai was entitled as a matter of law to treat its Agreement with ID as breached ...." Mem. of Law in Support of Def.'s Mot. for Post–Trial Relief at 67–70. Checkpoint further asserts that the court may decide the materiality of ID Security's breach as a matter of law. *Id.* at 70. This argument puts the proverbial "rabbit in the hat."

Whether ID Security materially breached its 1996 agreement with Tokai, however, is a different question from whether a valid contract between ID Security and Tokai, in fact, was in existence as of February 13, 1997. This is so because, under the statutory provisions cited by Checkpoint, cancellation of a contract is but one of *many options* for a seller faced with a buyer's breach, even if that breach is material. *See* 13 Pa. Cons.Stat. Ann. § 2703 (listing cancellation as one of six options that a seller aggrieved by a buyer's failure to make payments when due "may" pursue); 13 Pa. Cons.Stat. Ann. § 2610 (stating aggrieved seller may "resort to any remedy for breach," or may "suspend his own performance," for example); 13 Pa. Cons.Stat. Ann. § 2612(c) (providing that, in an installment contract, a breach of the whole contract occurs "[w]henever nonconformity ... with respect to one or more installments substantially impairs the value of the whole contract" but setting forth conditions under which an aggrieved party may reinstate the contract). Because material breach gives the nonbreaching party the option, but does not compel it to treat the contract as terminated, the question is not, therefore, as Checkpoint suggests, whether Tokai would have been justified in terminating its contract with ID Security. Instead, the question is whether, even assuming a material breach by ID Security for its refusal to pay for the RF tags that it had received, Tokai cancelled its 1996 agreement with ID Security, and whether a jury would have been warranted in finding that Tokai did not, in fact, do so.

Viewing the evidence at trial in a light most favorable to ID Security, the court concludes that there was legally sufficient evidence to support a jury finding that ID Security's breach, even if material, did not result in Tokai's cancellation of the 1996 contract with ID Security. It is undisputed that, in connection with the poor quality of the adhesive on Tokai's tags, and with ID Security's perception that Tokai had breached their contract by selling source tags to Checkpoint, ID Security placed no additional tag orders in December 1996,

and withheld payments on tags that it had already received. T.T. 5/1/02 (doc. no. 164) 187–88, 191–93. Given the evidence introduced at trial, however, there is sufficient evidence in the record from which a reasonable jury could have found that, despite ID Security's actions, Tokai did not cancel the parties' contract after ID Security refused to pay invoices, but rather managed to resolve the dispute with ID Security through negotiation, which actually culminated in a three-year extension of their business relationship.

One, despite ID Security's refusal to pay for its tags, Tokai did not cancel the contract immediately, but, instead, Haneda agreed to meet with Murdoch in Amsterdam in January 1997 to discuss the dispute between their two companies. T.T. 4/29/02 (doc. no. 159) at 162. In the interim, the parties agreed that they "would be at a standstill position relative to the requirement of purchasing more tags and making additional payments . . . ." T.T. 4/29/02 (doc. no. 159) at 159. These circumstances, viewed together, suggest that the contract was to continue in effect until the dispute between the parties was resolved.

Two, Murdoch's testimony suggests that one purpose of the Amsterdam meeting between Checkpoint and Tokai was that of repairing and continuing the parties' relationship. According to Murdoch, he discussed with Haneda future plans for their two companies, including improvements to Tokai's adhesive and the inclusion of laser fuse designs in "the next delivery of the product," and "the ongoing requirement for deliveries using white instead of pink ink to distinguish [ID Security and Tokai's product] from Checkpoint['s] and to provide a better quality product." T.T. 4/29/02 (doc. no. 159) at 164–65. Moreover, Murdoch testified that he and Haneda "talked about [how] once the adhesive was fixed that production would begin

again." T.T. 4/29/02 (doc. no. 159) at 165. Murdoch also testified that "[i]t was agreed that . . . the source tag material would only be supplied to ID Systems and to no other customer." T.T. 4/29/02 (doc. no. 159) at 165. Therefore, viewing the evidence in a light most favorable to ID Security, the winner of the jury verdict in this case, if the jury credited Murdoch's testimony, it could have concluded, from this evidence of continued negotiation and discussion between the parties, that Tokai did not treat its 1996 contract with ID Security as cancelled as a result of Checkpoint's refusal to pay for tags.

### ii. *Repudiation*

Checkpoint next asserts that, assuming that the April 1, 1996 contract between ID Security and Tokai remained in place even after ID Security refused to pay for tags, ID Security repudiated that contract as a matter of law when it refused to pay for tags until Haneda signed a January 28, 1997 confirmation, which purported to introduce different terms into the existing contract, and to extend the contractual period for an additional three years. Quoting a comment to 13 Pa. Cons. Stat. Ann. § 2610, Checkpoint asserts, in substance, that "under a fair reading," ID Security's behavior amounted to a statement of intention not to perform the 1996 contract except on conditions that went beyond the contract, and, therefore, to a repudiation. *See* Mem. of Law in Support of Def.'s Mot. for Post–Trial Relief, at 70–71.

As an initial matter, the court notes that Checkpoint's argument on repudiation suffers from the same flaw that derails its argument concerning material breach. *See* discussion, *supra* Part II.C.1.a.i. The comment that Checkpoint cites in support of its position is actually attached to 13 Pa. Cons.Stat. Ann. § 2610, which provides the relevant law on a seller's options when

faced with a buyer's repudiation of their contract with respect to performance not yet due. 13 Pa. Cons.Stat. Ann. § 2610. The comment merely clarifies what kind of conduct may constitute "repudiation" for purposes of the statute; it does not mandate that the court must find repudiation as a matter of law under the circumstances that the comment describes. *See id.* Accordingly, the appropriate question is not whether Tokai may have been excused or justified in suspending performance under or canceling its 1996 contract with ID Security, but rather whether there was legally sufficient evidence to support a jury finding that Tokai did not, in fact, treat ID Security's actions as a repudiation of their agreement, whose provisions were otherwise to remain in effect until April 1, 1998. *See* Ex. P–1. Viewing all evidence in a light most favorable to ID Security, the court concludes for the following reasons that the evidence was legally sufficient to support such a finding.

First, there is evidence to suggest that, although ID Security suspended payment of invoices as of December, 1996, the relationship originally established between ID Security and Tokai was intended to continue at least up until the Amsterdam meeting. Murdoch testified that the suspension of payments, which Checkpoint asserts is the "strongest element in repudiation," was effected by agreement with Haneda, T.T. 4/29/02 (doc. no. 159) at 159. Moreover, evidence introduced at trial suggested, and the jury could have found, that the parties had agreed that the outstanding invoices would be paid. Murdoch testified that the parties agreed that half of all invoices due as of the time of the Amsterdam meeting would be paid at the end of January, and the other half at the end of February, provided that parties reached a written agreement memorializing the manner in which they had re-

solved their differences. T.T. 4/29/02 (doc. no. 159) at 169–70.

Second, although it is undisputed that Murdoch sought to introduce new terms into and to extend the term of ID Security's contract with Tokai, *see* P–57, insisted on obtaining a written memorialization of the purported changes, T.T. 4/29/02 (doc. no. 159) at 169–70, and intended that the second agreement would thereafter replace all preexisting agreements between ID Security and Tokai, T.T. 5/1/02 (doc. no. 164) at 205, those circumstances do not compel a finding that ID Security repudiated the 1996 contract prior to February 13, 1997, the date that Tokai made Checkpoint the exclusive purchaser of its tags. Rather, the jury could have concluded that Murdoch's written memorialization of the Amsterdam meeting represented only ID Security's proposed modifications to its existing contract with Tokai, and that, by refusing to sign the confirmation letter, Haneda merely rejected the proposed terms, but left in place the existing contract between the parties.

Third, as late as April 8, 1997, approximately two months after the announcement that Checkpoint and Tokai had entered into an exclusive business relationship, Tokai sent ID Security a letter terminating the ID–Tokai contract. T.T. 4/30/02 (doc. no. 158) at 32–33; P–75. Viewed in a light most favorable to ID Security, this letter provides legally sufficient evidence for a jury to have concluded that the 1996 agreement between ID Security and Tokai outlived, and was not repudiated by, the purported oral contract that the parties reached in January 1997, and was actually terminated by this letter, after Checkpoint had already induced Haneda not to sign ID Security's confirmation letter extending the duration and modifying the terms of their contract.

The above evidence, considered together and in the light most favorable to ID Security, supports a jury finding that the 1996 contract between ID Security and Tokai was in effect at the time that Checkpoint became the only purchaser of ID Security's RF tags, regardless of ID Security's refusal to pay outstanding invoices and its attempts to modify the existing agreement. Noting that Checkpoint has not contested the sufficiency of the proof on any of the other three prongs of the framework under which claims of tortious interference with contractual relations are evaluated, the court concludes that there was also legally sufficient evidence to support a jury finding against Checkpoint on ID Security's claim that Checkpoint tortiously interfered with its contractual relationship with Tokai, and will deny Checkpoint's motion for post-trial relief on this ground.

### b. *Jury instructions*

Rule 51 of the Federal Rules of Civil Procedure provides that "[n]o party may assign as error the giving or failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Fed.R.Civ.P. 51. A timely objection to jury instructions has the effect of preserving the issue for appeal, and of subjecting the instructions to plenary review for a determination of whether, as a whole, they stated the correct legal standard. *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 135 (3d Cir.1997). However, "a party who does not clearly and specifically object to a charge he believes to be erroneous waives the issue on appeal," is eligible only for "plain error" review of the charges to which he has untimely objected. *Alexander v. Riga*, 208 F.3d 419, 426 (3d Cir.2000); *see also Srein v. Frankford Trust Co.*, 323 F.3d 214, 224 (3d Cir.2003) (addressing a situation where the court

gave the wrong instruction and the plaintiff failed to object, and stating that "[t]his instruction was plainly wrong for what it said, and for what it didn't say. Although plaintiff failed to object to the instruction and omission before the court charged the jury, the plain error requires us to take cognizance of it and act"). These teachings direct that a district court also must utilize plain error review when deciding whether to grant a reversal or new trial based on objections untimely raised. *See Horowitz v. Fed. Kemper Life Assurance Co.*, 946 F.Supp. 384, 391 (E.D.Pa.1996).

In its motion for post-trial relief, Checkpoint maintains that the court erred by failing to instruct the jury on tortious interference in a total of four respects, and that Checkpoint is therefore entitled to a new trial. In particular, Checkpoint protests the court's failure to instruct the jury properly with respect to (1) the effect of mutual breach on the existence of an enforceable contract between ID Security and Tokai, (2) the effect of preliminary negotiations regarding an agreement on a party's ability to enforce terms of that agreement if the agreement was never actually finalized, (3) the role and particulars of an alleged tortfeasor's improper purpose, and (4) the jury's right to draw negative inferences regarding a party's failure to call certain witnesses in support of its case. Each of these claims is addressed seriatim below.

#### i. *Waiver and Checkpoint's conduct at trial*

In order "to preserve an issue for appeal, counsel must state 'distinctly the matter objected to and the grounds for that objection.'" *Smith v. Borough of Wilkinsburg*, 147 F.3d 272, 277 (3d Cir. 1998) (quoting Fed.R.Civ.P. 51). The requirement "ensures that the district court is made aware of and given an opportunity

to correct any alleged error in the charge before the jury begins its deliberations." *Id.* at 276 (citing *Fashauer v. N.J. Transit Rail Operations, Inc.,* 57 F.3d 1269, 1288 (3d Cir.1995)). Thus, "it is clear that by filing and obtaining a ruling on a proposed instruction a litigant has satisfied Rule 51." *Id.* (quoting *Bowley v. Stotler & Co.,* 751 F.2d 641, 646 (3d Cir.1985)). The issue before the court is, therefore, whether Checkpoint filed and obtained a ruling on Proposed Jury Instructions Nos. 40, 44(a), 51(b), 51(c) and 13.

■ Checkpoint contends that, even though it never raised specific objections to the exclusion of any of the instructions at issue or even mentioned them during the lengthy charge conference, it nonetheless preserved its objections to their exclusion by (1) submitting them to the court as proposed instructions prior to the charge conference, and (2) by issuing the blanket statement at the conclusion of the charge conference that it was Checkpoint's intent to "renew for the record . . . all the issues . . . raised [at the charge conference] and our requests for instructions that have been submitted to the court," T.T. 5/21/02 (doc. no. 202) at 34. For the reasons that follow, the court does not agree.

Checkpoint mistakenly relies on *Smith* in support of its position. In *Smith,* the Third Circuit concluded that counsel was not required to object formally to a charge after it had been given to the jury, when he had already submitted to the court a request for a specific charge and when his explicit objection to the court's charge had been rejected by the court during the

charge conference. *Id.* at 277–78. Specifically, the Third Circuit declined to erode the important prophylactic contained in the specific objection requirement:

> Of course, to preserve an issue for appeal, counsel must state "distinctly the matter objected to and the grounds of the objection." Whether that occurs in an objection to the charge, in a request to charge, or otherwise, should not be determinative of the waiver issue.

*Id.* Thus, *Smith* stands for the proposition that the timing of the objection is not critical, as long as that objection otherwise meets the requirements of Rule 51.

An examination of the record in this case reveals that Checkpoint's purported "objections" do not, in fact, meet the specificity requirement of Rule 51. At the opening of the charge conference, the court explained to the parties that the draft jury instructions that it had prepared upon review of the parties' submissions constituted the court's "tentative ruling" on the instructions that they had proposed, and stated that "if I have not included your proposed instruction, that means that I tentatively decided to deny your request . . . ." T.T. 5/20/02 (doc. no. 200) at 2. The court then invited comments and argument from the parties. T.T. 5/20/02 (doc. no. 200) at 2. Checkpoint never mentioned Proposed Instruction No. 40, 51(b), 51(c) or 13 during the charge conference. Although Proposed Instruction No. 44 did garner some mention, the specific sentence of whose omission Checkpoint now complains, was never discussed. T.T. 5/21/02 (doc. no. 202) at 18–20.[25] Indeed, the only

---

**25.** That Checkpoint's counsel used aspects of its Proposed Instruction No. 44(a) to challenge the charge proposed by the court at the charge conference does not preserve any objection with respect to the particular sentence that it now contends should have been included in the final charge, but which was, in fact, never specifically brought to the court's attention. In *Ryder v. Westinghouse Elec. Corp.,* 128 F.3d 128 (3d Cir.1997), the Third Circuit addressed preservation in a similar context involving an allegedly erroneous instruction that was contained in a paragraph immediately succeeding an instruction that counsel had

allusion to any of the four unmentioned proposed instructions is Checkpoint's counsel's nebulous aforementioned reference to preserving instructions submitted to the court. While the statement that Checkpoint's counsel intended to renew all issues raised at the charge conference and requests for instructions submitted to the court may encompass all objections that were raised at the charge conference in response to the court's proposed instructions, it does not preserve objections to the draft instructions that went unarticulated at the charge conference.

Instructive is *Cooney v. Booth*, 28 Fed. Appx. 148, 2002 WL 215556 (3d Cir.2002) (not precedential). There, on facts analogous to those present here, the Third Circuit found that the district court had not issued a final ruling on the proposed instructions at the time of the charge conference, and, absent a specific objection following the actual charge, the court had no way of knowing that its accommodation efforts during the charge conference had not been wholly successful. *Id.* at 150–51. Accordingly, by failing to alert the court specifically that the draft instructions had not satisfied Checkpoint's request for a particular charge, Checkpoint failed to

"ensure that the district court is made aware of and given an opportunity to correct any alleged error in the charge before the jury begins its deliberations." *Id.* (quoting *Smith*, 147 F.3d at 276). Because Checkpoint failed to make an appropriate objection, it has waived that objection. *See* Fed.R.Civ.P. 51. Given Checkpoint's waiver, Checkpoint may successfully obtain a new trial based on errors in the jury instructions if the omissions in question constitute plain error. *See Horowitz v. Fed. Kemper Life Assurance Co.*, 946 F.Supp. 384, 391 (E.D.Pa.1996) (citing *Fashauer v. N.J. Transit Rail Operations, Inc.*, 57 F.3d 1269, 1289 (3d Cir.1995)).[26]

"Plain errors are those errors that 'seriously affect the fairness, integrity or public reputation of judicial proceedings.'" *Osei–Afriyie v. Med. Coll. of Pa.*, 937 F.2d 876, 881 (3d Cir.1991) (quoting *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936)). The Third Circuit has cautioned that the "power to review errors in jury instructions which were not objected to at trial should be exercised sparingly; otherwise we risk emasculating the important policies served by Rule 51." *Fashauer*, 57 F.3d at 1289 (citations, internal quotation marks and in-

attacked at the charge conference; counsel had never challenged the purportedly erroneous instruction itself before appeal. *Id.* at 135 n. 9. The Third Circuit examined the charge and concluded that an objection to the contested instruction at the conference "would not have alerted the district judge to the error advanced on appeal," that the error had not been preserved, and that plain error review was therefore warranted. *See id.* at 135 n. 9. The same is true in this case. At the charge conference, having reviewed the court's proposed charge, Checkpoint referenced its Proposed Instruction 44(a) only to request that the court include its proposed instructions on the parties' intent to be bound by a future contract; at no point did it alert the court that it should instruct the jury that "[w]hen parties have agreed to enter into good faith negotiations to reach a contract,

the failure of the parties to finalize the subsequent contract does not entitle one of the parties to enforce what it believes should have been the terms of the subsequent contract." Proposed Jury Instruction No. 44(a). Therefore, the court was not alerted to the error of which Checkpoint now complains, and may review the issue untimely raised only for plain error.

**26.** Proposed Instruction 51(a) is the only proposed instruction that was properly preserved, and is thus subject to plenary review. With regard to this instruction only, the court will determine whether, as a whole, the jury instructions as give stated the correct legal standard. *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 135 (3d Cir.1997).

ternal indication of alteration omitted). Therefore, the error complained of should be noticed only if it "is fundamental and highly prejudicial, or if the instructions were such that the jury is without adequate guidance on a fundamental question and [the] failure to consider the error would result in a miscarriage of justice." *Id.* (internal quotation marks omitted). Thus, "[w]hen reviewing a jury instruction for plain error, the 'analysis must focus initially on the specific language challenged, but must consider that language as part of a whole.'" *United States v. Gambone,* 314 F.3d 163, 183 (3d Cir.2003) (quoting *United States v. Gordon,* 290 F.3d 539, 544 (3d Cir.2002)).

### ii. *Exclusion of Proposed Instruction No. 40*

■ In its first attack on the jury instructions issued in connection with ID Security's tortious interference claim, Checkpoint argues that it is entitled to a new trial on the ground that the court failed to instruct the jury in accordance with its Proposed Jury Instruction No. 40, which provided:

> If you find that ID and Tokai each committed a material breach of their contract, then neither party could recover from the other for breach of the contract. Accordingly, if you find that ID and Tokai each committed a material breach of their contract, then ID may not recover on its tortious interference claim against Checkpoint.

Checkpoint Proposed Jury Instruction No. 40. In particular, Checkpoint asserts that "[t]he Court's refusal to instruct the jury on the significance of the parties' material breaches meant that the jury was unaware of its duty to evaluate the record facts to determine if there was an enforceable contract as of the date of Checkpoint's alleged interference." Mem. of Law in Support of Def.'s Mot. for Post–Trial Relief, at 75.

The court does not agree, and for the reasons that follow, concludes that the omission of Checkpoint's material breach instruction did not constitute plain error.

First, the court issued sweeping and generally applicable instructions on contract law that would enable the jury to assess whether a valid agreement had been reached between the parties. In particular, the court explained that "[a] contract is a legally enforceable agreement between two or more competent parties who have each promised to do or refrain from doing some lawful act," T.T. 5/21/02 (doc. no. 202) at 209, and that "[f]or an agreement to exist, there must be a meeting of the minds. The very essence of any agreement is that the parties mutually assent to the same thing. Without such an assent, there can be no enforceable agreement." T.T. 5/21/02 (doc. no. 202) at 209–10.

Second, the court highlighted for the jury the importance of the existence of a contract between ID Security and Tokai to a finding that Checkpoint had tortiously interfered with that contract. Indeed, the court instructed the jury that "essential to a right of recovery [by ID Security under a claim of tortious interference with contractual relations] is the existence of a contractual and/or business relationship between the plaintiff and a third person other than the defendant," T.T. 5/21/02 (doc. no. 202) at 209, and that "[i]n order to recover on a claim of tortious interference with contractual relations, the plaintiff must prove by the preponderance of the evidence that ... there was a contractual relationship [in effect]." T.T. 5/21/02 (doc. no. 202) at 209.

Finally, with regard to the enforceability of such an agreement, the court emphasized that "the test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its

terms ...." T.T. 5/21/02 (doc. no. 202) at 211. Further elaborating on enforceability and using the example of the situation presented by an inquiry into whether an agreement between parties had actually been reached, the court specifically informed the jury, "[y]ou must decide the intentions of ID and Tokai with regard to being bound by the enforceable contracts between them. You may consider the conduct of ID and Tokai during the *course* of their relationship, including the surrounding facts and circumstances." T.T. 5/21/02 (doc. no. 202) at 211 (emphasis supplied).

Considering the instructions as a whole, the court finds that the absence of a specific instruction concerning the effect of mutual material breaches on the relationship between ID Security and Tokai did not leave the jury without adequate guidance on the fundamental question of whether a contract existed between ID Security and Tokai at the time of the interference of which ID Security complained, and therefore did not seriously affect the fairness, integrity or public reputation of judicial proceedings. *Cf. Big Horn Coal Co. v. Commonwealth Edison Co.*, 852 F.2d 1259, 1271–72 (10th Cir.1988) (finding no plain error in an instruction informing the jury that contractual duties had to be performed in "good faith" where the court failed to define "good faith" because in closing argument defense counsel argued that certain conduct constituted bad faith). Consequently, the court determines that the exclusion of Checkpoint's proposed mutual material breach instruction does not amount to plain error warranting a new trial.

iii. *Exclusion of Proposed Instruction No. 44(a)*

▇▇▇ In its second attack on the jury instructions issued in connection with ID Security's tortious interference claim, Checkpoint argues that the court erred in declining to instruct the jury in accordance with its Proposed Instruction No. 44(a), which read:

> When parties have agreed to enter into good faith negotiations to reach a contract, the failure of the parties to finalize the subsequent contract does not entitle one of the parties to enforce what it believes should have been the terms of the subsequent contract.

Checkpoint's Proposed Jury Instruction No. 44(a). Checkpoint argues, in essence, that the omission of this proposed instruction from the final charge left the jury without adequate guidance which would allow it to assess whether an actual agreement was in place between ID Security and Tokai following the January 1997 negotiations between the two companies, given that Haneda ultimately did not sign a letter confirming the terms of any accord that the two companies had reached. The court does not agree.

Checkpoint's argument is untenable because the proposed instruction whose exclusion Checkpoint now protests does not differ significantly in substance from the instruction that the court actually gave at trial in order to explain the import and consequences of so-called "agreements to agree." The court specifically instructed the jury that "[e]vidence of preliminary negotiations or an agreement to enter into a binding contract in the future does not alone constitute a contract." T.T. 5/21/02 (doc. no. 202) at 211. In this context, the inclusion of the omitted portion of Proposed Instruction No. 44(a) would be duplicative of, and less clear than, the instruction actually given, and the court must conclude that the omission of Checkpoint's proposed instruction did not constitute plain error, or, indeed, error at all.

iv. *Exclusion of proposed instruction 51(a)*

▇▇▇ Checkpoint argues, in its only properly preserved objection, that the

court erred in failing to instruct the jury on improper purpose as detailed in its Proposed Jury Instruction 51(a). For the reasons that follow, the court concludes that the exclusion of this instruction, given the jury instructions as a whole, did not result in the court's failing to advise the jury of the appropriate legal standard under which to evaluate whether an actor acted out of improper purpose for purposes of a tortious interference claim.

As an initial matter, relevant to a discussion of Proposed Instructions 51(b) and (c), in addition to a discussion of Proposed Instruction 51(a), the court notes that it issued a very broad instruction concerning improper purpose. In particular, the court informed the jury:

> It is an essential element of the plaintiff's claim to prove that the conduct of the defendant was improper. It is up to you to determine whether the conduct of the defendant was improper. In order to do so, you may consider the following factors: One, the nature of the defendant's conduct; two, the defendant's motive; three, the interests of the plaintiff with which the defendant's conduct allegedly interfered; four, the interest of the defendant which it sought to advance by its conduct; five, the social interest in protecting the freedom of action of the defendant and the contractual interest of the plaintiff; six, the proximity or remoteness of the defendant's conduct of the interference; and, seven, the relationship between the parties.

T.T. 5/21/02 (doc. no. 202) at 214–15. Checkpoint argues that even this broad charge failed to state the correct legal standard, given the state of the law.

Checkpoint's liberal reading of *Windsor Secs., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655 (3d Cir.1993) serves as the basis for all three of its objections to the charge given at trial. *Windsor* involved the sponsor of a mutual fund that had imposed restrictions on investors' ability to effect transfers among sub-accounts through third party agents. *Id.* at 657. The district court granted summary judgment against the fund's sponsor, in part on the grounds that, although the fund's sponsor had acted out of legitimate business motives, namely to exclude from the fund a particular type of contract that made up a fraction of the total portfolio but imposed increased risk and cost on all fund members, it nonetheless acted improperly by restricting the contracts between its members and the third party agents. *See id.* at 663. The question on appeal was, in part, whether the district court erred in so concluding. *Id.* at 663.

The Third Circuit opened its discussion of improper purpose with an acknowledgment that Pennsylvania looks to the seven factors listed in the Restatement (Second) of Torts § 767 in order to determine whether an actor's conduct is "proper." *Id.* at 663. In the course of the discussion that followed, the Third Circuit noted that the case law "support[s] [the fund sponsor's] contention that where an actor is motivated by a genuine desire to protect legitimate business interests, this factor weighs heavily against finding an improper interference." *Id.* at 665. Finding, as had the district court, that the excluded types of contracts were detrimental to the fund as a whole, *id.* at 665–66, the Third Circuit then concluded that "[g]iven our conclusion that ... the interests [that the fund sponsor] sought to advance were legitimate, we believe that the district court attached inadequate significance to its finding that Hartford acted with a legitimate business motive." *Id.* at 666.

Based on *Windsor*, Checkpoint first contends that the court erred in failing to instruct the jury in accordance with its

Proposed Jury Instruction 51(a), which stated that, in the terms set forth in *Windsor, see id.* at 665, that should the jury "find that Checkpoint was motivated by a genuine desire to protect its own legitimate business interests, despite its conflict with ID's interests, this factor must weigh heavily against finding that Checkpoint engaged in improper interference." Proposed Jury Instruction 51(a). Checkpoint argues that, without this instruction, the jury was left without appropriate guidance with which to consider Checkpoint's desperate need for a tag supply to meet its growing demand. The court does not agree.

Contrary to Checkpoint's allegations, the court properly instructed the jury within the teachings of *Windsor,* because it relied on the Restatement (Second) of Torts § 767, which the *Windsor* court explicitly acknowledged as the framework under which Pennsylvania courts evaluate improper purpose on tortious interference claims, *Windsor,* 986 F.2d at 663, almost verbatim as the basis for its jury charge. *Compare* Restatement (Second) of Torts § 767 *with* T.T. 5/21/02 (doc. no. 202) at 214–15. Within this framework is the specific directive that "the interests sought to be advanced by the actor" is properly considered in a determination of whether those acts are "proper." *See* Restatement (Second) of Torts § 767. Indeed, this directive, which was clearly included by the court in the jury instructions given in this case, serves as the basis for *Windsor*'s elaboration on the role of legitimate business interests in a finding of improper purpose. *See Windsor,* 986 F.2d at 663.

In addition, the Restatement (Second) of Torts § 767 invites consideration of the "nature of the actor's conduct," "the actor's motive," and "the social interests in protecting the freedom of action in that actor." Restatement (Second) of Torts

§ 767. Thus, three additional prongs of the Restatement inquiry, with which the jury was instructed in this case, implicate consideration of whether a party accused of tortious interference acted out of a genuine desire to protect legitimate business interests. Therefore, the court's refusal to instruct the jury according to Checkpoint's Proposed Jury Instruction No. 51(a) and highlight further the role of a genuine desire to protect legitimate business interests did not result in the court's using the incorrect legal standard in this case, and does not warrant a new trial for Checkpoint on ID's tortious interference claim.

v. Exclusion of Proposed Jury Instruction *No. 51(b)*

■ Checkpoint also maintains that the court erred in not instructing the jury according to its Proposed Jury Instructions 51(b), which expounds in detail on what constitutes improper conduct for purposes of a tortious interference claim. Because Checkpoint failed to preserve this objection, *see* discussion, *supra* Part II.C.1.b.i., the court will examine whether the exclusion of Proposed Instruction No. 51(b) constitutes plain error warranting a new trial. The applicable inquiry is, therefore, whether the error complained of "is fundamental and highly prejudicial, or if the instructions [were] such that the jury [was] without adequate guidance on a fundamental question and [the] failure to consider the error would result in a miscarriage of justice." *Fashauer v. N.J. Transit Rail Operations, Inc.,* 57 F.3d 1269, 1289 (3d Cir.1995). This is a standard that Checkpoint's objections do not meet.

Checkpoint's Proposed Jury Instruction 51(b), and 51(c) add nothing substantive to the charge given by the court. Rather, the court's instructions were in keeping with Restatement (Second) of Torts § 767,

the established law in Pennsylvania. Checkpoint's Proposed Jury Instruction No. 51(b) provides:

> In determining whether Checkpoint's conduct was proper or improper, you must consider Checkpoint's intent and purpose. If you find that Checkpoint did not act criminally or with fraud or violence or other means wrongful in themselves, but was endeavoring to advance some interest of its own, the fact that Checkpoint may have been aware that it would cause interference with ID's contract with Tokai may be regarded by you as such a minor and incidental consequence and so far removed from Checkpoint's objective that, as against ID, the interference may be found to be not proper.

Proposed Jury Instruction No. 51(b). For the reasons that follow, the court finds that this instruction adds nothing of substance to the charge given to the jury, and that, instead, it risks confusing the issues for their consideration, and unduly biasing them in favor of Checkpoint.

First, the court's instruction that the jury consider the nature of the defendant's conduct, the defendant's interest, and the social interest directs the jury to consider whether the defendant used wrongful means as set forth in Checkpoint's proposed instruction. In this context, specific references to criminal, fraud or violent activity would confuse the jury as to the issues for their consideration, as no such allegations of wrongdoing were raised in the course of this trial.

Similarly, Checkpoint's remoteness instruction was also encompassed within the broad charge given by the court, which admonished the jury to consider the proximity and remoteness of the defendant's conduct, essentially as they saw fit, and taking into account the other six factors for their consideration. T.T. 5/21/02 (doc.

no. 202) at 214–15. Checkpoint's proposed charge seeks, however, to lead the jury subtly to a way of viewing the evidence in a light most favorable to Checkpoint, by highlighting one way in which the jury "may" regard the evidence. That the court did not cabin the jury's inquiry on this point with the language proposed by the defendant does not, therefore, constitute an error, much less plain error warranting a new trial.

### vi *Exclusion of Proposed Jury Instruction No. 51(c)*

Checkpoint's allegation of error regarding its Proposed Instruction 51(c) falters for similar reasons. The proposed instruction at issue submitted by Checkpoint provides:

> A contract is terminable at will if a party is free to terminate his relation with the other party when he chooses. If you find that Tokai or ID could have terminated the April 1, 1996 contract at any time prior to February 13, 1997 as a result of a breach .by the other party, then, even if you find that Checkpoint interfered with the contract between ID and Tokai, Checkpoint's conduct was not improper if:

a. The subject matter of the contract involved competition between ... Checkpoint and ID;

b. Checkpoint did not employ wrongful means;

c. Checkpoint's act did not create or continue an unlawful restraint of trade; and

d. Checkpoint's purpose was at least in part to advance its interests in competing with ID.

It is for you to decide whether Checkpoint's conduct was improper or not under the circumstances. You must decide whether Checkpoint employed wrongful means in allegedly interfering with the

contract between ID and Tokai. "Wrongful means" is conduct which is itself capable of forming the basis of liability for Checkpoint. Examples of such conduct constituting wrongful means include, but are not limited to, violence, fraud or criminal prosecutions. If you find that the contract between ID and Tokai was terminable at will, and if you find that Checkpoint's conduct was not improper for the reasons described above, then your verdict must be for Checkpoint on the tortious interference claim.

Proposed Jury Instruction No. 51(c). The court finds that it was not error to withhold this instruction.

First, the court, in the course of its charge, instructed the jury on the law of contract, and, in particular, on a contract's possible repudiation or termination in relation to the claims of the parties in this case, *see* T.T. 5/21/02 (doc. no. 202) at 209–14, so that additional instruction at this point would be duplicative and unnecessary. In addition, as set forth above, the proposed direction on wrongful means was encompassed in the broad charge given to the jury, and, with its references to criminal and violent activity, runs the risk of confusing the issues in this case.

Second, and most significantly, the charge given by the court allows the jury to consider all the factors that make up the elements of the competitor's privilege charge proposed by Checkpoint here. The charge given instructed the jury to consider the *nature* of the defendant's conduct. Thus, if confronted with an appropriate factual scenario, the charge given invites the jury to consider, for example, whether Checkpoint used wrongful means, or created or continued an unlawful restraint of trade. Moreover, under the court's charge, the jury was to consider the defendant's motive, the defendant's interests, and the plaintiff's interests. This broader inquiry subsumes Checkpoint's proposed direction that the jury consider the subject matter of the contract at issue or that the defendant's purpose might be, at least in part, to advance its interests in competing with ID Security. Therefore, the court concludes that its refusal to charge the jury in accordance with Checkpoint's Proposed Instruction No. 51(c) did not constitute plain error warranting a new trial

### vii. *Exclusion of Proposed Jury Instruction No. 13*

In its final challenge to the jury instructions given in connection with ID's tortious interference claim, Checkpoint contends that the court erred in refusing to give a negative inference instruction in connection with witnesses Angel and de Nood's failure to testify on behalf of ID Security.[27] Checkpoint points out that Angel and de Nood, Murdock's business partners, were referenced at numerous points throughout the litigation by Murdoch, who claimed that he consulted with them on his business dealings with Tokai, that they were present at a January 20, 1997 meeting with Murdoch and Haneda, and that they entered into an oral agreement with Phillips regarding its manufacture of Tokai tags. As a result, Checkpoint argues, a negative inference instruction was warranted because, in its absence, Murdoch could testify without running the risk of contra-

---

**27.** Checkpoint proposed the following instruction:

> If a party fails to call a person as a witness who has knowledge about the facts in issue and who is reasonably available to the party, and who is not equally available to the other party, then you may infer that the testimony of that person is unfavorable to the party who could have called the witness but did not.

Proposed Instruction No. 13.

diction, and the court's ultimate charge to the jury did not properly instruct the jury on the manner in which it should assess Murdoch's credibility. Noting that Checkpoint appears to have misconstrued the reasons and the showing necessary for a missing witness instruction to be given, the court does not agree.

"A 'missing witness' instruction is permissible when a party fails to call a witness who is either (1) 'favorably disposed' to testify for that party, by virtue of status or relationship with the party or (2) 'peculiarly available' to that party, such as being within the party's 'exclusive control.'" *Grajales–Romero v. Am. Airlines, Inc.*, 194 F.3d 288, 298 (1st Cir.1999); *see also United States v. Hines*, 470 F.2d 225, 230 (3d Cir.1972) ("The applicability of a 'missing witness' inference is based on the 'simple proposition that if a party who has evidence which bears on the issue fails to present it, it must be presumed that such evidence would be detrimental to his cause.'"). "The decision to give a missing witness charge 'lies in the sound discretion of the trial court,'" *United States v. Abelis*, 146 F.3d 73, 84 (2d Cir.1998) (quoting *United States v. Torres*, 845 F.2d 1165, 1170–71 (2d Cir.1988)), and the party seeking the instruction bears the burden of proving that it is warranted in a particular case. *See United States v. DeLuca*, 137 F.3d 24, 38 (1st Cir.1998). Checkpoint has failed to meet this burden of proof in its motion for post-trial relief.

First, although it is clear that de Nood and Angel, as Murdoch's business partners, could be expected to be favorably disposed toward ID Security, Checkpoint has failed to show that de Nood and Angel were, in fact, "peculiarly available" or "under the exclusive control" of ID Security. Indeed, it appears that Checkpoint never took steps to ascertain whether this was, in fact, this case. For example, as the court noted at trial, although it took other discovery abroad, Checkpoint never attempted to use the protocol available under the Hague Convention to depose de Nood. T.T. 5/17/02 (doc. no. 196) at 119. As a matter of process, in fact, it appears that both Angel and de Nood, as Dutch citizens living abroad, would be equally available and/or unavailable to both Checkpoint and ID Security, a fact that strongly militates against the court's issuing an instruction in this case. *Cf. United States v. Vastola*, 899 F.2d 211, 235 (3d Cir.1990), *vacated on other grounds*, 497 U.S. 1001, 110 S.Ct. 3233, 111 L.Ed.2d 744 (1990) ("A missing witness instruction is not appropriate when the witness is available to both the defense and the prosecution.").

Second, not every witness who possesses some knowledge of the facts at issue needs to be made the subject of the missing witness inference. *See Hines*, 470 F.2d at 230. Rather, "[t]he witness must appear to have 'special information relevant to the case, so that his testimony would not merely be cumulative.'" *Id.* (quoting McCormick, Evidence § 249 at 534 (1954)). Angel, for example, was barely mentioned at trial, and Checkpoint has pointed to no special information that he could offer the court, even had he appeared. Moreover, with respect to de Nood, ID Security was advised at trial, in the presence of Checkpoint's counsel, that the court was concerned that de Nood would not make an appropriate rebuttal witness because "[a]ll the information that Mr. de[ ]Nood apparently intended to provide in this case was testified to in extenso during the case in chief ...." T.T. 5/17/02 (doc. no. 196) at 113. Checkpoint has since offered no suggestion to the contrary.

Third, with respect to de Nood, it cannot truly be said that de Nood was a missing witness. In Houdini-like fashion, de Nood, in fact, appeared suddenly in court at the

end of trial, ostensibly intending to testify as a rebuttal witness for ID Security. Checkpoint strenuously objected to de Nood's testimony, and the court ultimately agreed to exclude his testimony. *See* T.T. 5/17/02 (doc. no. 196) at 112–20. Having objected to the testimony of a witness actually in court, Checkpoint cannot be heard to complain that de Nood was missing from trial at the plaintiff's behest.

Finally, with respect to Angel, from the sparse references to Angel at trial it can be deduced that, contrary to Checkpoint's recent assertions, he was not a central player in the events that were key to ID Security's claims. Thus, the court concludes that declining to charge the jury with a missing witness instruction with respect to Angel was not error, much less a fundamental or highly prejudicial one warranting a new trial in this case.

#### c. *Evidentiary objections*

Rule 61 of the Federal Rules of Civil Procedure provides in relevant part that "[n]o error in either the admission or the exclusion of evidence and no defect in any ruling or order … is ground for granting a new trial or for setting aside a verdict … unless refusal to take such action appears to the court inconsistent with substantial justice." Fed.R.Civ.P. 61. In this case, Checkpoint has produced a laundry list of evidentiary objections which, it contends, entitle it to a new trial. In particular, Checkpoint contends that the court erred in excluding (1) three letters authored by Haneda, notwithstanding the fact that they constitute verbally operative acts and therefore fall outside of the ambit of the hearsay rule, (2) affidavits supplied by Haneda, (3) certain Tokai invoices, (4) post-February 1997 evidence of Checkpoint's knowledge of ID Security and Tokai's contractual relationship, (5) portions of Geiges' testimony relating to that post-

February 1997 knowledge, and (6) portions of Mears' deposition. Each of these issues is addressed seriatim. None entitles Checkpoint to a new trial.

##### i. *Exclusion of Haneda letters*

The Federal Rules of Evidence define hearsay as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). However, "[t]he hearsay rule excludes [from its reach] 'verbal acts,' statements which themselves 'affect[ ] the legal rights of the parties or [are] circumstance[s] bearing on conduct affecting their rights.'" *United States v. Tyler*, 281 F.3d 84, 98 (3d Cir.2002) (quoting Fed.R.Evid. 801(c) advisory committee's note). The hearsay rule, therefore, distinguishes between those utterances that commit the speaker to a course of action, rather than making any claims of truth, and those that narrate, describe or otherwise convey information, which is only useful if true. *United States v. Montana*, 199 F.3d 947, 950 (7th Cir.1999). The former statements are admissible verbal acts, while the latter types of utterances constitute inadmissible hearsay. *See id.* In this case Checkpoint asserts that, independent of the truth of their content, the content of exhibits D–38, D–61 and D–88, constituted legally operative verbal acts, and therefore fall outside of the definition of hearsay, such that the court erred in excluding them from the evidence at trial, a prejudicial error that now warrants the grant of a new trial. Upon examination of both the letters in question, and the context in which they were offered, the court does not agree.

Exhibit D–61 is a December 9, 1996 letter from Haneda to Murdoch that states, in its entirety: "As shown in the attached paper, we have two Due Date Invoices, but until now we do not have any

instruction through our Bank. Please urgently inform us when did you make bank transfer on these two Invoices by return Fax within today." Exhibit D–88 is a December 17, 1996 letter from Haneda to Murdoch that states, in relevant part, "We have the following three Invoices of the due date. Please urgently inform us of the dates of your payments by return fax." The letter then lists the amounts of three ostensibly past-due invoices, totaling $444,300. Checkpoint characterizes the contents of these letters as "demands for performance" under ID Security's contract with Tokai, and asserts that, as such, they are verbal acts outside of the ambit of the hearsay rule. It attempts to bolster its argument with assertions that the letters commit Tokai to a "particular legal position," and that the letters placed ID Security on notice of allegations of breach and that Tokai would undertake a specific course of action. The court does not agree.

This is so because Exhibits D–61 and D–88 do not in fact purport to change the legal relationship of the parties in any way, nor are they properly characterized as circumstances bearing on the parties' rights. See Tyler, 281 F.3d at 98. The letters contain no mention of a change in Tokai's legal position, but merely relate naked allegations by Tokai that ID Security has failed to pay invoices. Indeed, Checkpoint attempted to use the letters during trial in the context of extracting from Murdoch on cross-examination whether, and in what amount, ID Security owed Tokai in unpaid invoices for RF tags; Checkpoint's counsel asked not a single question purporting to determine whether the letters committed Tokai to any legal course of action, including terminating the contract for breach. See T.T. 5/1/02 (doc. no. 164) at 180–87. Accordingly, the court concludes, upon consideration of Checkpoint's motion for post-trial relief, that it properly excluded

exhibits D–61 and D–88 from evidence as inadmissible hearsay.

Exhibit D–38 is a February 24, 1997 letter from Haneda to Murdoch. Referring to the April 1, 1996 letter agreement between ID Security and Tokai, the letter indicates in its first sentence that Haneda was "responding to [Murdoch's] facsimile letter of February 20, 1997 and referring to the letter agreement of April 1, 1996 between ID Security... and Tokai ... which was amended through the letter agreement of September 19, 1996 ...." The letter then states (1) that it is a "[r]equest for correction and notice of termination of the Agreement," (2) that Tokai "hereby request[s] ID to correct ID's breach of the terms of the Agreement described bellow (sic) within thirty (30) days after the receipt of this letter," (3) the amounts that Tokai contends that ID Security owes on unpaid tag invoices, in breach of their agreement, (4) that ID Security has failed to purchase its minimum monthly quota of tags starting in December 1996, (5) that ID Security was unjustified in cancelling its December 1996 tag order on the basis of the poor quality of Tokai's tags "[b]ecause ID has known the quality of Tokai's product from the beginning of the term of the Agreement ...," (5) that Tokai would terminate its contract with ID Security if ID Security did not correct its alleged breaches within 30 days, (6) that ID Security had "no excuse to fail to make the payment as stated above" and that Tokai had not breached any part of the agreement because it never sold source tags to any third party, including Checkpoint, and (7) in its last sentence, that Tokai reserves the right to claim any damages caused by ID Security's breach of the Agreement. The court considered the first and last sentences to be verbal acts, and allowed only those portions of D–38 to be read to the jury.

T.T. 5/2/02 (doc. no. 165) at 35. Checkpoint requested that the court admit this letter in its entirety as a verbal act, on the theory that the letter was notice of termination and that the reasons for the termination should also be admitted. T.T. 5/2/02 (doc. no. 165) at 31. The court did not agree at trial, and does not agree now.

First, the only language which relates to any sort of action taken by Tokai is contained in the first sentence, which indicates that the letter is the response to Murdoch's fax, and the last sentence, which indicates that Tokai, through that language, is officially reserving its rights to damages. The other content clearly relates to amounts owed and allegations of breach. Second, despite his initial assertion that the entire document constituted a verbal act, Checkpoint's counsel informed the court that the document was, indeed, actually being offered for the truth of its content. The court specifically asked Checkpoint's counsel at side bar whether Checkpoint was contending that the statements contained in the letter were the "real reason" for ID Security's termination. T.T. 5/2/02 (doc. no. 165) at 33. Checkpoint's counsel replied, "sure," and later protested, "we don't have a witness." T.T. 5/2/02 (doc. no. 165) at 33.[28] Because D–38 was offered for the truth of its content, and not as a verbal act, the court concludes that it constitutes inadmissible hearsay correctly excluded at trial.

ii. *Exclusion of the Haneda affidavits*

██ In its next attack on the verdict in ID's tortious interference claim, Checkpoint contends that the court erred in excluding in limine affidavits sworn by Haneda, who could not be compelled to appear in this trial, but who had sworn the affidavits in question in connection with 1997 litigation between ID Security and Tokai over alleged breach of Tokai's obligations under an exclusivity agreement. Checkpoint contends, in essence, that, contrary to the court's ruling on the ID Security's motion in limine, Haneda's affidavits were trustworthy, and that the interests of justice militate strongly in favor of the affidavits' admission under Rule 807 of the Federal Rules of Evidence, the residual exception to the hearsay rule. Checkpoint asserts that the exclusion of the Haneda affidavits constitutes prejudicial error warranting a new trial. The court does not agree.

Checkpoint's arguments rehash those earlier presented at the hearing on the motion in limine to exclude the Haneda affidavits. At that time, the court considered whether the affidavits in question should be admitted pursuant to Rule 807, the residual exception to hearsay, which provides for the admission of otherwise excludable hearsay statement, if the statement meets five requirements: trustworthiness, materiality, probative importance, interest of justice and notice. *See Coyle v. Kristjan Palusalu Maritime Co., Ltd.,* 83 F.Supp.2d 535, 545 (E.D.Pa.2000). At the hearing on ID Security's motion in limine, the parties hotly contested the trustworthiness and interests of justice prongs. *ID Sec. Sys. Canada, Inc. v. Checkpoint, Inc.,* 198 F.Supp.2d 598, 624–25 (E.D.Pa.2002). Checkpoint has advanced no argument that shows that the court's decision to

---

**28.** Checkpoint now contends that D–38 should be admissible to show Haneda's state of mind, i.e., his dissatisfaction with Checkpoint. Given counsel's representations to the court at sidebar, however, this is not the purpose for which the letters were offered at trial, *see* T.T. 5/2/02 (doc. no. 165) at 33. Because Checkpoint did not assert Haneda's state of mind as a basis for admission at trial, it may not now do so in a motion for post-trial relief. *See* Fed.R.Evid. 103(a).

exclude Haneda's affidavits on the basis of their untrustworthiness[29] was error.

■ As the court explained in its ruling on the motion in limine, seven factors bear on the trustworthiness of purported evidence, namely whether (1) the declarant was known and named, (2) the statement was made under oath and penalty of perjury, (3) the declarant "was aware of the pending litigation at the time he made the declaration and thus knew that his assertions were subject to cross examination," (4) the statements were based on personal observation, (5) the declarant was not employed by the plaintiff at the time of the statements, and thus had no financial interest in the litigation's outcome, (6) the affidavit was corroborated, and (7) the declarant's position and background qualified him to make the assertions. *See Bohler–Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 113 (3d Cir.2001). It is undisputed that Haneda, a known declarant, gave the statements in question under oath and penalty of perjury, and "to the extent that the affidavits note Haneda's reflection of the events at the Amsterdam meeting and the ongoing relationship between ID Security and Tokai, the affidavits are also based on his personal knowledge of those events and circumstances." *ID Sec. Sys.*, 198 F.Supp.2d at 626. These considerations mitigate in favor of the admission of Haneda's statements.

However, Haneda's affidavits falter on the fifth prong of the *Bohler–Uddeholm* inquiry. As the court explained, Haneda's affidavits are not sufficiently trustworthy to warrant their admission under Rule 807 because (1) at the time that he swore the affidavits, Haneda was Tokai's president and a member of Tokai's board of directors, was employed by the party on whose behalf he had filed the affidavits in 1997, and therefore had a financial interest in the outcome of the case, and (2) Haneda's refusal to cooperate in this trial as the result of an employment dispute with Checkpoint, indicated an "apparent willingness to withhold testimony to fit his purpose," and was probative of the trustworthiness of the testimony that he had offered in the earlier litigation. *Id.* at 626. That Checkpoint now asserts that ultimately "[t]he Affidavits are sufficiently trustworthy because they were corroborated, *at least in part,* by the evidence of record," Mem. of Law in Support of Def.'s Mot. for Post–Trial Relief, at 89 (emphasis supplied), an argument not advanced by Checkpoint during the pre-trial hearing, does nothing to undermine the court's findings during the motion in limine before a trial had occurred, and does nothing to remove the taint that Haneda's existing financial interest and refusal to cooperate placed on the trustworthiness of his statements.

29. Checkpoint has reasserted its previously articulated argument that the interests of justice warrant admission of Haneda's affidavits, on the theory that Checkpoint otherwise lacked the ability to counter Murdoch's testimony. The court considered this argument as it ruled on the motions in limine in this case, and concluded, then as now, that Checkpoint's difficulty in presenting its side of the story was equally counterbalanced by the fact that, unlike Murdoch's statements, the truth of Haneda's affidavits had "never been tested on the crucible of cross-examination," *ID Sec. Sys.*, 198 F.Supp.2d at 625. In this context,

the crux of the arguments on the admissibility of the Haneda affidavits rested, and continues to rest, on Haneda's trustworthiness. That the court commented, in connection with the sudden appearance of a new witness for ID Security after Checkpoint had rested its case at trial, that it found Mr. Murdoch's testimony concerning the reasons for the witness' appearance, "not credible," T.T. 5/17/02 (doc. no 196) at 118, does not constitute a finding as to Murdoch's overall credibility, and is, in any event, wholly irrelevant to the admissibility calculus that involved only Haneda and occurred before trial.

### iii. *Exclusion of Tokai invoices*

■ Checkpoint next argues that the court erred in excluding from evidence exhibits D–346, D–349 and D–350, three invoices that reflected that ID Security owed over $874,000 in past due invoices, on grounds that they qualified for the business exception to hearsay, pursuant to Fed. Civ. Evid. 803(6), because, in the absence of a Tokai employee knowledgeable about invoice generation during the relevant time period, Murdoch, who had been ordering tags from Tokai since 1994, T.T. 5/1/02 (doc. no. 164) at 137, was a "qualified witness" for purposes of Fed. R.Civ.P. 803(6). Checkpoint grounds its argument on this point on the fact that Murdoch recognized that the invoices were generated by as Tokai, T.T. 5/1/02 (doc. no. 164) at 176–77, 180–82, sent before shipment, payable after the labels were shipped, and that one invoice was not timely paid T.T. 5/1/02 (doc. no. 164) at 181–83. The court does not agree.

■ Although a "qualified witness" need not be the actual custodian of the records sought to be admitted, he "must still demonstrate that the records were made contemporaneously with the act the documents purport to record by someone with knowledge of the subject matter, that they were made in the regular course of business, and that such records were regularly kept by the business." *United States v. Pelullo,* 964 F.2d 193, 201 (3d Cir.1992). Murdoch's testimony does not meet this criteria. At no point at trial did Murdoch claim familiarity with Checkpoint's record keeping system, nor did he establish that the records were made by someone with knowledge of the subject matter.

■ Moreover, that the invoices were incorporated into and produced from ID Security's own regular files, and that the figures reflected in the invoices were incorporated by reference in some of the documents that ID Security itself generated is inapposite. There is no authority for the proposition that a "court may admit into evidence under the business exception to the hearsay rule documents containing hearsay simply because there are some indicia of the trustworthiness of the statements," where the witness is not otherwise a "qualified witness" for purposes of Rule 803(6). *Id.* Thus, the court concludes that it committed no error in excluding exhibits D–346, D–348 and D–350 as inadmissible hearsay outside of the business record exception to the hearsay rule.

### iv. *Exclusion of evidence of Checkpoint's post-February 13, 1997 knowledge and accompanying failure to instruct the jury on that knowledge's relevance*

■ Checkpoint next argues that the court erred in excluding testimony by witnesses Geiges, Austin and Dowd concerning a statement by Haneda, made after Checkpoint and Tokai entered into the February 13, 1997 contract by which, ID Security contended, Checkpoint initially interfered with its preexisting contract with Tokai. Checkpoint sought to introduce at trial a portion of Geiges' deposition testimony, in which he related that in the course of Checkpoint's investigation concerning Murdoch's February 20 and 24 allegations of a preexisting contract with ID Security, Haneda explained that he was of the opinion that the contract that Tokai had with ID Security was not a binding contract because he felt that ID Security had not fulfilled its obligations. T.T. 5/6/02 (doc. no. 171) at 35. Checkpoint also sought to elicit the same information as to Haneda's statement of opinion through testimony by Austin and Dowd, who obtained it from Geiges while they were conducting their own investigations of ID Security's February 20 and 24

claims. T.T. 5/13/02 (doc. no. 185) at 26, 159–60.

Checkpoint argues that none of these statements were hearsay because they were not intended to prove that a binding contract between Tokai and ID Security did not exist, but rather to demonstrate (1) Checkpoint's probable state of mind, i.e., knowledge of the existence of an enforceable contract between ID and Tokai, while Checkpoint, having received notice from Murdoch of a claimed preexisting contract between ID Security and Tokai, formulated a decision on whether it should renew its February 13, 1997 contract after 90 days had elapsed, and (2) Haneda's belief as to the enforceability of Tokai's contract with ID Security. At trial, the court excluded Geiges' statement as hearsay and as unduly prejudicial under Fed.R.Civ.P. 403, T.T. 5/6/02 (doc. no. 171) at 36, T.T. 5/7/02 (doc. no. 172) at 231, 233, and as irrelevant. T.T. 5/7/02 (doc. no. 172) at 233. The court excluded Austin's testimony on this point as hearsay, T.T. 5/13/02 (doc. no. 185) at 159, and struck Dowd's testimony from the record. T.T. 5/13/02 (doc. no. 185) at 26. Upon reconsideration of its rulings, the court concludes that the statement was, in fact relevant to the question of the extent of damages in this case, and that it bore on Checkpoint's state of mind vis a vis its decision to continue or renew its contract with Tokai, but was nonetheless correctly excluded in each of the three instances in which it was introduced under Rule 403, because the prejudice inherent in the comments substantially outweighed their probative value.

Checkpoint's state of mind after February 13, 1997 is relevant because, as demonstrated in both its opening and closing arguments at trial, ID Security advanced, at least nominally, on a theory that two acts on the part of Checkpoint were part and parcel of ID's tortious interference claim: (1) Checkpoint's initial February 13, 1997 contract with ID Security, and (2) Checkpoint's renewal of its contract with ID Security, even through it knew after February 20 and 24 that an enforceable contract between ID Security and Tokai existed. T.T. 4/29/02 (doc. no. 159) at 12–13; T.T. 5/21/02 (doc. no. 202) at 72. Therefore, Haneda's representations to Geiges, even if wholly untrue, bear on Checkpoint's state of mind, i.e., *knowledge* of whether an enforceable contract actually existed between ID Security and Checkpoint, and thus on the extent of damages for which Checkpoint could be liable after its initial interference on February 13, 1997. Thus, the statement is relevant within the meaning of Rule 401, and not hearsay within the meaning of Rule 801.

However, the court properly applied Rule 403 in excluding any statement conveying Haneda's representations. Haneda's opinion, circumstantial evidence bearing on Checkpoint's state of mind as it determined to continue or renew its contractual relationship with Tokai, has little probative value, given that Geiges testified directly as to Checkpoint's state of mind and knowledge as it determined whether to renew: "I was of the firm opinion that this was a problem between Tokai and ID Systems and had nothing to do with [Checkpoint]." T.T. 5/6/02 (doc. no. 171) at 37. Austin and Dowd testified in a similar vein. *See* T.T. 5/13/02 (doc. no. 185) at 24, 159–61.

On the other hand, admitting through Geiges, or others, this one statement by Haneda with regard to a matter of great importance in this case, when all of Haneda's other statements had been excluded by the court as untrustworthy, would have given the statements undue weight on the core issue of whether there was an enforceable contract in place between ID and Tokai. As the court explained at trial, if

allowed, "[t]he only words [Haneda]'s going to be heard to say is kind of like in the murder case having the victim say [before dying] he did it." T.T. 5/7/02 (doc. no. 172) at 233. In light of the unfair prejudice inherent in Geiges' statement, the court concludes that it was properly excluded. In a similar vein, a proper application of Rule 403 bars admission of these statements as revelatory of Haneda's state of mind and his beliefs regarding the enforceability of his contract with ID Security, relevant to the question of whether Checkpoint was the party that "induced" Tokai breach with ID Security. Although probative of inducement or lack thereof, the prejudice attached to these statements substantially outweighs their probative value.

■■■ In a related contention, and apparently in a strange reversal of position on the issue of Checkpoint's knowledge after February 13, 1997,[30] Checkpoint argues that the court erred in declining to adopt its supplemental Proposed Jury Instruction No. 49(a), which was intended to limit the jury's consideration of Checkpoint's knowledge of a contract between ID Security and Checkpoint to that acquired *before* February 13, 1997, the date of the first alleged interference.[31] *See* T.T. 5/20/02 (doc. no. 200) at 74–75. Because

Checkpoint's objection was properly preserved, the court must inquire into whether the jury instruction, given as a whole, states the correct legal standard.

A date restriction of the type proposed by Checkpoint would have rendered inaccurate an otherwise correct instruction by limiting the jury's ability to consider relevant evidence in this case. Instead, the court instructed the jury that in order "to subject Checkpoint to liability on ID's tortious interference claim, ID must prove by the preponderance of the evidence that Checkpoint had knowledge of a contract between ID and Tokai and had knowledge of the fact that it was interfering with the performance of a contract between ID and Tokai." T.T. 5/21/02 (doc. no. 202) at 213. This general instruction properly left for the jury the question of whether Checkpoint became liable for tortious interference, if at all, on February 13, 1997 or some time later when Checkpoint decided to renew its own contract with ID Security. For example, under this instruction a jury could have found that Checkpoint did not know of ID Security's contract with Tokai as of February 13, 1997, and thus did not intend to induce ID to breach that agreement, but that, once put on notice of ID Security's contract claim and having determined through investigation that ID

---

**30.** Checkpoint argued strenuously that the court erred in failing to allow it to introduce testimony by Geiges, Austin and Dowd as to Checkpoint's knowledge of the existence of a contract between ID Security and Tokai *after* February 13, 1997. The court has since concluded, for the reasons set forth above, that, even though the evidence was properly excluded under Rule 403, Checkpoint was correct relative to the general relevancy of that evidence, at least to the issue of damages or to a finding that Checkpoint interfered a second time with a contract between ID Security and Tokai. *See* discussion, *supra*. Checkpoint now takes an inconsistent position in arguing that the court erred in failing to give a jury instruction limiting the jury's consider-

ation of Checkpoint's knowledge to the period *before* February 13, 1997, with respect to ID Security's tortious interference claim.

**31.** Checkpoint's proposed jury instruction stated as follows:

If you find that ID has not proven by a preponderance of the evidence that as of February 13, 1997 Checkpoint knew of the contract between ID and Tokai, and knew that it was interfering with their performance of the contract, then you must find for Checkpoint on the tortious interference claim.

Def.'s Proposed Jury Instruction No. 49a.

Security's contract was enforceable, Checkpoint then intentionally induced Tokai to breach. Within the framework offered by the court, the jury was also free to find that Checkpoint's knowledge was sufficient to establish liability for tortious interference as of February 13, 1997. Therefore, the court concludes that the instruction given at trial, rather than the instruction proposed by Checkpoint, was proper.

### v. *Exclusion of a portion of Geiges' testimony*

■ Checkpoint next attacks an evidentiary ruling by which the court excluded on hearsay grounds a portion of Geiges' testimony conveying the degree to which Haneda kept him, and therefore Checkpoint, ignorant of the particulars of Tokai's existing contract with ID Security. Checkpoint argues, in substance, that the answer at issue did not contain a "statement," and therefore did not come within the ambit of the hearsay rule. Checkpoint further asserts that the exclusion of this statement from those read to the jury prejudiced its case by foreclosing the possibility that the jury might compare that statement to a statement in Geiges' affidavit in which he asserted actual knowledge of an ID–Tokai contract before February 13, 1997, and therefore draw an unfavorable inference as to Geiges' credibility. Undermining Geiges' credibility was vital to Checkpoint's case, Checkpoint contends, because Geiges was the sole witness able to testify to Checkpoint's knowledge of the existence of an enforceable agreement between ID Security and Tokai. For the reason that follows, the court does not agree.

First, although admittedly ambiguous, a fair reading of Geiges' testimony is, as the court concluded, that it contained inadmissible hearsay. The relevant exchange is as follows:

Q: Did you know that there was an issue raised between ID and Tokai regarding the sale of source material to the -

A: No.

Q: Mr. Haneda never discussed that with you?

\* \* \* \* \* \*

A: No. Haneda was very firm on all issues concerning other customers. He was in this respect very Japanese. He had an agreement and it was not discussed with me even though I was considered his friend, and sometimes it annoyed me.

Geiges Dep. at 64. The court excluded the question "Mr. Haneda never discussed that with you" and Geiges' response. T.T. 5/6/02 (doc. no. 171) at 25; T.T. 5/15/02 (doc. no. 192) at 72–74. Geiges' response reflects the question's unequivocal focus on discussions between Geiges and Haneda, and the answer, in turn, appears to involve a conversation or other exchange between the two. That exchange, in turn, is being offered for the truth of the matter asserted, namely that Haneda never discussed a customer's agreements with other customers. As such, the court correctly excluded Geiges' answer as inadmissible hearsay.

Second, even if Geiges' response were not considered hearsay, however, as would be the case if Geiges were merely discussing Haneda's personality traits and practices based on his own observations of and experiences with them, the exclusion of the response caused Checkpoint no prejudice warranting a new trial. Checkpoint asserts that a particular statement read later during trial, in which Geiges stated that he knew before February 13, 1997 that ID Security and Tokai had a contract, T.T. 5/6/02 (doc. no. 171) at 28, would have

greatly undermined Geiges' general credibility with the jury when read in conjunction with the excluded response, because, Checkpoint insists, the two are inconsistent. This is not so. In the excluded response, Geiges denied that he knew "that there was an *issue raised* between ID and Tokai *regarding the sale of source material* ...." Geiges Dep. at 64 (emphasis supplied). He did not deny any knowledge of the existence of a contract between the two. Because Geiges' responses are not truly inconsistent, the court concludes that its exclusion of this statement, even if the statement were not hearsay, did not prejudice Checkpoint in its ability to attack the credibility of Geiges at trial.

vi. *Exclusion of Greg Mears' deposition*

Checkpoint maintains that the court erred in excluding the final portion of Greg Mears' videotaped deposition, in which Mears, a former Sensormatic employee, detailed the manner in which Geiges, while still receiving a Checkpoint paycheck, solicited Sensormatic for both employment and investment, with the result that Geiges was ultimately fired, and sued by Checkpoint in connection with his theft of Checkpoint's trade secrets. In particular, Checkpoint argues that the excluded portion of Mears' deposition bore on Geiges' credibility, because it revealed his bias and motive to lie to Checkpoint's detriment. Checkpoint claims that Mears' testimony was both highly probative and critical in this case, because Geiges was the only witness who could attest to Checkpoint's knowledge of a contract between ID Security and Tokai. For the reasons that follow, the court does not agree.

First, the excluded portion of Mears' deposition constitutes impermissible impeachment of Geiges as to a collateral matter. A matter is collateral if "the matter itself is not relevant in the litigation to establish a fact of consequence, i.e., not relevant for a purpose other than mere contradiction of the in-court testimony of the witness." *United States v. Beauchamp*, 986 F.2d 1, 4 (1st Cir.1993). Here, the details of the circumstances surrounding Geiges' departure from Checkpoint, and the differences between Mears and Geiges on these points have no bearing on the ultimate issues in this case.

Second, the Mears' deposition excerpt is barred by the prohibition of Rule 608(b), which states, in relevant part, that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility ... may not be proved by extrinsic evidence." Fed. R.Evid. 608(b). Checkpoint readily admits that the specific incidents discussed by Mears were introduced in an attempt to show Geiges' bias against Checkpoint, *see* Mem. of Law in Support of Def.'s Mot. for Post–Trial Relief, at 109, a use not permitted under the Federal Rules of Evidence.

Third, the considerations set forth in Rule 403 strongly militate against the admission of the portions of Mears' deposition at issue. First, Checkpoint's insistence that the need for such evidence is great is undermined by the fact that Geiges himself placed information that might support an inference of bias against Checkpoint in front of the jury. Specifically, Geiges stated that he had been terminated for alleged theft of Checkpoint trade secrets, T.T. 5/6/02 (doc. no. 171) at 86, that, while on Checkpoint's payroll, he solicited Sensormatic for both personal employment and investment, even though he knew that Sensormatic was Checkpoint's major competitor, and was ultimately sued by Checkpoint in connection with that activity. T.T. 5/6/02 (doc. no. 171) at 82–83, 102. On the other hand, the introduction of the Mears deposition excerpt brought with it the substantial likeli-

hood of confusing the issues or misleading the jury by inundating them with minutia of transactions between Geiges and Sensormatic. Therefore, for all of the foregoing reasons, the court concludes that the disputed portion of Mears' deposition testimony was properly excluded from evidence.

### 2. Unfair competition

■ The jury returned a verdict against Checkpoint on unfair competition. The jury was instructed that the damages awarded for both tortious interference with contractual relations and unfair competition were the same. T.T. 5/21/02 (doc. no. 202) at 218. Checkpoint now argues that it is entitled to judgment as a matter of law, or, in the alternative, to a new trial due to jury instruction errors with respect to ID Security's unfair competition claim.

Although no Pennsylvania appellate court has formally recognized the common law tort of unfair competition, several lower state and federal courts have recognized the existence of a cause of action for unfair competition under some circumstances. *See, e.g., Yeager's Fuel, Inc. v. Pa. Power & Light Co.*, 953 F.Supp. 617, 668 (E.D.Pa. 1997); *Babiarz v. Bell Atl.-Pa., Inc.*, 2001 WL 1808554, at *9 (Pa. Com. Pl. July 10, 2001); *Lakeview Ambulance & Med. Servs., Inc. v. Gold Cross Ambulance & Md. Serv., Inc.*, No.1994–2166, 1995 WL 842000, at *1–*2 (Pa.Com.Pl. Oct. 18, 1995).

Under § 1 of the Restatement (Third),[32] the tort of unfair competition includes those forms and methods of competition which have been declared unlawful by the federal and state statutory law and state common law, as well as a residual category encompassing other business practices which, while not unlawful under current law, have been determined to be unfair. Restatement (Third) of Unfair Competition § 1 cmt. g. "As a general matter, if the means of competition are otherwise tortious with respect to the injured party, they will also ordinarily constitute an unfair method of competition." *Id.* Therefore, under the facts of this case, ID Security's claim of unfair competition depended on the jury's finding that Checkpoint had either violated the federal antitrust laws, or was liable for either tortious interference with contractual relations or some other common law tort.[33]

In this case, the court has determined that Checkpoint is entitled to judgment as

---

**32.** The Restatement provides as follows:

> One who causes harm to the commercial relations of another by engaging in a business or trade is not subject to liability to the other for such harm unless:
> (a) the harm results from ... other acts or practices of the actor determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public; and
> (b) the acts or practices of the actor are actionable by the other under federal or state statutes ... or general principles of common law apart from those considered in this Restatement.

Restatement (Third) of Unfair Competition § 1.

**33.** ID Security suggested at trial that the issuance of a press release in which defendant allegedly claimed that it had an exclusive contract with Tokai to serve as Tokai's distributor might serve as an additional and independent basis for the unfair competition claim on the theory that the press release's impact was to suggest unfairly to the world that ID Security was now without a supplier. T.T. 5/20/02 (doc. no. 200) at 68–69. The court concludes, however, that the issuance of the press release alone did not rise to the level of a common law tort, as would be the case had it defamed ID Security. Therefore, the court concludes that there is insufficient evidence to satisfy the "residual category" of conduct, which, although not unlawful, may, under certain circumstances, be deemed unfair.

a matter of law on ID Security's antitrust claims. Therefore, the antitrust claims cannot serve as the basis for predicating liability for unfair competition. However, the jury found that Checkpoint was liable for tortious interference with contractual relations; ergo, given the jury's verdict on tortious interference in favor of ID Security, and the fact that the court has affirmed that verdict against Checkpoint's attack on both the sufficiency of the evidence and the jury charge with respect to that count, Checkpoint is not entitled to judgment as a matter of law on ID Security's unfair competition claim.[34]

## D. Damages

Checkpoint contends that several errors bearing on the verdict warrant vacating the jury award of $13 million for lost sales of Tokai tags and $6 million for delayed production of Laserfuse tags, and granting Checkpoint a new trial on damages. Checkpoint's primary arguments in favor of a new trial center on the court's decision at the *Daubert* stage of this litigation to allow ID Security's damage expert, Dr. Samuel J. Kursh, to testify at trial as to ID Security's lost profits from sales of Tokai and Laserfuse tags. Checkpoint contends that Dr. Kursh's testimony regarding lost sales of Tokai tags should have been excluded as unreliable, given apparent factual realities concerning ID Security's capacity and its relationship with Tokai. Checkpoint argues that Dr. Kursh's opinion as to damages for a four year delay in Laserfuse tag production should also have been excluded as unreliable, given that it was based solely on information and projections supplied by Murdoch.

Checkpoint then argues that it is entitled to a new damages trial on three additional grounds, namely that (1) the court incorrectly construed Checkpoint's Patent No. 5,367,290, and erroneously concluded that Checkpoint's patent did not prevent ID Security from marketing its Laserfuse tag, (2) the court erred in admitting and allowing ID Security to show the jury two videotapes portraying Laserfuse production and Laserfuse street testing, and (3) the damage award in this case was against the great weight of evidence. For the reasons that follow, the court finds that Dr. Kursh's testimony with respect to lost sales of Tokai tags was properly admitted, but that his testimony with respect to lost sales of Laserfuse tags should have been excluded at the *Daubert* stage. However, even given the error of admitting Dr. Kursh's testimony with respect to Laserfuse delay damages, however, the court finds that a new trial is not warranted in this case. Rather, as a result, the $19 million verdict rendered against Checkpoint will be reduced by $6 million, comprising the amount of damages awarded for lost sales of Laserfuse tags. As a result of this disposition, the court determines that it need not address Checkpoint's other allegations of error.

### 1. *Future lost sales of Tokai tags*

Rule 702, as amended in 2000, provides that an expert witness with "scientific, technical, or other specialized knowledge," may testify in the form of an opinion "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

---

**34.** Should the judgment on tortious interference with contractual relations in favor of ID Security be vacated, however, in such a case Checkpoint would be entitled to a new trial on this count, given that the court's instructions were not congruent with the elements set out in the Restatement (Third) of Torts § 1.

Fed.R.Evid. 702. · In practical effect, Rule 702 imposes "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir.2000).

A court faced with the initial decision of whether to admit proffered expert testimony pursuant to Rule 702 must make a determination of the testimony's reliability and admissibility. *Montgomery County v. Microvote Corp.*, 320 F.3d 440, 447 (3d Cir.2003). Within the basic *Daubert* framework, the court must inquire into whether (1) the theory or technique employed by the expert is scientific knowledge that will assist the trier of fact, (2) the theory or technique has been subjected to peer review and publication, (3) the known or potential rate of error, and the existence and maintenance of standards for controlling the technique's operation, and (4) the general acceptance of the theory or technique. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[35]

The courts have noted that the *Daubert* factors "were devised in the context of testing the reliability of scientific methods of proof and do not so readily and easily apply in the context of testing the reliability of opinions concerning the characterization of complicated business transactions." *ProtoComm Corp. v. Novell Adv. Servs., Inc.*, 171 F.Supp.2d 473, 477 (E.D.Pa.2001). Therefore, in determining the admissibility of, as here, an economist's testimony with respect to a business' future lost profits, "the trial judge must have considerable leeway in deciding in a particular case whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Elcock*, 233 F.3d at 745–46 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). With these principles in mind, the court evaluated the reliability of the testimony of Dr. Kursh. In this case, Checkpoint has renewed the objections to Dr. Kursh's testimony that it earlier articulated at the *Daubert* stage of this litigation, and now contends, in light of Dr. Kursh's trial testimony, that a disconnect between Dr. Kursh's projections and the facts of this case renders his opinion nothing more than speculation that does not fit with the facts of the case. Thus, Checkpoint argues, Dr. Kursh's testimony as to future lost profits from lost sales of Tokai tags should have been excluded from evidence.

Dr. Kursh attempted to project the value of the contract between ID Security and Tokai for the sale of Tokai's RF tags from 1997 through 2008, and ultimately opined that by the year 2008, ID Security would have lost net profits in an amount between $11,445,021 and $17,254,546 in net lost profits on the sale of roughly 5 billion Tokai tags. *See* Ex. P–253 at 2; Ex. P–250. These estimates were generated from data on Checkpoint and Tokai's actual pro-

---

**35.** The Third Circuit expanded the list of factors to consider in *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir.1994):

(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique or methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the nonjudicial uses to which the method has been put.

*Id.* at 742 n. 8.

duction and sales from 1997 until the time of trial in 2000. Dr. Kursh calculated the maximum number of tags that ID Security would sell in a given year by subtracting the maximum number of tags that Checkpoint purchased and the number of tags that Tokai reserved for Asian sales from the total number of tags that Tokai had the capacity to produce. T.T. 5/9/02 (doc. no. 176) 124–27. Dr. Kursh calculated the minimum number of tags that ID Security would sell by subtracting Checkpoint and Asian sales from the actual number of tags that Tokai reported that it had sold. T.T. 5/9/02 (doc. no. 176) at 128. Dr. Kursh estimated lost sales for the years 2001 through 2008, for which there was no data available at the time of trial, by assuming that there would be no growth in either the production capacity or amount of Tokai tags actually sold from the year 2000 onward. T.T. 5/9/02 (doc. no. 176) at 126.

Checkpoint does not challenge Dr. Kursh's methodology per se, but rather contends that a laundry list of factual concessions elicited from Dr. Kursh during cross examination as to the realities of ID Security's ability to sell Tokai tags and the state of its relationship with Tokai reveal that his projections were "absurd" and that "[t]he jury should never have been able to speculate on the basis of baseless projections through the year 2008 given under the guise of expert testimony." Mem. of Law in Support of Def.'s Mot. for Post–Trial Relief at 126, 127. For example, attacking Dr. Kursh's conclusion that ID Security would have sold an unprecedented 350 million Tokai tags beginning in 1997, Checkpoint points out that Dr. Kursh acknowledged on cross examination that, in 1996, ID Security sold only 16 million tags, T.T. 5/9/02 (doc. no. 176) at 165, and warehoused 50 million tags that it had not sold, T.T. 5/9/02 (doc. no. 176) at 167, that significant adhesive problems plagued ID Security's Tokai tags and made them diffi-

cult to sell, T.T. 5/9/02 (doc. no. 176) at 159–62, and that ID Security was "having issues" in its contractual relationship with Tokai, T.T. 5/10/02 (doc. no. 182) at 8. Checkpoint contends that the apparent disconnect between the reality of ID Security's actual performance in 1996 and Dr. Kursh's rosy prediction of hitherto unprecedented future Tokai tag sales by ID Security in the next and all subsequent years reveals that Dr. Kursh's model was speculative and unreliable, based on unsupportable assumptions, and that the court erred in admitting Dr. Kursh's testimony into evidence. The court does not agree.

In this case, Checkpoint's attacks on the admissibility of Dr. Kursh's testimony reflects a fundamental confusion about the role of the court as a gatekeeper under *Daubert*, to determine the admissibility of evidence, and the role of the jury, as a fact finder, to determine the weight to be accorded to admitted evidence. The Supreme Court has admonished that trial courts considering the *Daubert* factors should focus "solely on principles and methodology, not on the conclusions they generate." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 595, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). It is true, of course, that conclusions and methodology may not be entirely distinct from each other, and that in some cases a "court may conclude that there is simply too great of a gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). However, "the trial court's role as gatekeeper [under *Daubert* ] is not intended to serve as a replacement for the adversary system," Fed. R.Evid. 702 advisory committee's note, and "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of at-

tacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786; *see also Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir.2002) ("A party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination."). Indeed, the Advisory Committee note to Rule 702 of the Federal Rules of Evidence cautions that:

> When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in [Rule 702] on "sufficient facts or data" is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

Fed.R.Evid. 702 advisory committee's note.

Against this background, the Third Circuit's approach to expert testimony in *LePage's, Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) is both analogous and instructive. In that case, the defendant demanded a new trial on damages, on the grounds that the plaintiff's damages theory should have been excluded from evidence as based on "improper assumptions," *id.* at 164, even though it conceded that the plaintiff's damages expert was both qualified, *id.* at 165 n. 16, had used a sound model to calculating future damages, *id.* at 165, and had based his projections of future damages on five years of actual financial data. *Id.* at 165. Evaluating the defendant's challenge, the Third Circuit stated that "[t]he credibility of LePage's and 3M's experts was for the jury to determine," *id.* at 165 (citing *Inter Med. Supplies, Ltd. v. EBI Med.*

*Sys., Inc.*, 181 F.3d 446, 462–63 (3d Cir. 1999)), and noted that the expert "was extensively cross-examined and [the defendant] presented testimony from its own damages expert who predicted more conservative losses . . . ." *Id.* at 165–66.

In this case, the court finds that Dr. Kursh's testimony as to future lost profits from the sale of Tokai tags was properly admitted into evidence following a *Daubert* inquiry into the soundness of its methodology. Confronted with the disconnect between ID Security's volume of sales in 1996 and the 1997 sales predicted by his model, Dr. Kursh fended off Checkpoint's attack on his use of sales and production figures from Checkpoint and Tokai to project future sales by ID Security by explaining that it was not proper to look to ID Security's sales performance prior to its contract with Tokai, because the contract with Tokai provided ID Security with a new business opportunity for substantial growth. *ID Sec. Sys. Canada v. Checkpoint Sys., Inc.*, 198 F.Supp.2d 598, 612 (E.D.Pa.2002). Furthermore, according to Dr. Kursh, there were good reasons why ID Security's 1996 sales do not indicate accurately its capacity for future performance. One, the volume of sales was kept low by the fact that problems with Tokai's adhesive, later to be resolved, hampered sales efforts. *Id.* at 612–13. Two, ID Security chose to warehouse tags, rather than sell them, in order to gain a foothold as a second supplier, *id.* at 613,[36] and, three, ID Security was preparing to get financing to expand its marketing force and sales beginning in 1997. *Id.* Satisfied with Dr. Kursh's explanation of his methodology and the reasons that he chose Checkpoint and Tokai's sales and production figures to estimate ID Security's fu-

---

**36.** ID Security hoped to use the claim that it had a large quantity of tags at a warehouse to infuse prospective customers with a level of comfort that, should they choose to place an order with ID Security, the tags would be readily available for delivery.

ture sales, and keeping in mind that ID Security was not required to present its lost profits estimates with mathematical certainty, the court found that Dr. Kursh's testimony satisfied the requirements of *Daubert.*

An examination of the points that Checkpoint now offers in favor of its argument that Dr. Kursh's testimony should never have been admitted reveals that Checkpoint, through vigorous cross-examination of Dr. Kursh, put before the jury its own theory regarding the underlying disputed facts. In other words, through cross-examination, Checkpoint asserted its position that ID Security's difficulties with Tokai were insurmountable and that ID Security lacked the actual capacity to succeed in the RF tag market. Also through cross-examination, Checkpoint attempted to convince the jury that ID Security's efforts to expand in the RF tag aftermarket would be hampered by customer reluctance to buy no-name tags, the higher prices that ID intended to charge as a second source supplier of RF tags, and continued problems with Tokai's adhesive. *See* Mem. of Law in Support of Def.'s Mot. for Post–Trial Relief at 126; T.T. 5/9/02 (doc. no. 176) at 155–160. Checkpoint further attempted to use Dr. Kursh's testimony to reveal that, contrary to what Dr. Kursh's model predicted, ID Security lacked the actual capacity for the kind of expansion that his model predicted because ID had thus far sold a maximum of only 16 million tags, and had warehoused 50 million tags because it could not sell them, rather than because it was building inventory. *See* Mem. of Law in Support of

Def.'s Mot. for Post–Trial Relief at 126; T.T. 5/9/02 (doc. no. 176) at 165, 167. Checkpoint further challenged the soundness of Dr. Kursh's assumptions that ID Security with a projected sales staff of 5 could sell as many tags as Checkpoint, which had a sales staff of 700, that ID Security's contract with Tokai would continue through 2008, even though the parties were "having issues" by 1997,[37] and that ID Security would sell Tokai tags through 2008, rather than replacing them with sales of its new Laserfuse product. *See* Mem. of Law in Support of Def.'s Mot. for Post–Trial Relief at 126–27; T.T. 5/9/02 (doc. no. 176) at 170; T.T. 5/10/02 (doc. no. 182) at 8–10, 13–14.

These attacks, if credited by the jury, would diminish the weight that they accorded Dr. Kursh's projection that ID Security could and would transform itself into a thriving business in a year's time, based on the market capacity as demonstrated by Checkpoint and Tokai's sales and production figures, but do not cast doubt on the admissibility of that projection. *Cf. Micro Chem., Inc. v. Lextron, Inc.,* 317 F.3d 1387, 1392 (C.A.Fed.2003) ("The parties disputed many of the facts relevant in determining a reasonable royalty … When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of the facts underlying one expert's testimony."); *Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 249 (5th Cir.2002) ("[T]he answer to the critical causation question will depend on which set of predicate facts the factfinder believes: the plaintiff's contention that the content of

---

**37.** The court notes that the fact that Dr. Kursh projected damages through the year 2008 is not, by itself, problematic. Dr. Kursh's projections of lost profits were broken down by year. If the jury were to conclude, based on the facts of record, that ID Security would have ceased to manufacture

Tokai tags in a year prior to 2008, the jury could easily disregard Dr. Kursh's projections as to subsequent years. Indeed, it appears that the jury, in awarding ID Security $13 million in lost profits on Tokai tags, may have stopped the damage clock in 2000 or 2001.

the ... syringe ... was contaminated or the defendant's that it was not.").

In this context, Checkpoint's reliance on *Elcock v. Kmart Corp.*, 233 F.3d 734 (3d Cir.2000) in support of its position is misplaced. In *Elcock*, the Third Circuit found that the district court had abused its discretion in admitting into evidence an economic damages model offered by an economist previously qualified through a *Daubert* hearing, because the model relied on empirical assumptions that the record did not support, namely that it (1) assumed 100 percent disability, regardless of the plaintiff's other evidence admitting only 50 to 60 percent disability, (2) calculated damages on an hourly wage much higher than that testified to at trial, without making the basis of the economist's calculations part of the trial record, and (3) did not discount damages by the amount that the plaintiff was still able to earn post-injury. *Id.* at 755–56. In this case, by contrast, although it is true that some facts in the record, if credited by the jury, tend to call the accuracy of Dr. Kursh's projections into question, it cannot be said that the projections lack a proper foundation. Indeed, Dr. Kursh made clear that sales and production figures from both Checkpoint and Tokai served as the basis for his forecast. T.T. 5/9/02 (doc. no. 176) at 123–28; Ex. P–249;

Ex. P–250. Accordingly, the court concludes that Dr. Kursh's testimony as to lost sales of Tokai tags was properly admitted into evidence under *Daubert.*

### 2. *Future lost sales of Laserfuse tags*

■ Checkpoint contends that the court also erred in admitting at the *Daubert* stage Dr. Kursh's projections of ID Security's lost profits attributable to a purported four-year delay in the introduction of Laserfuse tags, as a result of Checkpoint's interference with the ID–Tokai contract. For the reasons that follow, and upon review of the record and of the relevant materials, the court concludes that admitting Dr. Kursh's testimony on this point was indeed error, and will reduce the award by $6 million, the amount that the jury awarded to ID Security for lost sales of Laserfuse tags.

At the *Daubert* hearing, Checkpoint challenged the admissibility of Dr. Kursh's testimony with respect to lost Laserfuse profits on the grounds that, as Dr. Kursh readily admitted, Murdoch provided all of the production volumes, sales and number of Laserfuse tags that ID Security was to sell. *ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.*, 198 F.Supp.2d 598, 615 (E.D.Pa.2002).[38] At the time, the court

---

**38.** Dr. Kursh's testimony at trial tracked closely that which he had offered at the *Daubert* hearing. An examination of the language used by Dr. Kursh during his direct testimony in relation to his Laserfuse lost sales projections reveals their speculative and unsupported nature. Dr. Kursh initially conceded that the analysis necessary to estimate lost profits that resulted from the alleged delay in the production of Laserfuse was necessarily less "straightforward" than that utilized to predict lost profits from future Tokai tag sales. T.T. 5/9/02 (doc. no. 176) at 142. Instead, Dr. Kursh's projections are, in turn, based on other projections, and, in particular, on what Murdoch told him that ID Security "expected to sell, [namely] 50 million in the first year,

150 million in the second, 500 million in the third and 800 million in the fourth," T.T. 5/9/02 (doc. no. 176) at 142, and that Murdoch "advised him" that ID "would sell the labels at $40 per thousand." T.T. 5/9/02 (doc. no. 176) at 146. Dr. Kursh further relates that he satisfied himself that Murdoch's expectations were accurate because the accounting firm of Arthur D. Little estimated that the potential market for RF tags "is around 30 billion units per year" and because "*maybe* [this] label would have expanded the markets for these labels ...." T.T. 5/9/02 (doc. no. 176) at 142–44 (emphasis supplied). Moreover, Murdoch gave Dr. Kursh "some broad parameters as to what the production

concluded that Dr. Kursh had sufficiently tested the information with which Murdoch provided him because Dr. Kursh had conducted research on the EAS systems industry through interviews of industry participants, by reviewing industry forecasts performed by the accounting firm Arthur D. Little, as well as by reviewing the Laserfuse technology and production process. *Id.* In so concluding, the court attempted to distinguish Dr. Kursh's testimony from that offered by the expert in *JMJ Enters., Inc. v. Via Veneto Italian Ice, Inc.,* No. Civ. A. 97–CV–0652, 1998 WL 175888 (E.D.Pa. Apr. 15, 1998), in which the district court concluded that lost sales expert's testimony lacked an appropriate factual basis to warrant admission where the expert relied on his client's independently prepared tax returns as his data source without verifying the accuracy of the figures therein, and had not researched the industry in question through market surveys or studies. *Id.* at *7. In particular, the court found that Dr. Kursh's research into the EAS industry and the Laserfuse technology set his testimony apart from testimony of the type deemed inadmissible in JMJ. *ID Sec.,* 198 F.Supp.2d at 615. Upon reconsideration, the court concludes that this effort to distinguish this case from the facts of *JMJ* was in error.

Rule 703 permits experts to rely on hearsay, into which category Murdoch's out-of-court predictions clearly fall, on the theory that "the expert's 'validation, expertly performed and subject to cross examination, ought to suffice for judicial purposes.'" *TK–7 Corp. v. Estate of Barbouti,* 993 F.2d 722, 732 (10th Cir.1993) (quoting Fed.R.Evid. 703 advisory committee's note). An examination of Dr. Kursh's expert report, submitted in conjunction with the *Daubert* hearing in this case, reveals that there was no such expert validation undertaken in this case. Rather, Dr. Kursh explains that he conducted generalized research into the EAS systems market, but states no *specific* steps that he took to verify Murdoch's predictions in particular. Thus, the admission of his testimony under the *Daubert* inquiry should have been governed by a case, characterized by similar facts, in which the Tenth Circuit explained:

> [The rationale of Rule 703] is certainly not satisfied ... where the expert failed to demonstrate any basis for concluding that another individual's opinion on a subjective financial prediction was reliable, other than the fact that it was the opinion of someone he believed to be an expert who had a financial interest in making an accurate prediction. [The expert's] lack of familiarity with the methods and the reasons underlying [his source's] projections virtually precluded any assessments of the validity of those projections through cross-examination of [the expert].

*Id.* Indeed, Dr. Kursh's reliance on Murdoch's testimony is even more questionable in this case, given that Murdoch, the President of ID Security, had even more of an incentive than an independent expert making a projection, to inflate his own predictions of Lasterfuse sales and the ease with which such tags could be produced and marketed. Moreover, in this case, as in *TK–7 Corp.,* there is no indication in Dr. Kursh's expert report that other experts in his field would so rely on a company president's testimony. *Cf. id.* at 733 (citing 3 J. Weinstein & M. Burger, Weinstein's Evidence ¶ 703[03] at 703–25 (1988) for the proposition that Rule 703 "implicitly requires that the information be viewed as reliable by some independent, objective

process *would* entail." T.T. 5/9/02 (doc. no. 176) at 144 (emphasis supplied).

standard beyond the opinion of the individual witness").

Given Dr. Kursh's reliance on Murdoch's projections against the background of only generalized research into the EAS systems market and Laserfuse technology and production, the court concludes that Dr. Kursh's testimony as to future lost Laserfuse profits should not have been admitted at the *Daubert* stage of these proceedings, nor should it have been placed before the jury at trial, even if the arithmetic model used accurately predicts future lost profits in the typical case. For the reasons that follow, however, the court will not award Checkpoint a new trial on damages, but rather will vacate the jury award of $6 million for lost sales of Laserfuse tags.

■■■ A trial judge generally may not "unconditionally reduce the amount of damages awarded by verdict, for to do so impermissibly encroaches upon the litigants' constitutional right to a jury.'" *Carter v. Dist. of Columbia*, 795 F.2d 116, 134 (D.C.Cir.1986) (quoting 11 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2815, at 99 (1973)). Remittitur, the standard remedy that the court may grant if it "finds that a decision of the jury is clearly unsupported and/or excessive," *Spence v. Board of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1201 (3d Cir.1986), forces the party against whom it is granted to choose between accepting a reduced damage award and proceeding to a new trial on the issue of damages. *See McDermott v. Party City Corp.*, 11 F.Supp.2d 612, 620 (E.D.Pa. 1998).

■■■ However, "[w]hen it is apparent as a matter of law that certain identifiable sums included in the verdict should not have been there, district courts possess the power to reduce the amount of the verdict accordingly." *C.L. Maddox, Inc. v. The Benham Group*, 88 F.3d 592, 603 (8th Cir.

1996); *see also Bereda v. Pickering Creek Indus. Park*, 865 F.2d 49, 55 (3d Cir.1989) (ordering remand for new damages trial because "[t]his is not a case where it is apparent as a matter of law that certain identifiable sums included in the verdict should not have been there"); *Garrett v. Faust*, 183 F.2d 625, 629 (3d Cir.1950) (noting that, if a portion of a jury award is supported by sufficient evidence and "clearly identifiable as representing the jury's [justified] determination of the amount due by the defendants," rather than granting remittitur, the court may allow that portion to stand, even if it sets aside the balance). Such action on the part of the district court is not, technically speaking, a remittitur. *C.L. Maddox*, 88 F.3d at 603. The use of a special verdict form, of the type used in this case, enables a court to identify and isolate an error in the verdict, and correct it without granting a new trial. *See Carter*, 795 F.2d at 134 (stating that, with the use of a special verdict form, a "segregated, precisely stated [and erroneous] award would be readily identifiable as relating to a wholly discrete issue of law, and the special verdict can be rectified by the court without further jury proceedings.").

■■■ An examination of the evidence offered at trial by ID Security in support of its damage claim for lost Laserfuse tags reveals that, absent Dr. Kursh's erroneously admitted testimony on that point, ID Security's claim for damages would fail as a matter of law. "Under Pennsylvania law, loss of profits may be recovered in a contract action if there is (1) evidence to establish the damages with reasonable certainty; (2) [the damages] were the proximate cause of the wrong; and (3) [the damages] were reasonably foreseeable." *Advent Sys., Ltd. v. Unisys Corp.*, 925 F.2d 670, 680 (3d Cir.1991) (citing *Delahanty v. First Pa. Bank, N.A.*, 318 Pa.Su-

per. 90, 464 A.2d 1243, 1258 (1983)). Within this framework, a plaintiff may establish damages "with a fair degree of probability," rather than with mathematical precision. *Id.*

■ Because "[t]he Pennsylvania Supreme Court has been skeptical of claims for loss of profits by a 'new and untried business,'" *Id.* (quoting *Exton Drive–In, Inc. v. Home Indemnity Co.*, 436 Pa. 480, 261 A.2d 319, 324 (1969)), new businesses claiming prospective damages are not exempt from the standard that governs prospective claims by old businesses, *see id.*, and thus may recover only if they can show that the claimed damages were "reasonably foreseeable" and "capable of proof with reasonable certainty." *Gen. Dynafab, Inc. v. Chelsea Indus., Inc.*, 301 Pa.Super. 261, 447 A.2d 958, 960 (1982). Indeed, as the Pennsylvania Superior Court recently observed, "the courts of this commonwealth have adopted the [Restatement] rule ... that new businesses may be able to adduce sufficient evidence to obtain an award for lost profits while recognizing that such proof is often more difficult to present." *Jahanshahi v. Centura Devel. Co.*, 816 A.2d 1179, 1184 (Pa.Super.2003) (also noting that damages for future lost profits "may not be awarded when the evidence leaves the trier of fact without any guideposts except his or her own speculation").

Because ID Security offered the jury no evidence purporting to quantify its Laserfuse losses, aside from Dr. Kursh's erroneously admitted testimony, the jury awarded ID Security Laserfuse damages based solely on testimony that should have been barred from evidence as unreliable, pursuant to a proper application of *Daubert.* Absent this opinion, which was, in any event, too unreliable to have been admitted into evidence, the jury was left without any proof of ID Security's damages, and would have been left to speculate as to the amount of any actually sustained on the Laserfuse line. Accordingly, the court will vacate the jury award of $6 million in favor of ID Security for damages for lost Laserfuse sales.[39]

## III. CONCLUSION

For the foregoing reasons, Checkpoint's motion for post-trial relief will be granted in part and denied in part. On the antitrust claims, the jury verdict will be vacated, and Checkpoint will be granted judgment as a matter of law with respect to ID Security's attempted monopolization and conspiracy to monopolize claims. On the state law claims, Checkpoint's motion for judgment as a matter of law or for a new trial as to ID Security's tortious interference and unfair competition claims will be denied. Checkpoint's motion for a new trial on damages will be denied, but the damages award will be reduced by $6 million, the court having found that there was insufficient evidence to support lost sales of Laserfuse tags. The balance of damages in the amount of $13 million will be affirmed.

An appropriate order follows.

### *ORDER*

**AND NOW**, this **28th** day of **March, 2003**, it is hereby **ORDERED** that defendant Checkpoint's motion for post-trial relief (doc. no. 220) is **GRANTED in part** and **DENIED in part** as follows:

**39.** Given the court's resolution of this issue, the court determines that it need not decide whether it erred in construing Checkpoint's patent or in showing the two videotapes concerning Laserfuse operation and production. The court also concludes that, in light of the fact that Checkpoint will be granted judgment as a matter of law with respect to ID Security's antitrust claims and in light of the reduction in damages on ID Security's state law claims, the verdict rendered is not against the great weight of evidence.

1. The jury verdict on the antitrust claims is **VACATED**.

2. Checkpoint's motion for judgment as a matter of law with respect to ID Security's attempted monopolization and conspiracy to monopolize claims is **GRANTED**.

3. Checkpoint's motion for judgment as a matter of law or, in the alternative, for a new trial with respect to ID Security's claim of tortious interference with contractual relations is **DENIED**.

4. Checkpoint's motion for judgment as a matter of law or, in the alternative, for a new trial with respect to ID Security's claim of unfair competition is **DENIED**.

5. The damage award for tortious interference with contractual relations and for unfair competition is **REDUCED** by $6 million.

6. The balance of damages in the amount of $13 million is **AFFIRMED**.

**AND IT IS SO ORDERED.**